1   ROBERT W. BROWNLIE (Bar No. 138793)
    GERARD A. TRIPPITELLI (Bar. No. 235788)
2   NOAH A. KATSELL (Bar No. 217090)
    **DLA PIPER LLP (US)**
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel:  619.699.2700
    Fax:  619.699.2701
5
6   Attorneys for Defendants REMEC, INC.,
    RONALD E. RAGLAND, WINSTON E.
7   HICKMAN
8
9               UNITED STATES DISTRICT COURT
10             SOUTHERN DISTRICT OF CALIFORNIA
11
12  IN RE:                                  **CASE NO. 04 CV 1948 JLS (AJB)**
13  REMEC INCORPORATED SECURITIES           **MEMORANDUM OF POINTS AND**
    LITIGATION                              **AUTHORITIES IN SUPPORT OF**
14                                          **DEFENDANTS' MOTION FOR**
    This Document Relates to:               **SANCTIONS, INCLUDING AN ORDER**
15                                          **STRIKING OR DISMISSING THE**
                                            **FOURTH AMENDED COMPLAINT OR,**
16             ALL ACTIONS                  **ALTERNATIVELY, PRECLUDING THE**
                                            **USE OF STOLEN DOCUMENTS AND**
17                                          **ALL DISCOVERY MATERIALS**
                                            **DERIVED THEREFROM**
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.   STATEMENT OF FACTS ........................................................................................ 3

    A.   Dismissal of the First Two Consolidated Complaints ........................................... 4

    B.   Plaintiffs' Knowingly Received Documents Stolen from REMEC, and Used Them to Avoid Dismissal of the Third Amended Complaint....................... 4

        1.   REMEC's Internal Documents Were Stolen by Robinson ......................... 5

        2.   The Stolen Documents Allowed Plaintiffs to Avoid Dismissal ................. 6

    C.   Plaintiffs Attempted to Conceal the Source of the Documents ............................. 6

    D.   Robinson Took the "Fifth" and Plaintiffs Refuse to Provide Any Information Regarding Their Receipt of the Stolen Documents. .......................... 7

III.  THE APPROPRIATE SANCTION FOR THE RECEIPT AND USE OF REMEC'S STOLEN DOCUMENTS IS DISMISSAL OF THE FAC. ............................. 8

    A.   Plaintiffs' Counsel Has a History of Paying for Stolen Documents ..................... 9

        2.   Plaintiffs' Misconduct is Directly Relevant to this Case ......................... 16

        3.   Plaintiffs Should Not Be Allowed to Use Stolen Documents to Avoid the Stay of Discovery Under the PSLRA...................................... 17

        4.   Dismissal is Necessary to Cure the Prejudice Caused by Plaintiffs.......... 18

        5.   Plaintiffs Must Bear the Consequences for the Theft and Use of the Stolen Documents. ................................................................................. 20

IV.   ALTERNATIVELY, PLAINTIFFS SHOULD BE PRECLUDED FROM ANY AND ALL USE OF THE STOLEN DOCUMENTS....................................................... 23

V.    CONCLUSION ...................................................................................................... 25

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Adcor Indus., Inc. v. Bevcorp, LLC,*
    411 F. Supp. 2d 778 (N.D. Ohio 2005)...................................................................... 11

5

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.,*
    69 F.3d 337 (9th Cir. 1995)........................................................................... 8, 18

6

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989) ....................................................................... 9

7

8

*Ashman v. Solectorn Corp.,*
    2008 WL 5071101 (N.D. Cal. Dec. 1, 2008) ......................................... 23

9

*Best Western Intern. v. CSI Intern. Co.,*
    1995 WL 505565 (S.D.N.Y. 1995) ............................................................. 14

10

11

*Carpenters Health & Welfare Fund v. The Coca-Cola Company,*
    2008 WL 4997199 (N.D. Ga. 2008) ...................................................... 2, 9

12

*Chambers v. NASCO,*
    501 U.S. 32 (1991)........................................................................................ 8

13

14

*Doe ex rel. Rudy-Glanzer v.  Glanzer,*
    232 F.3d 1258 (9th Cir. 2000)................................................................... 15

15

*Fayemi v. Hambrecht & Quist, Inc.,*
    174 F.R.D. 319 (S.D.N.Y. 1997) .............................................................. 23

16

17

*Halaco Eng'r Co. v. Costle,*
    843 F.2d 376 (9th Cir. 1988)................................................................. 8, 9

18

*Harrison v. United States,*
    392 U.S. 219 (1968)................................................................................... 25

19

20

*Herrera v. Calhoun,*
    1998 WL 229499 (S.D.N.Y. 1998) .......................................................... 23

21

*In re Network Assoc., Inc., Sec. Litig.,*
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................... 21

22

23

*In re Shell Oil Refinery,*
    143 F.R.D. 105 (E.D. La 1992)........................................................... 24, 25

24

*In re Versata Inc., Sec. Litig.,*
    2001 WL 34012374 (N.D. Cal. 2001) .................................................... 20

25

26

*Jackson v. Microsoft Corp.,*
    211 F.R.D. 423 (W.D. Wash. 2002) ................................................. passim

27

28

DLA Piper LLP (US)
San Diego

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Maldanado v. New Jersey*,
    225 F.R.D. 120 (D. N.J. 2004) ................................................................. 12, 14

4

*Perna v. Electronic Data Sys., Corp.*,
    916 F. Supp. 388 (N.J. 1995) ...................................................... 12, 14, 16, 19

5

6

*Pillsbury, Madison & Sutro v. Schectman*,
    55 Cal. App. 4th 1279 (1997) ................................................................. 19, 20

7

*Pure See Power Boot Camp v. Warrior Fitness Boot Camp*,
    2008 WL 4866165 (S.D.N.Y. Oct. 23, 2008) ................................. 17, 23, 24, 25

8

9

*Ravens v. Iftikar*,
    174 F.R.D. 651 (N.D. Cal. 1997)...................................................... 21, 22, 23

10

*SEC v. Brady*,
    238 F.R.D. 429 (N.D. Tex. 2006) ................................................................. 12

11

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998)........................................................................ 16

12

13

*SG Cowen Sec. Corp. v. United State Dist. Ct. for the N.D. of California*,
    189 F.3d 909 (9th Cir. 1999)..................................................................... 17, 18

14

*Serafino v. Hasbro*,
    82 F.3d 515 (1st Cir. 1996) ........................................................................ 16

15

16

*United States v. Solano-Godines*,
    120 F.3d 957 (9th Cir. 1997)........................................................................ 15

17

*Valley Eng'rs*,
    158 F.3d at 1057........................................................................................ 18

18

19

*Wehling v. Columbia Broadcasting System*,
    608 F.2d 1084 (5th Cir. 1989)..................................................................... 16

20

21

## STATUTES

22

15 U.S.C. § 78u-4(b)(3)(B) .................................................................................. 17

23

18 U.S.C. § 1030 .................................................................................................. 6

24

18 U.S.C. § 2702 .................................................................................................. 6

25

Cal. Civ. Code § 3426 ........................................................................................... 6

26

Cal. Penal Code § 502 ........................................................................................... 6

27

28

DLA PIPER LLP (US)
SAN DIEGO

WEST\21613530.2

04 CV 1948 JLS (AJB)

## TABLE OF AUTHORITIES
**(continued)**

**Page**

Fed. R. Civ. P. Rule 26 ......................................................................................... 1

Fed. R. Civ. P. Rule 26(a)(1) ................................................................................. 6

Restatement (Second) of Agency:
  § 312 (1958) ..................................................................................................... 12

## MISCELLANEOUS

ABA Comm. on Ethics and Prof. Responsibility, Formal Op. 06-440 at n.8 .............................. 12

Daniel J. Pope & Stephanie J. Kim, *Ethics and Professionalism: Opposing Party's
  Privileged or Confidential Documents,* 64 Def. Couns. J. 617, 618 (Oct. 1997) ............ 12

Joint Explanatory Statement of the Committee of Conference, H.R. Conf. Rep.
  No. 104-369, 104th Cong. 1st Sess. at 32 (1995),
  *reprinted in* 1995 U.S.C.C.A.N. Sess. 731 ................................................................ 18

Model Rules of Prof. Conduct ............................................................................. 10, 11

Model Rules of Prof. Conduct R. 4.4 ....................................................................... 12

Model Rules of Prof. Conduct R. 8.4 ....................................................................... 12

DLA PIPER LLP (US)
SAN DIEGO

WEST\21613530.2

04 CV 1948 JLS (AJB)

I.      **INTRODUCTION AND SUMMARY OF ARGUMENT**

This motion presents the issue of whether, and to what extent, Plaintiffs in a securities fraud class action lawsuit can maintain their case based on documents that were stolen from the corporate defendant by a former employee.  As discussed below, such conduct does not comport with the judicial or ethical rules of fair play and similar self-help methods of "discovery" are not tolerated – particularly where the underlying removal of documents has been criminal.  Consequently, courts have used their inherent authority to address situations such as this and have fashioned remedies that include preclusion of the stolen documents and dismissal.  The unique facts in this case warrant dismissal.

In early 2006, Plaintiffs' case was on the rocks.  The Court had granted Defendants' motion to dismiss for the second time, dismissing Plaintiffs' Second Amended Complaint ("SAC"), but giving "Plaintiff one last opportunity to state a claim that complies with [the specificity requirement of] the PSLRA."  On March 23, 2006, Plaintiffs filed a Third Amended Complaint ("TAC") that was little changed from the SAC.

However, before Defendants were able to move to dismiss the TAC, Plaintiffs brought an *ex parte* motion for leave to file a Fourth Amended Complaint ("FAC").  In their *ex parte* application, Plaintiffs represented that "through their ongoing investigative efforts [Plaintiffs] obtained additional documents, including approximately 50,000 pages of internal Company documents that were made available on March 21, 2006. . . .  In addition, approximately 10,000 more documents were made available to Lead Counsel between April 3 and 7, 2006 . . . which further support Lead Plaintiffs' claims."  Plaintiffs did not disclose their source for the documents, nor did they identify how they came to be in their possession.  The Court granted Plaintiffs' *ex parte* motion, and Plaintiffs filed the FAC, a 160-page tome, larded with quotes from scores of internal REMEC, Inc. ("REMEC") documents.  These documents allowed Plaintiffs to survive dismissal.

As part of their Rule 26 initial disclosures a year later, on March 23, 2007, Plaintiffs produced 67,000 pages of internal REMEC documents, consisting of email messages and their attachments.  Most, if not all, of the emails included in the production were redacted to conceal

-1-

1   their source — except one.  Buried within the production was one page that Plaintiffs missed.

2   That page showed that on March 10, 2006, "lisa_robinson@cox.net" forwarded internal REMEC

3   documents to "Ken Keatly" via email.

4         Defendants determined that Ken Keatly ("Keatly") worked for L.R. Hodges & Associates,

5   a private investigative firm used by Plaintiffs' counsel.  Defendants also determined that a Lisa

6   Robinson ("Robinson") worked for REMEC from June 2004 to September 2004.  A review of

7   Plaintiffs' production showed that Robison either sent or received virtually all of the emails

8   included in the production, making Robison the likely source of the documents produced by

9   Plaintiffs (which Plaintiffs' counsel later admitted).  Thus, Robinson somehow obtained and gave

10  to Plaintiffs' investigator 67,000 pages of internal REMEC documents *sixteen months after she*

11  *left REMEC*.

12        Defendants' subsequent investigation of Robinson revealed that she had a history of

13  personal bankruptcies, and that she filed bankruptcy in February 2008.  Her bankruptcy petition

14  showed that within 12 months of the filing, Robinson had suffered $228,000 in "Gambling Losses

15  from Casinos," but no casinos were identified as creditors in her bankruptcy petition – indicating

16  that Robinson had somehow paid-off her gambling debts to the casinos.

17        Interestingly, Plaintiffs' counsel in this case, Milberg LLP, has a practice of paying former

18  employees of the companies they sue for documents.  This practice was revealed in February

19  2008 in *Carpenters Health & Welfare Fund v. The Coca-Cola Company*.  In that case, it is

20  undisputed that Plaintiffs' counsel paid two former Coca-Cola employees $75,000 each for 3,023

21  internal Coca-Cola documents.  The same thing may have happened here.

22        Once discovery started in this case, REMEC attempted to investigate the issue and to

23  pursue third party discovery related to Robison.  Such discovery was thwarted by Robinson and

24  Plaintiffs' counsel.  REMEC also attempted to pursue discovery from L.R. Hodges, which was

25  resisted.  As the case shifted to deposition discovery, REMEC attempted to depose Robinson

26  herself.  Those efforts were delayed as a result of scheduling conflicts with Robinson's initial

27  lawyer and then by criminal defense counsel retained by (or for) her.  Defendants ultimately

28  deposed Robinson on December 8, 2008.  At her deposition, Robinson invoked her Fifth

-2-

Amendment privilege against self-incrimination no less than 270 times. She refused to answer on Fifth Amendment grounds questions such as whether Plaintiffs' counsel asked her to take the internal REMEC documents and whether she was paid by Plaintiffs' counsel or L.R. Hodges for the documents.

This case would not have survived dismissal without the benefit of the documents Robinson stole from REMEC and gave to Plaintiffs. This entire case is, therefore, the fruit of the poisonous tree of Robinson's theft. In both civil and criminal cases, courts regularly exclude the use of illegally obtained evidence and the fruit of the poison tree, and have fashioned or considered remedies that include dismissal, disqualification of counsel, exclusion of the stolen documents (as well as duplicate documents produced from other sources) and monetary sanctions. Here, Plaintiffs' entire case should be dismissed. Nevertheless, whatever remedy the Court determines is appropriate, some remedy is required. Plaintiffs' receipt and use of documents stolen from Defendants violates Plaintiffs' counsel's ethical duties and the rules of discovery in securities cases and fair play. Indeed, in cases such as this, where figurehead plaintiffs through their lawyers loudly and publicly accuse companies and individuals of committing securities fraud,[1] plaintiffs and their lawyers should be held – at the very least – to the standards to which they seek to hold the defendants. As the saying goes, "People who live in glasshouses should not throw stones."

## II.   STATEMENT OF FACTS

This case involves an alleged securities fraud class action suit against REMEC and its former Chief Executive Officer and former Chief Financial Officer. REMEC was a San Diego-based high technology company that was a defense contractor and a manufacturer and supplier of infrastructure equipment to the wireless communications industry. *See* Docket No. 78 (FAC), ¶ 2.[2] On September 27, 2004, the first of three identical complaints were filed on the heels of an announcement by REMEC that it had written off the goodwill on its balance sheet associated with

---

[1] After this case initially was filed, seven press releases were issued announcing the filing of the case and soliciting potential plaintiffs. *See* Declaration of Noah A. Katsell filed concurrently herewith ("Katsell Decl."), ¶ 15.
[2] Hereinafter, citations to Plaintiffs' Fourth Amended Complaint are directly to the document, as opposed to Docket No. 78.

its commercial wireless business segment and that it had taken a non-cash charge for the write-off.  *See* Docket No. 1.  Plaintiffs claim that the goodwill should have been written off earlier.

### A.      Dismissal of the First Two Consolidated Complaints.

On March 10, 2005, Plaintiffs filed a Consolidated Amended Complaint.  *See* Docket No. 38.  Defendants filed a motion to dismiss on April 19, 2005 (Docket Nos. 41, 42 & 45), and the Court granted Defendants' motion on August 17, 2005, with leave to amend.  *See* Docket No. 51.

Plaintiffs responded by filing the SAC on September 16, 2005.  *See* Docket No. 56.  Defendants filed a motion to dismiss on October 28, 2005 (Docket Nos. 60-63 & 65), and the Court granted the motion on February 14, 2006, again with leave to amend.  *See* Docket No. 66.  In this Order, the Court held that Plaintiffs' "allegations resonate with generalities, lacking the specificity required to show the strong inference of scienter required" (*id.* at 13:16-17), but gave "Plaintiff one last opportunity to state a claim that complies with [the specificity requirement of] the PSLRA."  *Id.* at 18:10-12.

### B.      Plaintiffs' Knowingly Received Documents Stolen From REMEC, and Used Them to Avoid Dismissal of the Third Amended Complaint.

On March 23, 2006, Plaintiffs filed the TAC, only slightly amending the allegations set forth in the SAC.  *See* Docket No. 72.  However, before Defendants could move to dismiss the TAC, Plaintiffs sought leave to amend their complaint again.   *See* Docket Nos. 73-75; Declaration of Robert W. Brownlie filed concurrently herewith ("Brownlie Decl."), ¶ 4.

Before seeking leave of court, Plaintiffs told Defendants that they had "additional information" that they had received after filing the TAC, and they asked that Defendants stipulate to yet another amended complaint.  Brownlie Decl., ¶ 4.  Defendants responded that it was up to the Court, but that Defendants would not object.  *Id.*; *see also* Docket No. 74 (Rogers Decl.), ¶ 6.  Plaintiffs sought leave to amend and argued that "through their ongoing investigative efforts [Plaintiffs] obtained additional documents, including approximately 50,000 pages of internal Company documents that were made available on March 21, 2006. . . .  In addition,

1   approximately 10,000 more documents were made available to Lead Counsel between April 3

2   and 7, 2006 . . . which further support Lead Plaintiffs' claims."  Docket No. 73. (Pl. *Ex Parte*

3   App.) at 1:9-11, 17-19; Docket No. 74 (Rogers Decl.), ¶ 4.  At no time did Plaintiffs inform

4   Defendants or the Court how they had received the 60,000 pages of documents or who had

5   provided them.  Brownlie Decl., ¶ 5.  The Court granted Plaintiffs' leave to amend (Docket

6   No. 76), and Plaintiffs filed their 171 page FAC on May 4, 2006.  *See* Docket No. 78.  Defendants

7   moved to dismiss the FAC on June 2, 2006.  *See* Docket Nos. 79-80 & 82.

8               **1.      REMEC's Internal Documents Were Stolen by Robinson.**

9          As Defendants would later find out, one of Plaintiffs' key witnesses, Robinson, a former

10  REMEC employee, stole the documents that Plaintiffs used to support the FAC and bolster their

11  case.  *See, e.g.*, FAC ¶¶ 30(o), 112, 117, 123, 127, 137, 182, 189, 196-201, 203, 314, 315, 318,

12  319, 331, 340 (identifying Robinson as "Confidential Witness No. 15); *see also* Docket No. 101

13  (Pl. R. 26 Disclosure) at 13:1-3.  Curiously, Robinson worked for REMEC for only three months,

14  from June 28, 2004 through September 13, 2004 — just after the Class Period ended in this case.

15  *See* Docket No. 175 (Pl. Mot. To Quash) at 2:16-17.

16         As Director of Base Station Operations/Finance for REMEC, Robinson had access to

17  REMEC's confidential, proprietary and privileged documents, and she regularly sent or was

18  copied on communications with counsel.  *See* Declaration of Richard Sackett filed concurrently

19  herewith ("Sackett Decl."), ¶ 4; Katsell Decl., ¶ 4.  Moreover, Robinson signed a "Proprietary

20  Information and Invention Assignment Agreement" ("Proprietary Rights Agreement"), when she

21  was hired by the Company.  Sackett Decl., ¶ 5, Exh. 1.  The Proprietary Rights Agreement

22  specifically provides that "[d]uring the term of [Robinson's] employment and thereafter,

23  [Robinson] will hold in strictest confidence and will not disclose, use or publish any of the

24  Company's Proprietary Information, except as may be required in connection with [her] work for

25  the Company, or unless expressly authorized by the Company."  *Id.*  "Proprietary Information" is

26  defined in the Proprietary Rights Agreement as including, among other things, "business plans,

27  budgets and unpublished financial statements, licenses, prices and costs . . ."  *Id.*

28  /////

1  Nevertheless, in violation of the Proprietary Rights Agreement (and other state and federal

2  laws),[3] Robinson accessed REMEC's database and stole thousands of pages of REMEC

3  documents. *See* Sackett Decl., ¶ 6. Robinson then sent the stolen REMEC documents to

4  Plaintiffs. *See* Docket No. 175 (Sokolowski Decl.), ¶ 3.

5  **2.  The Stolen Documents Allowed Plaintiffs to Avoid Dismissal.**

6  On September 25, 2006, the Court denied Defendants' motion to dismiss the FAC,

7  specifically noting that Plaintiffs' use of REMEC's internal documents was the reason Plaintiffs

8  were able to survive dismissal. *See* Docket No. 85. The Court stated that although the general

9  nature of the allegations in the FAC were the same as the previous five complaints:

10  The FAC . . . provides substantial detailed allegations, based upon
    the review of over 50,000 pages of internal Remec documents . . .

11  These allegations identify specific transactions and detailed internal
    information concerning Remec's financial condition, including

12  product sales, acquisitions, profit margins, and sales forecasts

13  *  *  *

14  In sum, the court concludes that Plaintiffs' new allegations . . .
    adequately allege specific facts giving rise to an inference that

15  Defendants . . . acted with deliberate or conscious recklessness.

16  *Id.* at 1:28-2:9, 6:22-24. Indeed, Plaintiffs themselves acknowledged that without the documents

17  (stolen by Robinson), the TAC might not have been able to survive a motion to dismiss. *See*

18  Docket No. 74 (Rogers Decl.), ¶ 5 (stating that "significant and material new facts" were omitted

19  from the Third Amended Complaint and Plaintiffs would be "severely prejudiced" if it were

20  dismissed without leave to amend).

21  **C.  Plaintiffs Attempted to Conceal the Source of the Documents**

22  In their Rule 26(a)(1) disclosures on February 23, 2007, Plaintiffs identified Robinson as

23  one of more than 100 potential former or current employees of REMEC "likely to have relevant

24

25  [3] Robinson's conduct arguably violated several federal and state statutes, including: 18 U.S.C. § 1030 (prohibiting the intentional access of information without authorization from a protected computer involved interstate communication); 18 U.S.C. § 2702 (prohibiting the intentional access of information without authorization from a

26  facility through which an electronic communication service is provided and disclosing such communications to third parties who were not authorized to receive them); Cal. Penal Code § 502 (prohibiting a person from knowingly

27  accessing and, without permission, taking data from a computer); Cal. Civ. Code § 3426 (preventing the disclosure and use of information that derives economic value from not being generally known to the public, provided that

28  reasonable efforts have been made to keep it secret).

-6-

1   information regarding certain allegations in the Complaint." *See* Docket No. 101 (Pl. R. 26

2   Disclosure) at 13:1-3.  Then, on March 23, 2007 (more than 10 months after filing the FAC),

3   Plaintiffs produced 67,000 pages of documents to Defendants.  *See* Katsell Decl., ¶ 4.  However,

4   Plaintiffs redacted the time, date, sender, recipients and subject line of the initial email

5   (identifying who forwarded the documents to Plaintiffs).  *Id.* at ¶ 6.  As luck would have it,

6   Plaintiffs inadvertently failed to redact one email, which shows that on March 10, 2006 (six

7   months after Robinson left REMEC), Robinson sent an internal financial report belonging to

8   REMEC (and dated July 13, 2004) to Keatly.  *Id.* at ¶ 7; Exh. 4.  Defendants then discovered that

9   virtually <u>all</u> of the emails in Plaintiffs production were sent or received by Robinson, and that

10  Keatly works for L.R. Hodges & Associates ("L.R. Hodges"), a private investigative firm used by

11  Milberg.  *Id.* at ¶¶ 6-7.

12       Defendants immediately sought to depose Robinson, and requested documents from L.R.

13  Hodges and other third parties relating to Robinson.  *Id.* at ¶ 10.  Robinson moved to quash the

14  subpoenas.  *Id.*; Docket Nos. 168-174 & 177.  And, although they admitted that Robinson had

15  been the source of the documents in question, Plaintiffs moved for a protective order.  *See* Docket

16  No. 175.  Plaintiffs argued: "the discovery at issue is wholly improper and will only serve to

17  annoy, embarrass and intimidate Ms. Robinson."  *Id.* (Pl. Mot. For Protec. Order) at 1:15-17.

18  Plaintiffs also argued that if Defendants were allowed to proceed with discovery relating to

19  Robinson, it would "intimidate her and other potential witnesses and dissuade them from

20  cooperating with Lead Plaintiffs' counsel."  *Id.* at 2:13-16.  The Court granted Plaintiffs' motion

21  for a protective order in July 2008, and Defendants agreed to stay any subpoenas directed towards

22  L.R. Hodges pending the oral deposition of Robinson, herself.  *See* Katsell Decl., ¶ 10.

23       **D.   <u>Robinson Took the "Fifth" and Plaintiffs Refuse to Provide Any Information
24       Regarding Their Receipt of the Stolen Documents.</u>**

25       After several months of delay, Robinson was deposed by Defendants on December 8,

26  2008.  *Id.* at ¶ 11.  Robinson testified that she was heavily in debt and declared bankruptcy in

27  February 2008.  *Id.* at ¶ 12.  Robinson also testified that she had gambling losses in 2007 of

28  approximately $228,000, and approximately $100,000 in gambling losses in 2006, even though

-7-

1   her annual salary in 2007 was less than $150,000.  *Id.*  Robinson refused to testify, however,

2   regarding her employment with REMEC or anything having to do with the litigation or the stolen

3   documents.  *Id.* at ¶ 11.  Indeed,  Robinson responded: "I decline to answer based on my privilege

4   against self-incrimination" approximately 273 times during her deposition.  *Id.*

5        Unable to get any information from Robinson, Defendants renewed their subpoenas to

6   L.R. Hodges and Keatly, and requested information from Milberg *relating solely to*

7   *communications with Robinson.  Id.* at ¶ 13.  Both Milberg and L.R. Hodges moved to quash the

8   subpoenas, and have taken the position that any communications with Robinson by L.R. Hodges

9   or Keatly are attorney work-product.  *Id.*

10       To date, Plaintiffs have failed to produce un-redacted copies of the emails and documents

11   provided to them by Robinson, on the grounds that the information is attorney work-product.  *Id.*

12   at ¶ 8.  Plaintiffs have only recently provided Defendants with a privilege log identifying the

13   documents being withheld on the basis of privilege.  *Id.* at ¶ 9. The privilege log, however, is

14   incomplete and does not identify all documents that were redacted and/or withheld by Plaintiffs in

15   their production, nor does it say much, if anything, about the documents listed.  *See id.* at ¶ 9.  As

16   such, Defendants are unable to determine the totality of the documents provided to Plaintiffs by

17   Robinson, when they were provided, and under what circumstances they were provided.  *Id.* at

18   ¶ 8.  Consequently, Defendants have no way of knowing whether Robinson provided Plaintiffs

19   with other documents that have not been produced, including REMEC document that are

20   protected by the attorney-client privilege.  *Id.*

21   **III.    THE APPROPRIATE SANCTION FOR THE RECEIPT AND USE OF REMEC'S**
22   **STOLEN DOCUMENTS IS DISMISSAL OF THE FAC.**

23       Federal courts have the inherent equitable authority to prevent abuse, oppression and

24   injustice in the litigation process.  *See Chambers v. NASCO,* 501 U.S. 32, 50 (1991) (courts may

25   impose sanctions and rely upon their inherent authority even "where the conduct at issue is not

26   covered by one of the other sanctioning provisions").  The court's inherent power includes the

27   power to dismiss an action, where appropriate.  *See Halaco Eng'r Co. v. Costle,* 843 F.2d 376,

28   380 (9th Cir. 1988); *Anheuser-Busch, Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 348 (9th

1   Cir. 1995).  This authority stems from a court's ability to prevent the perpetration of a fraud upon

2   the court.  "A fraud on the court occurs where it can be demonstrated, clearly and convincingly,

3   that a party has sufficiently set in motion some unconscionable scheme calculated to interfere

4   with the judicial system's ability impartially to adjudicate a matter by improperly influencing the

5   trier or unfairly hampering the presentation of the opposing party's claim or defense."  *Aoude v.*

6   *Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir. 1989).

7          The following factors are relevant in deciding whether to grant terminating sanctions:

8   "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its

9   docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring

10  disposition of cases on their merits; and (5) the availability of less drastic sanctions."  *Jackson v.*

11  *Microsoft Corp.,* 211 F.R.D. 423, 430-31 (W.D. Wash. 2002).  Other factors to consider include:

12  (1) the existence of extraordinary circumstances; (2) willfulness, bad faith, or fault by the

13  offending party; and (3) the relationship between the misconduct and the matter in controversy.

14  *See Halaco Eng'r Co. v. Costle,* 843 F.2d 376, 380 (9th Cir. 1988).  However, "the list of factors

15  amounts to a way for a district judge to think about what to do, not a series of conditions

16  precedent before the judge can do anything."  *Jackson,* 211 F.R.D. at 431 (citing *Valley Eng'rs*

17  *Inc. v. Electrical Eng'r Co.,* 158 F.3d 1051, 1057 (9th Cir. 1998)).

18          **A.      Plaintiffs' Counsel Has a History of Paying for Stolen Documents.**

19          In general, the fact pattern giving rise to this motion is extraordinary.  However, as

20  recently as February 2008, Milberg was implicated in a strikingly similar situation involving

21  payment of a corporate defendant's former employees for stolen documents.  *See* Request for

22  Judicial Notice ("RJN"), Exh. 1 (Special Master's Report and Recommendation Regarding

23  Plaintiffs' Motion for Class Certification in *Carpenters Health & Welfare Fund v. The Coca-Cola*

24  *Company,* 2008 WL 4997199 (N.D. Ga. 2008)) at pp. 44-69).

25          In considering the adequacy of counsel element of class certification in *Carpenters Health*

26  (an alleged securities fraud case), the Special Master in that litigation observed that two of the

27  defendant's former employees entered into a "consulting agreement" with Milberg Weiss and

28  other law firms representing the plaintiffs, guaranteeing the employees $75,000 each.  *See* RJN at

p. 50, n.30.  After executing the agreement, one of the former employees "delivered to Plaintiffs' Counsel 3,023 documents he took from the Company without its knowledge or consent following his being terminated." *Id.* at p. 51.

The Special Master found that it was "clear that Plaintiffs' Counsel [i.e. Milberg] were on notice that the company documents they purchased were wrongfully taken by" a former employee, and he noted that several courts have sanctioned counsel for using confidential documents that had been wrongfully taken by their clients. *Id.* at pp. 55-56.  The Special Master then explained that Milberg Weiss' conduct was aggravated by the fact that "[t]he stolen documents were purchased by Class Counsel despite their knowing how they were acquired by" the former employee. *Id.* at p. 56.  The Special Master also observed that Milberg Weiss may have violated several rules of professional conduct, including the ABA Model Rules of Professional Conduct that prohibit a lawyer from using "methods of obtaining evidence that would violate the rights of his clients or third parties." *Id.* at pp. 56-59.  By using the stolen documents, the Special Master observed, "Plaintiffs' counsel places themselves in a position akin to that of a person who has committed the offense of receiving stolen property." *Id.* at p. 61

Plaintiffs' counsel advanced several theories to justify their conduct, all of which were dismissed by the Special Master.  In rejecting Plaintiffs' argument that the former employees were whistleblowers, the Special Master found that while the Sarbanes-Oxley Act protects whistleblowers from retaliation, it does not give "license to whistleblowers to violate the law themselves in connection with their assisting in prosecuting those who violate the securities laws." *Id.* at p. 63.  In sum, the Special Master found that "Plaintiffs cite to nothing that supports the proposition that in the furtherance of any public policy a party is authorized to use unlawful means, and certainly has pointed to nothing that would authorize the purchase *or use* of stolen documents in this case." *Id.* (emphasis added).[4]

---

[4] After the Special Master issued his report and recommendations, the parties agreed to settle the case and seek approval of the class for settlement purposes. *See* RJN, Exh. 2 (Order Preliminarily Approving Settlement, Providing for Notice, and Setting Final Approval Hearing).  In connection with the motion to preliminarily approve the settlement, and for settlement purposes only, the court rejected the Special Master's report and certified the class, thereby letting plaintiffs off the hook for their conduct *Id.* at ¶ 2.  Nonetheless, plaintiffs' counsel's actions were widely publicized and discussed in the legal press. *See* Katsell Decl., ¶ 16.

1   Here, as in the case above, Plaintiffs were undoubtedly aware that Robinson had stolen

2   internal REMEC documents.  Plaintiffs admit that they interviewed Robinson (along with other

3   REMEC employees), and even a cursory interview would have elicited the fact that Robinson

4   only worked for REMEC for a brief time, and that she had not worked for the Company for

5   several months.  *See* Docket No. 175 (Sokolowski Decl.), ¶ 3 ("In the course of Lead Plaintiffs'

6   investigation . . .  Lead Counsels' investigators contacted and spoke with . . . Robinson [and she]

7   turned over documentary evidence . . . which Lead Plaintiffs used to draft the Fourth Amended

8   Complaint").  If so, why did Robinson have thousands of internal REMEC documents in her

9   possession?  Surely Plaintiffs must have asked Robinson where, how and when she obtained

10   60,000+ pages of internal REMEC documents and whether she had permission to have the

11   documents.  If Plaintiffs had asked even the most perfunctory questions, they would have learned

12   that Robinson had stolen the documents in violation of, among other things, the Proprietary

13   Rights Agreement she signed with REMEC.  *See, e.g., Adcor Indus., Inc. v. Bevcorp, LLC*, 411

14   F. Supp. 2d 778, 785-786 (N.D. Ohio 2005) (discussing various cases supporting the theory that a

15   person has constructive knowledge of theft of trade secrets when the facts available to him would

16   make a "reasonably prudent person suspicious," thereby creating a duty to inquire further).

17   Despite this, Plaintiffs chose to chart a course that they knew was contrary to acceptable

18   discovery practices so as to obtain documents necessary to save their case from dismissal.  *See*

19   *Jackson,* 211 F.R.D. at 431 (stating that the vast quantity of unauthorized data (nearly 10,000

20   pages) in the possession of plaintiffs "was egregious in the extreme").

21           a.      **Plaintiffs' Conduct Violated Their Ethical Obligations.**

22   Given that Plaintiffs knew the documents from Robinson were stolen, they should have

23   immediately notified Defendants of their receipt of the documents and their source.  "An attorney

24   who receives on an unauthorized basis materials of an adverse party should, upon recognizing the

25   privileged or confidential nature of the materials:  (1) either refrain from reviewing such materials

26   or review them only to the extent required to determine how appropriately to proceed; (2) notify

27   the adverse party's attorney that he or she has such materials; and (3) either follow instructions of

28   the adversary's attorney with respect to the disposition of the materials, or refrain from using the

1    materials until a definitive resolution of the proper disposition of the materials is obtained from a

2    court." *See SEC v. Brady*, 238 F.R.D. 429, 445 (N.D. Tex. 2006); *accord Perna v. Electronic*

3    *Data Sys., Corp.,* 916 F. Supp. 388 (N.J. 1995).

4           Further, under the Model Rules of Professional Conduct, Plaintiffs were ethically bound

5    to honor the confidentiality of REMEC's documents even though REMEC was not their client

6    and their first inclination might have been to use the documents to help their case.  *See* Model

7    Rules of Prof'l Conduct R. 4.4 ("In representing a client, a lawyer shall not . . . use methods of

8    obtaining evidence that violate the legal rights of [a third party]"); *see also* Daniel J. Pope &

9    Stephanie J. Kim, *Ethics and Professionalism: Opposing Party's Privileged or Confidential*

10   *Documents,* 64 Def. Couns. J. 617, 618 (Oct. 1997) ("lawyers should not need a rule telling them

11   that it is inappropriate and unethical to refuse to return something that clearly belongs to

12   another").  It is well established that an attorney cannot do indirectly (e.g., assist or induce

13   another) to do that which he or she could not do directly.  Model Rules of Prof'l Conduct R. 8.4.

14   Likewise, pursuant to the American Bar Association Standing Committee on Ethics and

15   Professional Responsibility, in a situation like this where Plaintiffs received documents belonging

16   to REMEC that they knew were confidential or, from a source that they knew was not authorized

17   to send them, Plaintiffs should have – at the very least – notified Defendants of their receipt of

18   REMEC documents from Robinson, and should properly have refrained from using the materials

19   until authorized to do so by the court.  *See* ABA Comm. on Ethics and Prof'l Responsibility,

20   Formal Op. 06-440 at n.8 (noting that an attorney is subject to sanctions by the Court if the

21   attorney receives and uses documents from a person who likely engaged in tortious or criminal

22   conduct in obtaining them); *see also Maldanado v. New Jersey,* 225 F.R.D. 120, 142 (D. N.J.

23   2004) (plaintiffs' counsel disqualified after retaining and using privileged documents from an

24   unauthorized source); Restatement (Second) of Agency: Intentionally Causing or Assisting Agent

25   to Violate Duty § 312, cmt. c (1958).

26          Instead, Plaintiffs did the opposite.  They seized the opportunity to take advantage of the

27   documents in an effort to avoid dismissal of the TAC.  Plaintiffs "thoroughly review[ed] and

28   analyze[d] these documents [with the] assistance from forensic accountants and other

-12-

1   consultants." Docket No. 74 (Rogers Decl.), ¶ 3.  Plaintiffs then sought to hide their complicity in

2   Robinson's theft by redacting the documents to conceal their source.  Plaintiffs did not admit that

3   Robinson was the source of the documents (confirming Defendants' suspicion) until June 2008

4   when Plaintiffs opposed Defendants' attempts to seek discovery into the facts surrounding the

5   suspicious email.  *See generally* Docket No. 175.

6          Plaintiffs' receipt of stolen documents in violation of their ethical duties, and their

7   deliberate use of the documents (and their attempt to cover up their source) is clear evidence of

8   willfulness and bad faith.

9                          **b.      Plaintiffs Likely Received Privileged Communications.**

10         Apart from knowingly receiving and using stolen documents, Plaintiffs are likely in

11  possession of privileged material belonging to Defendants.  Plaintiffs received tens of thousands

12  of pages of proprietary and confidential documents that were stolen from REMEC, and it is

13  logical to presume that included in those documents are privileged communications and attorney

14  work-product belonging to REMEC.

15         As Director of Base Station Operations/Finance for REMEC, Robinson was privy to

16  attorney-client communications and had access to attorney work-product generated in-house at

17  REMEC and by outside counsel.  Sackett Decl., ¶ 4; *see also* Katsell Decl., ¶ 8.  Robinson was

18  copied on emails to and from REMEC's General Counsel, and her name appears on numerous

19  emails that included counsel *and that were produced by Plaintiffs as part of their production*.

20  Katsell Decl., ¶ 8 (Plaintiffs' production shows that Robinson provided at least 80 emails (with

21  attachments) to Plaintiffs that contained communications with REMEC's attorneys).  Thus,

22  documents containing privileged communications and attorney work-product are likely among

23  the documents that Robinson stole from REMEC and provided to Plaintiffs.  *See id.* (several of

24  the documents produced by Plaintiffs are arguably privileged).  Indeed, it is inconceivable that

25  Robinson culled out privileged communications from the documents she stole before she turned

26  them over.  To date, Plaintiffs and their investigators have refused to provide any information

27  about the documents they received from Robinson, claiming that the information is privileged.

28  *Id.* at ¶¶ 9, 13.  Indeed, Plaintiffs' privilege log confirms that they have emails from Robinson

-13-

1   that they have not produced.  *Id.* at ¶ 9 (Plaintiffs' privilege log identifies 26 emails *from*

2   *Robinson to Keatly* as attorney work-product).

3            Assuming Plaintiffs were provided privileged documents, they have had the benefit of

4   those documents (and may have been privy to Defendants' attorneys' thoughts, impressions and

5   strategy) for nearly two years.  Prejudice to Defendants is presumed in such cases.  *See Perna,*

6   916 F. Supp at 401.  Not only is this conduct further evidence of bad faith, but it is grounds for

7   disqualification of Plaintiffs' counsel and dismissal of the entire action.  *See Best Western Intern.*

8   *v. CSI Intern. Co.,* 1995 WL 505565, at *2 (S.D.N.Y. 1995) ("conduct that merely suggests that

9   one side might enjoy the disclosure of confidential information may warrant disqualification,

10  [and] any doubt is to be resolved in favor of disqualification"); *Jackson,* 211 F.R.D. at 432

11  (plaintiff's possession of proprietary information "cannot be erased" and warranted dismissal);

12  *Maldanado,* 225 F.R.D. at 142.

13                    **c.      Plaintiffs May Have Been Complicit in Robinson's Theft.**

14           Plaintiffs appear to be complicit in Robinson's theft.  What is known is that six months

15  after Robinson left REMEC, she sent documents via her personal email account to Plaintiffs'

16  investigator.  *See* Katsell Decl., ¶ 7.  However, a search of all emails sent by Robinson to her

17  personal email account during the time she worked at REMEC yields only a handful of emails,

18  only some of which appear to have been produced by Plaintiffs.  *See* Katsell Decl., ¶ 14.

19  Consequently, because she did not send the 60,000+ pages of documents to her personal email

20  account when she worked at the Company, somehow she apparently accessed REMEC's

21  computer system and acquired REMEC's documents *after* she left the Company.

22           The question remains, why? Robinson's personnel file shows that she left REMEC on her

23  own and on good terms, and was eligible for rehire at a later date.  Sackett Decl., ¶ 7.  Nothing in

24  her file shows that she was a "whistleblower" or that she had an axe to grind against REMEC or

25  anyone at REMEC.  *Id.*  However, Defendants have learned that after leaving REMEC, Robinson

26  suffered significant financial distress.  In 2006 and 2007, Robinson sustained massive gambling

27  losses — nearly $230,000 in 2007 alone — and declared bankruptcy in February 2008.  Katsell

28  /////

1    Decl., ¶ 12.  Such financial pressures may have caused Robinson to sell the REMEC documents

2    to Plaintiffs.

3           Interestingly, in her deposition, Robinson refused to shed any light on the subject, and

4    refused to answer the following questions:

5           •      "Did anyone at the Milberg law firm ask you to take a job at REMEC?"  Katsell

6    Decl., Exh. 6 (Robinson Depo. Excerpts) at 78:6-22.

7           •      "Did Mr. Keatly tell you to get a job at Remec for the purpose of sending him

8    Remec proprietary documents?"  *Id.* at 153:6-15.

9           •      "Did you leave Remec after three months because you had collected the

10   documents that Milberg or someone else had asked you to collect to support their lawsuit and

11   therefore you had no reason to remain at Remec?"  *Id.* at 80:19-81:5.

12          •      "Did Mr. Keatly or anyone else for that matter offer you money in exchange for

13   providing Remec's proprietary documents?"  *Id.* at 150:20-151:5.

14          •      "Were you able to pay off your [$228,000] gambling debts with the money that

15   Milberg paid you for Remec proprietary documents?" *Id.* at 180:9-23.

16          Likewise, Plaintiffs have blocked discovery into how or when Robinson gave Plaintiffs

17   the documents in question.  Plaintiffs have even gone so far as to argue that any testimony

18   regarding communications with Robinson invades the attorney work-product doctrine because

19   Plaintiffs' mere recollection of what was said by Robinson is work-product.  Katsell Decl., ¶ 13.

20   Nevertheless, because there is ample evidence that Plaintiffs knowingly received confidential

21   documents stolen from Defendants and used the documents just when they needed it most to

22   survive dismissal of their case, a reasonable inference to draw from Robinson's assertion of the

23   Fifth Amendment and Plaintiffs' assertion of the work-product privilege is that a truthful response

24   to the questions posed above would be unfavorable to Plaintiffs.  Indeed, as a matter of law,

25   Defendants are entitled to an inference that Plaintiffs were involved or complicit in Robinson's

26   theft of documents from REMEC.  *See United States v. Solano-Godines,* 120 F.3d 957, 962 (9th

27   Cir. 1997) ("[i]n civil proceedings . . . the Fifth Amendment does not forbid fact finders from

28   drawing adverse inferences against a party who refuses to testify"); *Doe ex rel. Rudy-Glanzer v.*

-15-

1    *Glanzer,* 232 F.3d 1258, 1264-65 (9th Cir. 2000) (adverse inferences may be drawn in civil cases

2    when "independent evidence exists of the fact to which the party refuses to answer" and when

3    "there is substantial need for the information and there is not another less burdensome way of

4    obtaining the information."); *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir. 1998) ( "[p]arties are

5    free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse

6    inferences from their failure of proof"); *see also Serafino v. Hasbro,* 82 F.3d 515, 518 n.5 (1st

7    Cir. 1996) (noting courts have the "power to dismiss even in the face of a party's proper assertion

8    of the privilege"); *Wehling v. Columbia Broadcasting System,* 608 F.2d 1084, 1089 (5th Cir.

9    1989) (if invocation of privilege prejudices the other party, the court is "free to fashion whatever

10   remedy is required to prevent unfairness").

11        Complicity in the theft of REMEC's internal documents is clear evidence of Plaintiffs'

12   bad faith and grounds for dismissal.  This is so regardless of whether Plaintiffs paid for the

13   documents at issue because their receipt and use of documents when they knew or should have

14   known they were stolen is sufficient evidence of Plaintiffs' bad faith.

15                    **2.    Plaintiffs' Misconduct is Directly Relevant to this Case.**

16        Plaintiffs' receipt and use of the stolen documents relates directly to the matters in

17   controversy, and interferes with the rightful disposition of the case.  *See Perna,* 916 F. Supp. at

18   401.  The crucial issue is Plaintiffs' improper *conduct*, not necessarily what documents were

19   transmitted by Robinson and used in the litigation.  "The actual content of the documents whether

20   privileged, non-privileged, relevant or irrelevant is not the crux of this dispute.  It is the general

21   abuse of the discovery process being conducted under the authority of [the] court and the ability

22   to punish the perpetration of fraud upon the court that must be sanctioned."  *Id.*

23        Here, Plaintiffs received stolen documents and used the documents to save their case

24   from dismissal *with prejudice*.  Then, Plaintiffs redacted the documents in a transparent attempt to

25   conceal their source, which would have exposed that they were stolen by one of Defendants'

26   former employees.  Plaintiffs subsequently used the stolen documents to formulate oral and

27   written discovery to Defendants and third-parties.  Plaintiffs have not denied these allegations.

28   Rather, they try to downplay their actions by asserting that the documents provided them by

1    Robinson were subsequently produced in discovery.  Katsell Decl., ¶ 13.  This is irrelevant.  *Pure*

2    *See Power Boot Camp v. Warrior Fitness Boot Camp*, 2008 WL 4866165, at * (S.D.N.Y. Oct. 23,

3    2008) (overruling plaintiffs' "inevitable discovery" argument and precluding use of ill-gotten

4    documents even though documents were later produced in discovery by defendants or third-

5    parties).  What is relevant is that Plaintiffs received and used the stolen documents.

6           **3.      Plaintiffs Should Not Be Allowed to Use Stolen Documents to Avoid**
            **the Stay of Discovery Under the PSLRA.**
7

8           By using the documents Robinson stole from REMEC to bolster the FAC and avoid

9    dismissal, Plaintiffs effectively circumvented the stay of discovery under the Private Securities

10   Litigation Reform Act of 1995 ("PSLRA" or the "Act").

11          Congress passed the PSLRA "in response to several perceived abuses in securities

12   litigation, including discovery abuses."  *SG Cowen Sec. Corp. v. United State Dist. Ct. for the*

13   *N.D. of California*, 189 F.3d 909, 911 (9th Cir. 1999).  The Ninth Circuit explained:

14                The purpose of the Act was to restrict abuses in securities class-
                  action litigation, including: (1) the practice of filing lawsuits against
15                issuers of securities in response to any significant change in stock
                  price, regardless of defendants' culpability; (2) the targeting of
16                "deep pocket" defendants; (3) the abuse of the discovery process to
                  coerce settlement; and (4) manipulation of clients by class action
17                attorneys.

18   *Id.* (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530-31 (3d Cir. 1999)).

19          One of the reforms implemented by the PSLRA is an automatic stay of discovery.  *See*

20   15 U.S.C. § 78u-4(b)(3)(B).  The PSLRA stays discovery in securities fraud cases during the

21   pendency of motions to dismiss.  *Id.*  The Ninth Circuit observed that Congress included the

22   discovery stay in the PSLRA because:

23                The cost of discovery often forces innocent parties to settle
                  frivolous securities class actions. According to the general counsel
24                of an investment bank, "discovery costs account for roughly 80% of
                  total litigation costs in securities fraud cases."  In addition, the
25                threat that the time of key employees will be spent responding to
                  discovery requests, including providing deposition testimony, often
26                forces coercive settlements.

27   /////

28   /////

1 | *SG Cowen*, 189 F.3d at 911 (quoting Joint Explanatory Statement of the Committee of

2 | Conference, H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. at 32 (1995), *reprinted in* 1995

3 | U.S.C.C.A.N. Sess. 731.)

4 |      As explained above, in this case, Plaintiffs used the stolen documents to evade the

5 | PSLRA's discovery stay and to survive Defendants' motion to dismiss.  While, "Congress clearly

6 | intended that complaints in these securities actions should stand or fall based on the actual

7 | knowledge of the plaintiffs rather than information produced by the defendants after the action

8 | has been filed" (*id.* at 912 [quotations omitted]), nowhere in the PSLRA did Congress condone,

9 | encourage or allow plaintiffs to use or rely upon documents stolen from the defendant in order to

10 | plead a claim that could survive dismissal.  Indeed, the very purpose of the PSLRA was to combat

11 | abusive practices by plaintiff lawyers in securities class action suits.  *See id.* at 911.

12 | Consequently, Plaintiffs' use of the stolen documents is compound by the fact that they did so in

13 | an effort to evade a statute intended to curb abusive practices in securities cases such as this.

14 |     **4.**      **Dismissal is Necessary to Cure the Prejudice Caused by Plaintiffs.**

15 |      Although the Court must consider the availability of less drastic sanctions, "it is not

16 | always necessary for the court to impose less serious sanctions first, or to give any explicit

17 | warning" before granting terminating sanctions.  *Valley Eng'rs*, 158 F.3d at 1057.  Further, it is

18 | appropriate to reject lesser sanctions where such sanctions would not assure that fairness of the

19 | proceedings or cure the inappropriate conduct.  *See Anheuser-Busch*, 69 F.3d at 352; *Jackson,*

20 | 211 F.R.D. at 432.  "It is well settled that dismissal is warranted where . . . a party has engaged

21 | deliberately in deceptive practices that undermine the integrity of the judicial proceedings: courts

22 | have inherent power to dismiss an action when a party has willfully deceived the court and

23 | engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser-*

24 | *Busch*, 69 F.3d at 348 (citations omitted).

25 |      Here, Plaintiffs' conduct has prejudiced Defendants.  By Plaintiffs' own admission,

26 | without the stolen documents, the TAC would have been dismissed with prejudice, and this case

27 | would have ended in September 2006.  Moreover, Plaintiffs' conduct has prejudiced Defendants'

28 | ability to fairly defend themselves in this action and because Plaintiffs likely received REMEC's

-18-

1  privileged communications and attorney-work product.  *See Jackson,* 211 F.R.D. at 431

2  (plaintiff's possession of proprietary information for 10 months prejudiced defendants and could

3  only be cured by dismissal); *Perna,* 916 F. Supp at 401.

4          In *Perna*, the court addressed a similar situation in which the plaintiffs improperly

5  reviewed and made copies of documents belonging to opposing counsel.  Although plaintiffs later

6  destroyed the copies and argued that there was nothing prejudicial that was gained from their

7  unauthorized access to defendant's documents, the court found that "there is a general duty to

8  preserve the integrity of the judicial process and prevent the perpetration of fraud on the tribunal."

9  *Id.* at 397 (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* 322 U.S. 238 (1944)).  While

10 acknowledging that a court's judicial powers must be exercised with restraint and discretion, and

11 that "a primary aspect of  that discretion is the ability to fashion an appropriate sanction for

12 conduct which abuses the judicial process" (*Perna,* 916 F. Supp at 397), the court held:

13              [Plaintiff's] unauthorized conduct of viewing the defendants'
                documents, irrespective of whether or not the documents were
14              privileged, work-product or relevant, is the type of scandalous
                behavior that must not be condoned.  It is the *act* that necessitates
15              discipline.  Striking [plaintiff's] testimony would be ineffective.
                Ordering [plaintiff] to obtain new counsel would likewise be
16              ineffective as [plaintiff] would have already tainted the entire
                litigation process by this intrusion.  Further, the assessment of costs
17              and fees would be conveying a message to litigants that money
                could cure one's improper act.
18
19                              *     *     *

20              Accordingly, dismissal is the only form of discipline that will
                insure the orderly administration of justice and the integrity of the
21              courts.  It is the only remedy that will punish the perpetration of
                fraud upon the court.  It is [plaintiff's] conduct which offends the
22              basic notions of fair play that must be sanctioned.  Thus, there is no
                other sanction available that will . . . deter him as well as others
23              from engaging in this type of behavior.

24 *Id.* at 400-401.

25         Similarly, in *Pillsbury, Madison & Sutro v. Schectman*, 55 Cal. App. 4th 1279 (1997), the

26 court affirmed an injunction against a former employee of Pillsbury, Madison & Sutro, who took

27 documents from the firm that he intended to use in an employment case against it.  There, the

28 court explained: "The fact counsel still conduct much pretrial preparation and discovery without

-19-

1   judicial assistance does not mean parties to litigation can operate outside the applicable

2   parameters of the Discovery Act or may violate other laws or common law strictures in their zeal

3   to pursue litigation." *Id.* at 1288 (citation omitted).  In rejecting the former employee's argument

4   that his theft of documents was justified, the court stated that his means justify the ends argument

5   is an insufficient reason "to subvert society's interest in preserving personal property, as well as

6   maintaining the jurisdiction of the courts to administer the orderly resolution of disputes." *Id.*

7   Thus, the court held that courts "have refused to permit 'self-help' discovery which is otherwise

8   violative of ownership or privacy interests and unjustified by any exception to the jurisdiction of

9   the courts to administer the orderly resolution of disputes." *Id.* at 1289.

10      Here, regardless of the content of the stolen documents, had Plaintiffs not improperly

11   obtained and used Defendants' proprietary and confidential documents, there is a significant

12   chance that Defendants' motion to dismiss the TAC would have been granted and this case would

13   have been dismissed nearly *two years ago.  See Jackson,* 211 F.R.D. at 431 (finding plaintiff's

14   "secretive behavior and clear reliance on stolen documents in the preparation of his case only

15   makes dismissal more appropriate").  Instead, Defendants have had to defend against Plaintiffs'

16   frivolous claims and incurred millions of dollars in fees and costs since the FAC was filed.

17   Brownlie Decl., ¶ 6.  More importantly, Plaintiffs' conduct has resulted in harm to the litigation

18   process.  "There is a public interest in discouraging an 'anything goes' approach to litigation,"

19   and Plaintiffs should not be permitted to simply disregard their ethical obligations and the rules of

20   litigation. *See Jackson,* 211 F.R.D. at 431.  Plaintiffs conduct cannot be condoned and the most

21   appropriate and proper sanction would be dismissal of the FAC.

22   **5.      Plaintiffs Must Bear the Consequences for the Theft and Use of the Stolen Documents.**

23

24      Due to Plaintiffs' efforts to block relevant discovery, Defendants have not been able to

25   determine if the Class Representatives participated directly in the receipt of the stolen documents.

26   Nevertheless, the record shows that the documents were received for their benefit.  Moreover, the

27   Class Representatives' testimony shows that they are mere figureheads and this case has been

28   driven exclusively by Plaintiffs' counsel. *See In re Versata Inc., Sec. Litig.,* 2001 WL 34012374,

-20-

1   at *1-2 (N.D. Cal. 2001) ("Congress observed that securities litigation had become 'lawyer

2   driven,' that 'such litigation had been typically initiated and controlled by plaintiffs' counsel, bark

3   to core, start to finish.'") (citing Conference Report on Sec. Litig. Reform, H.R. Conf. Rep.

4   No. 104-39 at 31 (1995)); *In re Network Assoc., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1020 (N.D.

5   Cal. 1999); *Ravens v. Iftikar,* 174 F.R.D. 651, 661 (N.D. Cal. 1997).

6        Class Representative John Hu ("Hu") testified that he heard about this case after receiving

7   a solicitation in the form of a "lead plaintiff certification" in the mail from Milberg Weiss.

8   Katsell Decl., Exh. 12 (Hu Depo.) at 46:1-17.  Before becoming part of the "Cuvelier Group," Hu

9   did not know any of the other plaintiffs in the group.  *Id.* at pp. 97:3-101:9.  He did not know who

10  selected the group.  *Id.* at p. 101:13-16.  When asked who was in charge of the group, Hu replied,

11  "I don't know.  My—our lawyers."  *Id.* at p. 101:17-19.  The group never made a decision to hire

12  an attorney.  *Id.* at p. 106:14-18.  Hu felt it was automatic for Milberg to be counsel, as it had set

13  up the group, and he considered no other lawyers.  *Id.* at pp. 106:14-25; 88:17-19.  Hu did nothing

14  to determine whether his lawyers were trustworthy, reliable, or competent.  *Id.* at pp. 88:8-16;

15  107:10-25.

16       Class Representative Lowel Sitton ("Sitton") testified similarly.  Sitton admitted that

17  neither he nor the "group" selected counsel, as contemplated by the Reform Act.  He testified the

18  "Cuvelier Group" did not retain Milberg Weiss and in fact did not exist before the litigation.  *See*

19  Katsell Decl., Exh. 13 (Sitton Depo.), at 198:22-25; 191:23-25.  He had no input into the selection

20  of the members of the group.  *Id.* at p. 192:1-14.  Moreover, the group did not consider any other

21  law firms, or discuss the qualifications or characteristics the group would want in an attorney, etc.

22  *Id.* at p. 199:1-19.  He did not understand that under the PSLRA it was lead plaintiff's duty to

23  retain counsel, nor was he even aware it was an option to select a firm other than Milberg Weiss,

24  and did nothing to investigate or verify Milberg Weiss's qualifications.  *Id.* at pp. 199:24-200:2;

25  p. 202:11-16.

26       Hu essentially testified that he left the prosecution of the case to Milberg Weiss.  He

27  admitted he was "guilty" (Katsell Decl., Exh. 12 (Hu Depo.) at 133:15-17) of not even reading

28  the entirety of any the complaints in this matter.  *Id.* at 139:10-16; 144:14-23.  Indeed, he had

only read, at most, a few pages of the complaints. *Id.* at 135:23-136:23.  He acknowledged that he did not know what was said in the complaints because he did not read them.  *Id.* at 146:11-15.  The first time he read the sentences about the centerpiece goodwill impairment allegations was at his deposition. *Id.* at 157:2-158:19.  Despite holding a doctorate in chemical engineering from Notre Dame and spending a career as a research engineer, he offered no excuse for not bothering to read the complaints other than that the they were "too thick" for him to read (*Id.* at 136:14-16) and English is not his "native tongue."  *Id.* at 137:3-139:3.  Hu did not know what a legal claim was.  *Id.* at 111:25-112:7.  He did not know of any basis or see any evidence related to the accusations against Ragland, REMEC and Hickman.  *Id.* at 113:24-115:15; 133:13-21.  In fact, he believed that the accusations against the company and the two individual defendants were the same.  *Id.* at 114:23-115:2.  He did nothing to verify that what his lawyers were telling him was correct (*Id.* at 115:18-20; 136:5-7; 147:14-24), and did not even ask them whether the accusations were correct.  *Id.* at 115:21-116:14.  Hu provided no text and suggested no revisions to his lawyers for any of the complaints or oppositions, nor did he discuss its contents with any of the other members of the "Cuvelier Group."  *Id.* at 130:3-13; 132:23-25; 146:22-25; 135:6-8.)  He never asked the basis for the allegations in the complaint or claims.  *Id.* at 121:1-9, 15-22.  He just assumed that his lawyers had a basis and did nothing more.  *Id.* at 120:4-25.

Sitton was no more involved that Hu.  He could not recall receiving the Second Amended Complaint but, if he did, he merely thumbed through it rather than reading it.  Katsell Decl., Exh. 13 (Sitton Depo.) at 208:10-17; 209:4-17.  It was the same with the Third Amended Complaint and Fourth Amended Complaint.  *Id.* at 217:21-24; 222:23-223:7.  Sitton did not understand much of the complaints  (*id.* at 92:15-19; 210:5-19; 217:25-218:12; 223:8-224:7), but did nothing to try to gain an understanding.  *Id.* at 92:20-25.  He also did nothing to verify the accuracy or basis of the allegations made in the complaint, simply accepting it "on faith," as presented to him.  *Id.* at 93:1-11; 94:15-16.  He did not think that his role was to question the allegations.  *Id.* at 95:16-19.  He never understood when the tenure of Ragland or Hickman was or bothered to find out.  *Id.* at 118:2-119:15.  While Sitton admitted that this case is about a goodwill impairment charge (*id.* at 97:10-23), he has no understanding of what goodwill is or the

-22-

1  allegations in the FAC concerning goodwill.  *Id.* at 98:20–99:24.  Sitton admitted in response to a

2  question asking if he had ever gotten himself comfortable with the concept of goodwill:  "I've

3  never been comfortable understanding exactly what goodwill is.  I still am not to this day."  *Id.* at

4  99:21-24.  He admitted that he cannot determine if REMEC misled him about goodwill because

5  he does not know what goodwill is.  *Id.* at 101:7-11.

6          Accordingly, dismissal of the FAC is fair, reasonable and appropriate because the named

7  Plaintiffs are only nominally interested in this action, and no other sanction available would

8  punish the perpetration of fraud on the Court by Milberg and cure the prejudice to Defendants.

9  **IV.  ALTERNATIVELY, PLAINTIFFS SHOULD BE PRECLUDED FROM ANY AND
        ALL USE OF THE STOLEN DOCUMENTS.**

10

11         In the event the Court declines to dismiss the case, Plaintiffs should be precluded from

12  any use of the stolen documents, including the fruit of the poisonous tree derived from them.

13  Accordingly, Plaintiff's Fourth Amended Complaint should be stricken, and Plaintiffs should be

14  required to return all documents stolen by Robinson, including all privileged documents.

15         The court's inherent authority specifically includes the power to preclude use of evidence

16  improperly obtained outside discovery.  *See Pure Power Boot*, 2008 WL 4866165, at *18;

17  *Herrera v. Calhoun*, 1998 WL 229499, at *3 (S.D.N.Y. 1998) (court's inherent authority includes

18  the ability to exclude proprietary documents obtained unfairly and outside the context of formal

19  discovery); *Fayemi v. Hambrecht & Quist, Inc.,* 174 F.R.D. 319, 324 (S.D.N.Y. 1997) (same);

20  *Ashman v. Solectorn Corp.,* 2008 WL 5071101 (N.D. Cal. Dec. 1, 2008) (same).

21         *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, is instructive.  There, plaintiffs

22  sought an injunction and damages based on the defendant's alleged theft of trade secrets when

23  they worked for plaintiffs' fitness club.  However, to support their case, plaintiffs accessed the

24  computers previously used by the defendants when they worked at plaintiffs' club, as well as the

25  defendants' personal email accounts.  2008 WL 4866165, at *2-4.  Plaintiffs found several

26  incriminating emails that definitively showed that defendants had set up a competing business

27  using plaintiffs' proprietary information, and plaintiffs used the emails to support their case.  *Id.*

28  Defendants brought a motion to preclude the use of the emails stolen by plaintiffs and appealed to

-23-

1    the Court's inherent authority to exclude the emails given that they were improperly obtained

2    outside the discovery process. *Id*. at *18. Plaintiffs argued that they did not receive the emails

3    improperly, and that the emails were inevitably produced in discovery. *Id*. at *19. Plaintiffs also

4    argued that precluding use of the emails would grant defendants a windfall because the emails

5    conclusively proved that that the defendants had committed the acts alleged in the lawsuit. *Id*.

6    Although the court recognized that that the relief requested by defendants could be dispositive of

7    plaintiffs' case (because without the emails the plaintiff would likely not be able to meet their

8    burden), the court precluded affirmative use of the emails. *Id*. at *21-22. The court dismissed

9    plaintiffs' argument that the emails would have been inevitably discoverable through other

10   independent sources and held that "pursuant to its inherent equitable powers to sanction a party

11   that seeks to use in litigation evidence that was wrongfully obtained, the court may preclude the

12   use of stolen evidence in litigation, notwithstanding the fact that it would have been otherwise

13   discoverable." *Id*. at *19. Indeed, the court found that "preclusion of the e-mails is the remedy

14   most compatible with maintaining the integrity of the litigation process." *Id*. at *21. "In the end,

15   the one thing that should remain unsullied is the integrity of the judicial process. In this Court's

16   view, that integrity is threatened by admitting evidence wrongfully, if not unlawfully, secured."

17   *Id*. at *22.

18         Similarly, in *In re Shell Oil Refinery*¸ the court used its "inherent authority to control and

19   preserve the integrity of its judicial proceedings" and precluded any use of documents improperly

20   obtained by plaintiffs. 143 F.R.D. 105 (E.D. La 1992). There, the defendant learned that

21   plaintiffs had obtained documents outside the discovery process from the defendant's current

22   employee. *Id*. at 107. In addressing plaintiff's receipt of the documents, the court explained that

23   "[t]he problem here is that the [plaintiff] has not just communicated with [defendant's] employee,

24   but has surreptitiously obtained from this employee proprietary documents belonging to

25   [defendant]." *Id*. at 108. The court noted that plaintiff's "receipt of [defendant's] proprietary

26   documents in this manner was inappropriate and contrary to fair play." *Id*. "The receipt of

27   [defendant's] documents was more than informal fact-gathering. [Plaintiffs have] effectively

28   circumvented the discovery process." *Id*. The court held that it was "obliged to take measures

-24-

1  against unethical conduct occurring in connection with any proceeding before it," and it ordered

2  plaintiff to return the documents to defendant, and prohibited plaintiff "from making any use of

3  the documents." *Id.* at 108-109 (citations omitted).

4      As set forth above, Plaintiffs' knowledge of and participation in the theft of documents

5  from REMEC (even through their counsel) and their attempt to cover it up amounts to bad faith,

6  and use of the documents should be precluded, including the use of all "fruits" of Plaintiffs'

7  improper conduct.  Thus, Plaintiffs' Fourth Amended Complaint should be dismissed, as should

8  any and all discovery referring or relating to the stolen documents.  *See Pure Power,* 2008 WL

9  4866165, at *19 (plaintiff's use of stolen information "taints the judicial process").

10     In cases involving illegally obtained evidence, courts not only exclude the use of the

11 illegally obtained evidence, but also "other evidence acquired through their unlawful use.  *See,*

12 *e.g.*, *Harrison v. United States*, 392 U.S. 219, 222 (1968).  Here, all of the evidence developed

13 through discovery is the fruit of the poisonous tree because, as discussed above, this case would

14 not have survived Defendants' motions to dismiss without the use of the stolen documents.

15 Consequently, Plaintiffs would not have been able to conduct discovery at all without the stolen

16 documents.  Therefore, all of the materials received by Plaintiffs in discovery are the direct result

17 of their use of the stolen documents, all of which should also be excluded.

18 **V.     <u>CONCLUSION</u>**

19     For the reasons set forth above, Defendants respectfully request that their motion be

20 granted.

21 Dated:  January 29, 2009

22                                          DLA PIPER LLP (US)

23

24                                          **s/Robert W. Brownlie**
                                           Attorney for Defendants
25                                         REMEC, INC., RONALD E. RAGLAND and
                                           WINSTON E. HICKMAN
26                                         E-mail: robert.brownlie@dlapiper.com

27

28