

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

IN RE: REMEC INCORPORATED
SECURITIES LITIGATION

CASE NO. 04-CV-1948-MMA (AJB)

12

**ORDER DENYING DEFENDANTS'
MOTION FOR SANCTIONS**

13

This Document Relates to all Actions.

[Doc. No. 240]

14
15

    This matter comes before the Court on Defendants REMEC, Inc., Ronald E. Ragland, and

16

Winston E. Hickman's motion for sanctions based on allegations of serious misconduct against

17

Plaintiffs' counsel in this securities fraud class action.  Defendants request that the Court exercise

18

its inherent power to impose terminating sanctions and dismiss the case.  Upon initial

19

consideration of Defendants' motion, the Court deferred ruling and held a sealed evidentiary

20

hearing on July 29 and July 30, 2009.  Witnesses were sworn and called to testify; documents and

21

other exhibits were offered and received into evidence; and, subject to the filing of post-hearing

22

briefs and closing arguments presented on September 14, 2009, the Court took the matter under

23

submission.  For the reasons stated below, the Court **DENIES** Defendants' motion.

24

/ / /

25

/ / /

26

/ / /

27

/ / /

28

/ / /

04CV1948

1

**BACKGROUND**

2       This securities class action arises out of events related to Defendant REMEC, Inc.'s

3  September 8, 2004 announcement of goodwill impairment and internal control deficiencies, and

4  the sharp decline in the value of REMEC's stock following the announcement.  Plaintiffs are a

5  class of purchasers of REMEC securities between September 8, 2003 and September 8, 2004,

6  charging REMEC with violation of the Securities Exchange Act of 1934.  September 27, 2009 will

7  mark the fifth anniversary of this litigation.  As a result, the case has a lengthy procedural history,

8  the majority of which shall not be detailed here.  The following background information is specific

9  to the matter currently before the Court.

10      On April 13, 2006, Plaintiffs filed an *ex parte* application and supporting declaration of

11  counsel [Doc. Nos. 52-53], seeking leave to file a Fourth Amended Complaint, stating that they

12  had obtained newly discovered evidence in support of their allegations through their ongoing

13  investigative efforts ("including approximately 50,000 pages of internal Company documents that

14  were made available on March 21, 2006 . . . [and] approximately 10,000 more documents [that]

15  were made available to Lead Counsel between April 3 and 7, 2006").  Plaintiffs did not disclose

16  the source of this "newly discovered evidence" in the *ex parte* application.

17      On May 4, 2006, after being granted leave by the Court and without objection from

18  Defendants, Plaintiffs filed their Fourth Amended Complaint ("FAC") [Doc. No. 56], including an

19  additional 76 pages of detailed allegations obtained from "confidential" witnesses not found in the

20  Third Amended Complaint.  The FAC identified confidential "Witness 15" as a "former Remec

21  Director of Base Station Operations," and made reference to several internal e-mails, and other

22  internal company documents and reports, which had been "copied to" or otherwise acquired by

23  "Witness 15" ("Witness 15" was later identified as Lisa Robinson).  On September 25, 2006, the

24  Court denied Defendants' motion to dismiss [Doc. Nos. 57-58] the FAC, based in part upon the

25  Court's determination that the newly discovered evidence provided sufficient support under

26  Federal Rules of Civil Procedure 12(b)(6) and 9(b) for Plaintiffs' allegations of fraud and scienter.

27  Defendants answered the FAC on November 6, 2006 [Doc. No. 67].

28      On March 23, 2007, as part of their Rule 26 initial disclosures, Plaintiffs produced

1   approximately 60,000 pages of internal REMEC documents, most of which consisted of email

2   messages and documents attached thereto.  The majority of those email messages were redacted to

3   conceal their source, but at least one revealed that Lisa Robinson (i.e., confidential "Witness 15")

4   was its source.  Thereafter, as Defendants acknowledge in their moving papers, "review of

5   plaintiffs' production showed that Robinson either sent or received virtually all of the emails

6   included in the production, making Robinson the likely source of the documents produced by

7   Plaintiffs."

8          Following the commencement of discovery in this case, the parties engaged in a number of

9   contentious discovery disputes regarding the newly discovered emails and other internal company

10  documents and reports.  The parties filed a Joint Discovery Status Report on April 25, 2008 [Doc.

11  No. 127].  In that report, Defendants reference the Robinson documents in a footnote (FN2, p. 6),

12  alleging for the first time in the record of the case that Robinson illegally possessed and supplied

13  the documents used by Plaintiffs to support the FAC:

14          [t]hese documents were clearly taken from REMEC in violation of employment
            agreements and company policy. Neither Plaintiffs, nor their counsel, nor the
15          individuals who initially pilfered the documents have any right to them. REMEC
            reserves its rights with respect to these documents.
16

17  Subsequently, Defendants attempted via subpoenas and deposition testimony to prove these

18  allegations.

19         On May 2, 2008, this Court, by counsel for Defendants, issued subpoenas duces tecum to

20  previous employers of Robinson and educational institutions attended by Robinson, requesting

21  records from these entities concerning Robinson's employment and educational background.

22  Pursuant to Federal Rule of Civil Procedure 45(c)(3), Plaintiffs sought an order of the Court

23  quashing and/or modifying the subpoenas, which Magistrate Judge Anthony J. Battaglia granted

24  based on his finding that the material sought in the subject subpoenas was not relevant or

25  reasonably calculated to lead to the discovery of admissible evidence, and even if relevant,

26  implicated Robinson's privacy rights [Doc. No. 55].

27         REMEC deposed Robinson in December 2008.  (*See e.g.*, Doc. Nos. 155 & 269.)

28  Robinson, who has since retained her own attorney, asserted her Fifth Amendment privilege

against self-incrimination over 250 times in response to defense counsel's inquiries regarding her employment at REMEC, her access to confidential and proprietary information during and after her employment, her communications with Plaintiffs' investigators, the manner in which she obtained the internal documents upon which Plaintiffs based their FAC, whether she was paid for the documents, if so, by whom, and other related subjects. Robinson responded to questioning regarding her financial status. Robinson testified that she was heavily in debt and that she declared bankruptcy in February 2008. Robinson also testified that she had gambling losses in 2007 of approximately $228,000, and approximately $100,000 in gambling losses in 2006, even though her annual salary in 2007 was less than $150,000.

Subsequent to the deposition, Defendants issued subpoenas to L.R. Hodges & Associates and Lynne Hodges, investigators hired by counsel for Plaintiffs, Milberg LLP,[1] seeking facts surrounding communications with Robinson and Milberg's receipt of REMEC's internal documents from Robinson. Milberg and L.R. Hodges filed separate objections to the subpoenas, asserting that any communications between Robinson and L.R. Hodges or Milberg qualified as attorney work-product, entitled to protection from discovery by Defendants. Judge Battaglia agreed and issued an order quashing the subpoenas [Doc. No. 269].

In the interim, Defendants filed the motion for sanctions currently before the Court. As the primary basis for their motion, Defendants contend that the subject e-mails and other internal company documents "were stolen or embezzled" from REMEC by Robinson, and that Milberg "may have been complicit" in that theft or embezzlement, and/or that they "intentionally received documents that were stolen or embezzled by Robinson by knowingly or recklessly doing so," which "could very well constitute a violation of California Penal Code section 496(a)." Defendants seek dismissal of the case, requesting that the Court exercise its "inherent equitable authority to prevent abuse, oppression and injustice in the litigation process."

Milberg denies these allegations of misconduct, and contends that there is no basis to

---

[1] Generally, investigators and Plaintiffs' counsel shall be referred to collectively hereafter as "Milberg." The actions of L.R. Hodges & Associates and their investigators may be imputed to Milberg. *See* Model Rules of Prof'l Conduct R. 8.4(a) (2005) ("It is professional misconduct for a lawyer to ... violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or *do so through the acts of another*.") (emphasis added).

dismiss this case or to levy any alternative sanction against them.  Briefly stated, Milberg contends that Robinson voluntarily provided internal company documents that Milberg believed at the time, and still believe, were lawfully obtained by Robinson while in REMEC's employ.  Milberg contends further that at all times they adhered to the applicable standard of care in investigating this case, and they took reasonable precautions to assure that no privileged or confidential documents were received from Robinson.  Milberg asserts that in the absence of evidence establishing their "bad faith," the Court has no power, inherent or otherwise, to impose sanctions based on the facts and circumstances of this case.

The Court found in its initial review that Defendants' motion was based entirely on speculation and allegations of wrongdoing, devoid of evidentiary support.  Based on the seriousness of the accusations, considering the impact they might have on the disposition of the case, the Court ordered the parties to appear for a two-day evidentiary hearing.  The parties submitted exhibits, presented witness testimony, and filed post-hearing briefs.  During a final hearing before the Court on September 14, 2009, counsel for the parties presented closing arguments in support of their respective positions.

**THE EVIDENCE**

In their case in chief**,** Defendants called three witnesses: Karen Rogers, a former attorney/partner at the Milberg firm who worked on this case until her departure from the firm in May 2009; Jeff Westerman, an attorney/partner at the Milberg firm who currently serves as lead counsel on this case; and Ken Keatly, the current Director of Investigations at L.R. Hodges & Associates, who serves as Milberg's investigator on this case.

### 1.    *Testimony of Karen Rogers*

Karen Rogers testified that she was responsible for the day-to-day handling of this case under the general supervision of Jeff Westerman until she left Milberg in May 2009, with the exception of one brief leave of absence from the firm.  As was her practice, Rogers worked closely with the firm's investigator Ken Keatly and generally directed the investigation.  It was routine for the investigator to develop a list of former employees of the target defendant to be contacted, and to be asked whether they had any relevant internal documents they would be willing to turn over.

Rogers learned from Keatly during the course of the investigation that he had been in contact with a former employee named Lisa Robinson, who said that she had copies of internal company documents that she was willing to turn over to them.

As was their custom and practice, Milberg asked Robinson to review the documents prior to turning them over and cull out any confidential or trade secret documents and anything subject to the attorney-client privilege, and then email the remaining documents to Keatly.  Keatly would then email the documents to Milberg, at which time they would be screened by law firm staff members (not the lawyers handling the case) for any legally privileged materials.  After this second screening, the remaining documents were forwarded to the lawyers handling the case. Rogers testified that her usual custom and practice was followed in this case, and that no legally privileged documents were identified in the documents produced by Robinson.  The documentary evidence produced supports Rogers' testimony in this regard.  (*See, e.g.*, Exhibit 57, which generally describes the document review process).

With regard to the existence of a confidentiality agreement between Robinson and REMEC, Rogers testified that it has always been Milberg's custom and practice to advise witnesses that they are not being encouraged to violate any confidentiality agreement, and that they should seek legal advice from their own attorney if they have any concerns along those lines. Rogers recalled Robinson saying that she (Robinson) thought she had signed a confidentiality agreement of some sort when she began her employment with REMEC, but Rogers was not provided a copy of the agreement, and was not told what type of information, etc., it may have covered.  Since she was not acting as Robinson's attorney, Rogers did not believe it to be appropriate to advise Robinson further on that subject.  Rogers believed it was adequate under the circumstances to ask Robinson to perform an initial review and screening of the documents before turning them over to Keatly, and instructed her to remove anything that might violate a confidentiality agreement with her former employer.

While Rogers apparently had little, if any, direct contact with Robinson (other than emails), she testified that it was always her understanding, mainly from what she was told by Keatly, that Robinson had obtained these documents "legally" while employed at REMEC (i.e., she didn't

some how "hack into" the company computer after she left to obtain them), and that she had retained them primarily to protect herself in case she was later accused of misconduct.  It never occurred to her, Rogers testified, that Robinson might have "stolen" the documents, or otherwise obtained them "illegally," since, among other things, she (Rogers) knew that REMEC was out of business at that point, and was in the process of being dissolved, such that any "trade secret" or "competitive advantage" issues were non-existent.

During the evidentiary hearing and when questioning Rogers under oath, defense counsel placed substantial reliance on the fact that Milberg paid a sum of money to Robinson allegedly as a "bribe" or "purchase price" for the "stolen" documents.  Rogers testified that Milberg paid a sum of money ($1500) to Robinson, but testified that it was not payment for the documents – Robinson had offered the documents without requesting any payment – but rather compensation for Robinson's time (10 hours at $150.00 per hour) in conducting the initial review and screening of the documents to eliminate confidential or privileged materials.  The documentary evidence presented on this subject supports Rogers' contention in this regard.  For example, Exhibit 58 is an email from Robinson to Keatly describing her document review activities and indicating that she "may need 6 more hours to finish," which accompanied her initial "Invoice" for $525.00 for "Consulting;" Exhibit 63 is an email from Robinson to Keatly enclosing a second "Invoice" for $975.00 for "Consulting-Email File Recovery" and "Consulting-Files Search and Backup to DVD;" and, Exhibit 95 is the Form 1099-MISC sent by the Milberg to Robinson reflecting total "non-employee compensation" of $1500 paid in 2006.

Defense counsel also questioned Rogers regarding the fact that Milberg had been accused previously in another case, *Carpenters Health & Welfare Fund v. The Coca-Cola Company*, of having "paid for stolen documents," accompanied by the assertion that "[t]he same thing may have happened here."  Disregarding the admissibility of any such evidence, Rogers testified that she did not work on the *Coca-Cola* case, and that to her knowledge none of the attorneys who worked on that case worked on the REMEC case.  Moreover, she disavowed any policy or practice on her part to pay for "stolen documents" in shareholder litigation, and specifically denied any such intent in this case.

1      Rogers testified that the "original" documents, excluding some email transmittals from

2 Robinson to Keatly, provided by Robinson were produced (albeit some in redacted form) to

3 Defendants as part of Plaintiffs' Rule 26 disclosures in March 2007, and that despite a variety of

4 contacts with defense counsel after that date, including several settlement meetings, defense

5 counsel did not allege that the subject documents were "stolen," or that Rogers or Milberg

6 otherwise improperly obtained them.

7      **2.**    ***Testimony of Jeff Westerman***

8      Jeff Westerman confirmed that he is the lead partner in charge of handling this case for

9 Milberg; that Rogers worked on the case under his general supervision; that the document review

10 procedure described by Rogers was implemented in this case at his direction; that no documents

11 produced by Robinson were reviewed by the lawyers handling this case until after they were

12 screened for privileged and/or confidential materials; that, to his knowledge, defense counsel never

13 claimed that the subject documents were "stolen" (or otherwise accused the Milberg firm of

14 misconduct) or asked that any of the documents be returned until the subject sanctions motion was

15 filed on January 21, 2009; and that neither he nor anyone else at Milberg to his knowledge had any

16 information or suspicion that Robinson had "stolen" the subject documents or that she otherwise

17 had any criminal intent in acquiring and producing them.

18      With regard to the *Coca-Cola* case, Westerman testified that the original "Milberg" firm

19 split in May 2004, with the West coast office becoming the "Lerach" firm, and that the *Coca-Cola*

20 case went with the "Lerach firm."  He testified further that neither he, nor Rogers, nor anyone else

21 in his office (i.e., the Los Angeles office of the former "Milberg" firm) ever worked on that case.

22 He testified further that Milberg had denied the allegations made against it in that case, and that

23 the Special Master's Report finding those allegations to be true was never adopted by the court

24 (since the case ultimately settled).  He conceded on cross-examination, however, that L.R. Hodges

25 & Associates was also the investigator hired by Milberg, pre-split, in the *Coca-Cola* case.

26      With regard to the generally recognized ethical obligation to return and not use documents

27 or other evidence inadvertently produced in discovery or otherwise improperly acquired,

28 Westerman professed his own and his firm's agreement with and adherence to that obligation.

Apropos of that obligation, he recalled an incident in this case when he complied with a request from defense counsel that certain inadvertently produced documents be returned and not used. However, he testified that no such request was ever made by defense counsel with respect to the documents produced by Robinson.

### 3.     *Testimony of Ken Keatly*

Ken Keatly testified that he currently serves as the Director of Investigations of L.R. Hodges & Associates, where he has worked for approximately 10 years, and that 85-90% of his work is in securities litigation cases.  He explained how he located and contacted Lisa Robinson through a process of identifying and locating former employees of REMEC.  In that regard, he identified and authenticated his initial March 2, 2006 email exchange with Robinson (Exhibit 44), in which she told him that she has "hundreds if not thousands of emails accumulated in my short time at Remec . . . ," and that "if you decide you need further information, please have your attorneys contact me."  He also identified and authenticated his redacted "Investigation Memorandum" (Exhibit 45) sent to Milberg on March 3, 2006, which describes his initial contacts and interviews with Robinson.  Keatly identified and authenticated several other emails to and from the Milberg office and Robinson describing his on-going contacts with her.

Keatly testified that Robinson told him that she received the subject emails and attachments on her computer during the normal course of her employment at REMEC, not after she left REMEC, and that he had no reason to believe that she had "stolen" them or otherwise improperly acquired them.  Keatly confirmed Rogers' testimony that Robinson was being paid an hourly rate for her time in conducting an initial screening of the documents (i.e., she was not being paid to "steal" the documents, or otherwise being paid for the documents themselves).  When asked by defense counsel how Robinson possibly could have screened or reviewed over 60,000 documents in the 10 hours allegedly allotted for that task, Keatly testified that in reality there were approximately 2200 documents, totaling approximately 60,000 pages, and many of the documents were in the form of Excel spreadsheets.

Keatly also testified that he has conducted many investigations in the course of his employment with L.R. Hodges, and that most of the investigations involved shareholder class

1  action cases similar to this case.  It has been his custom and practice in those cases to do

2  essentially the same types of things he did here, particularly including obtaining documents from

3  former employees with potential evidentiary value to the pending litigation.

### DISCUSSION

5  **1.  *Legal Standard***

6      It is well established that a federal court has inherent power, independent of the Federal

7  Rules of Civil Procedure, such as Rules 11 and 37, and of statutes, such as 28 U.S.C. § 1927, to

8  impose sanctions both to prevent fraud upon the court and to protect the integrity of the judicial

9  process.  *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  Defendants ask the Court to exercise its

10  inherent power to impose terminating sanctions based on Milberg's allegedly unethical conduct.

11  *Chambers*, 501 U.S. at 50.  "A court must, of course, exercise caution in invoking its inherent

12  power, and it must comply with the mandates of due process, both in determining that the requisite

13  bad faith exists and in assessing [sanctions]."  *Id.*  (citing *Roadway Express, Inc. v. Piper*, 447 U.S.

14  752, 767 (1980)).  "Dismissal under a court's inherent powers is justified in extreme

15  circumstances, in response to abusive litigation practices, and to insure the orderly administration

16  of justice and the integrity of the court's orders."  *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380

17  (9th Cir. 1988) (citations omitted).  The effectiveness of lesser sanctions must be considered, such

18  as excluding documents obtained unfairly, which Defendants cite as an alternative to dismissal.

19      As noted by the Court in its June 11, 2009 Order, the Ninth Circuit has set forth a five

20  factor analysis governing a court's inherent power to sanction litigants and counsel.  As stated in

21  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir.1995), these

22  five factors are "(1) the public's interest in expeditious resolution of litigation; (2) the court's need

23  to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy

24  favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

25      As the moving party, Defendants have the burden of proof, and accordingly, were given the

26  opportunity to open and close evidence presented during the evidentiary hearing.  An initial issue

27  arose as to whether the Court was to apply a "clear and convincing evidence" or a "preponderance

28  of the evidence" standard of proof.  As pointed out by defense counsel, it appears that no Ninth

Circuit case has applied a "clear and convincing" standard when imposing sanctions for "bad faith" conduct under the court's inherent powers.  However, the Ninth Circuit does require the trial court to make a "specific finding of bad faith" before issuing sanctions pursuant to its inherent powers.  *See, e.g.*, *United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir. 1986); *Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993).

### 2. *Analysis*

Defendants' argument can be distilled to two key points.  First, Defendants allege that Robinson embezzled the documents she turned over to Milberg from REMEC.  Second, Defendants argue that Milberg knew the documents belonged to REMEC, not Robinson, and therefore Milberg received, reviewed, and used the documents in this litigation in bad faith. Defendants frame their accusations against Milberg, as well as Robinson, in a criminal context.[2] Framing the allegations in this manner places paramount importance on Robinson's actions. Defendants claim that Robinson had a Proprietary Information Agreement ("PIA") with REMEC; Robinson acted as a custodian of the documents during her employment; Robinson committed embezzlement when she kept the documents and used them for her own purposes; and Robinson committed theft when she gave the documents to Milberg.  Defendants argue that Milberg knew all of these facts, and paid Robinson for the documents, thus leading to the ultimate conclusion that Milberg's actions constitute bad faith, so tainting the litigation that Plaintiffs' case must be dismissed.  Working within Defendants' framework, as a threshold matter a preponderance of the evidence must support a finding that Robinson acted unlawfully.  Without sufficient evidence to prove wrongdoing by Robinson, Defendants' most serious allegations against Milberg are a non sequitur.

In considering Defendants' assertions of ethical violations in this matter, the Court is bound by Civil Local Rule 83.4.b, which reads in pertinent part:

---

[2] In California, "receiving stolen property is a serious crime involving moral turpitude."  *In re Waisbren* (1975) 15 Cal.3d 553, 556 (citing *In re Plotner* (1971) 5 Cal.3d 714, 726); *see also In re Conflenti* (1981) 29 Cal.3d 120, 124 (attorney disbarred following conviction for attempt to receive stolen property).  California law provides for summary disbarment of an attorney convicted of a felony offense involving moral turpitude.  Cal. Bus. & Prof. Code, § 6102, subd. (c).  Section 6102 serves as a clear indicator of the seriousness of Defendants' allegations against Milberg.

1
2
3
4
5

> Every member of the bar of this court and any attorney permitted to practice in this court shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California, and decisions of any court applicable thereto, which are hereby adopted as standards of professional conduct of this court. This specification shall not be interpreted to be exhaustive of the standards of professional conduct. In that connection, the Code of Professional Responsibility of the American Bar Association should be noted. No attorney permitted to practice before this court shall engage in any conduct which degrades or impugns the integrity of the court or in any manner interferes with the administration of justice therein.

This rule embodies several principles. First, the Court shall hold attorneys before it to the standards set out by the California Rules of Professional Conduct. Second, in the absence of applicable California standards, the Court may use the Model Code of Professional Responsibility as guidance. Finally, the Court must protect its own integrity and the fair administration of justice.

In order to determine whether these codes of conduct have been violated by Milberg, the Court must step outside the framework used by Defendants, noted above. Although Robinson's actions plainly are significant here, the Court's jurisdiction is over the parties and the attorneys in this case. The Court's inherent power to sanction only extends to these individuals. Therefore, the Court's inquiry is focused on the conduct of Milberg. The Court's ruling hinges on whether Milberg acted unethically at any stage in their dealings with Robinson – not whether Robinson acted illegally.

　　　　i)　　Plaintiffs Did Not Commit An Ethical Violation by Contacting and Communicating with Robinson

The first point at which Milberg could have acted unethically arose when they contacted Robinson through their investigative efforts and communicated with her thereafter. Although this initial contact is not the focus of Defendants' allegations, at various points in the pleadings and during the hearings on this matter Defendants have cast aspersions on Milberg's pre-answer efforts to investigate this case, including the search for individuals with relevant information, witnesses to any alleged wrongdoing, and particularly, former REMEC employees with firsthand knowledge and/or supporting documentation of fraud.

Defendants assert that: "Milberg was [not] merely a passive recipient of REMEC documents from Robinson. By their own admission and the admission of their investigator, the documents were obtained through a diligent, result-oriented investigation. Such conduct is

1    anything but passive and is evidence of their bad faith conduct." (*See* Doc. No. 360 at 22.)

2    During the final hearing on this matter, defense counsel argued that Milberg actively solicited the

3    disclosure of documents containing privileged and/or confidential information from a party-

4    opponent's former employee.  The implication is that Milberg's investigative efforts, including

5    their method of contacting Robinson and communication with her to obtain her cooperation in this

6    litigation, constitute unethical conduct and warrant a finding by the Court of bad faith.

7            Karen Rogers testified regarding this issue during the evidentiary hearing.  When asked by

8    defense counsel about Milberg's investigative methods, Rogers described the interaction between

9    the firm and their investigators at L.R. Hodges:

10       A:    We worked with L.R. Hodges for many years.  They're familiar with sort of the
                process we need to go through and what sorts of things we need to investigate,
11              so – but yes, I would talk to them about the specifics of the case, the facts of
                the case, what we're looking for.  It was routine that they would develop a
12              witness list that would include former employees and lots of other people and
                they would try to contact people.

13       Q:    So one of the goals was to find some former employee that might have some
14              relevant information about REMEC?

15       A:    Yes.  Who was there during the class period and could shed light on the
16              situation.

17       ( . . . )

18       Q:    Whenever you find the witness, you actually interview the witness.  Or not,
                maybe not you, or one of the investigators?

19       A:    One of the investigators would interview.

20       ( . . . )

21       Q:    In the interview, if the person is willing to talk to you, that person would
                provide information about what they know about REMEC and other relevant
22              things, is that right?

23       A:    Sometimes they do, sometimes they don't, yeah.

24       Q:    And that's what happened with Ms. Robinson, is that right?  She was
                interviewed?
25

26       A:    Yes.

27   (*See Transcript of Evidentiary Hearing*, Day One, 48:8-19; 49:16-19; 50:4-10.)

28           Underlying Milberg's investigative methods in this case are the requirements of the Private

Securities and Litigation Reform Act of 1995 ("PSLRA").  The Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."  *In re Silicon Graphics Inc*., 183 F.3d 970, 974 (9th Cir. 1999).  Courts often dismiss plaintiffs' complaints if the allegations rest solely on witness statements and fail to point to any specific documents or data in support of their contentions.  *See, e.g., Lipton v. PathoGenesis Corp*., 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA:); *In Re Silicon Graphics, Inc.*, 183 F.3d 970, 985 (9th Cir. 1999) ("a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability"); *see also, In re Vantive Corp. Secs. Litig*., 283 F.3d 1079, 1087-88 (9th Cir. 2002).  It is within this context that contact and communication with former employees can be vital, as these individuals are more likely to possess relevant information and/or internal documents and data demonstrating wrongdoing by their former employer.

The ethical requirements that bind an attorney in any other situation are equally binding when the attorney engages in *ex parte* contact with an unrepresented former employee of an opposing organizational party to obtain information and documentation in a securities case. *Shearson Lehman Bros., Inc. v. Wasatch Bank*, 139 F.R.D. 412, 418 (D. Utah 1991).  The matter of *ex parte* contacts is regulated by Rule 4.2 of the American Bar Associations Model Rules of Professional Conduct.  Courts that have considered the issue have held that Rule 4.2 does not bar *ex parte* communications with an adversary's former employees who are not themselves represented in the matter.  *See, e.g., Davidson Supply Co. v. P.P.E., Inc.*, 986 F. Supp. 956, 958 (D. Md. 1997); *Hanntz v. Shiley, Inc.*, 766 F. Supp. 258, 263 (D.N.J. 1991): *Tipton v. Sonitrol Sec. Sys*., 958 F. Supp. 447, 451-52 (E.D. Mo. 1996).  Courts adopting this view generally have found that the language of Rule 4.2, which refers to "a party," cannot be reasonably interpreted to include former employees where there is no continuing relationship between the organizational employer and its former employee that would furnish a sufficient legal basis for imputing the

1   former employee's statements to the employer.  *See Aiken v. Bus. & Indus. Health Group. Inc*.,

2   885 F. Supp. 1474, 1476 (D. Kan. 1995) ("The plain meaning of the phrase 'party the lawyer

3   knows to be represented by another lawyer in the matter' means a party to the litigation.  A former

4   employee with no present relationship to the organizational party is not a 'party' as referred to in

5   the rule."); *Hanntz*, 766 F. Supp. at 266 ("Because RPC 4.2 refers only to represented parties and

6   because the purposes of RPC 4.2 would not be served by an interpretation otherwise, it cannot be

7   said that RPC 4.2 applies to former employees who are not parties.").

8         Although *ex parte* contact with former employees is not subject to Rule 4.2, attorneys have

9   a responsibility to refrain from inquiring about privileged matters.  Therefore, an attorney may

10  have *ex parte* contact with an unrepresented former employee of an organizational party, subject to

11  the limitation that the attorney may not inquire into areas subject to the attorney-client privilege or

12  work product doctrine.  *See Palmer v. Pioneer Hotel & Casino*, 19 F. Supp. 2d 1157, 1167 (D.

13  Nev. 1998).

14        Defendants fail to show that Milberg inquired into privileged matters during their

15  communications with Robinson.  Plaintiffs' counsel testified that Milberg took appropriate

16  precautions against disclosure of privileged information by informing Robinson that she would not

17  be asked about areas likely to involve privileged communications, nor would she be asked to

18  produce such documents.  Karen Rogers testified at the evidentiary hearing on this matter:

19        A:      We were taking precautions.  We would not take documents that were of a
20                trade secret sensitive kind of nature, even though the company was basically
                  out of business.  We had told them we didn't want confidential or proprietary
21                information and we didn't want privileged information.  And we set out to
                  explain what we meant by that and asked her to review the documents before
22                she turned them over.  In fact, she wanted to turn all the documents over
                  without even looking at them and we said we would not take them under those
23                circumstances.  We needed her to know what she was giving us and make that
                  first determination that the documents were not confidential, sensitive trade
24                secrets or privileged . . .

25   ( . . . )

26        A:      Okay.  Ms. Robinson's screening, we made it clear we did not want any
                  confidential proprietary sensitive information that might be covered by the
27                confidentiality agreement or privileged information . . .

28   (*See Transcript of Evidentiary Hearing*, Da y One, 75:24-76:11; 80:14-17.)  Defendants presented

1    no evidence to contradict Rogers' representations.

2           Having reviewed the evidence and considered the relevant testimony, the Court finds that

3    Milberg did not commit an ethical violation by finding, contacting, and communicating with

4    Robinson.  The investigative methods used by the firm do not seem unusual or suspect within the

5    context of a securities class action.  Accordingly, the Court turns to the crux of Defendants'

6    allegations and considers whether Milberg acted unethically and with bad faith by taking the

7    documents proffered by Robinson and using them in a pivotal manner in this litigation.

8                  ii)      Plaintiffs Did Not Commit An Ethical Violation by Receiving,

9                           Reviewing, and/or Using REMEC's Internal Documents

10          Defendants accuse Robinson of embezzlement and theft of REMEC's internal documents,

11   and acceptance of payment for those documents from Milberg.  Defendants allege that after

12   Milberg contacted and communicated with Robinson, Milberg took the stolen documents and used

13   them in this litigation despite knowing that: Robinson had a confidentiality agreement with

14   REMEC; the documents in Robinson's possession were REMEC's property; and Robinson kept

15   the documents for her own personal use after her termination from REMEC.  Defendants argue in

16   their briefing that "Milberg's deliberate disregard of REMEC's rights and conscious decision to

17   treat the matter of stolen documents as Robinson's problem is the very definition of bad faith."

18   The Court shall address the propriety of Milberg's handling of the documents in three stages:

19   receipt of the documents, review of their content, and use of the documents in this case.

20                  a)      *Receipt of the Documents*

21          Defendants accuse Milberg of knowingly receiving stolen property.  They frame the

22   allegation in a criminal context, perhaps because it is axiomatic that an attorney's commission of a

23   criminal act to further a client's cause constitutes behavior warranting the most severe sanctions.

24   Defendants argue that Milberg "knew more than enough about the circumstances under which

25   Robinson possessed REMEC's documents and thereafter provided those documents . . . to support

26

27

28

a conviction for receipt of stolen property" in violation of California Penal Code section 496(a).[3] (*See Defendants' Post-Hearing Brief*, 7.)  Defendants further assert that "the testimony of Rogers, Westerman and Keatly that they did not believe that Robinson stole the documents does not absolve them."  (*Id*.)  To lay the foundation for this allegation against Milberg, Defendants endeavored at length in their submissions to the Court and during the evidentiary hearing to show that Robinson unlawfully possessed the documents, making her guilty of embezzlement.

Defendants allege that Robinson breached the Proprietary Information Agreement ("PIA") that she had with REMEC as a condition of her employment.  During the hearings, Defendants relied heavily on the language of the PIA, including the broad definition of proprietary information which includes trade secrets, confidential information, as well as other data and information belonging to REMEC, and the post-termination non-disclosure provision.  Defendants argue that the PIA makes it clear that, at best, Robinson was a custodian of the documents in her possession, not the owner, which under California law renders her susceptible to charges of embezzlement and theft, and implicates REMEC's legal rights with respect to the documents.  On the basis of these allegations, Defendants assert that Milberg violated Rule 4.4 of the American Bar Association's Model Rules of Professional Conduct, which states, in pertinent part: "In representing a client, a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of such a person."

For evidentiary support, Defendants point to Robinson's email correspondence with Keatly in which she offered documents containing proprietary information, stating that the documents contained "emails and spreadsheets related to the Q2 reserve calculation and forecasting that you asked about."  (Exhibit 44.)  Defendants cite Keatly's memorandum to Milberg, in which he states "she said that she had retained 'hundreds if not thousands' of emails from her brief tenure at REMEC, as well as spreadsheets directly related to sales forecasting and reserve calculation issues

---

[3] The Court notes that to the extent Defendants rely on Rule 4.4, subdivision (b) of the American Bar Association Model Rules of Professional Responsibility, the rule is inapplicable on its face.  Its applies to documents that are  "inadvertently" sent to opposing counsel.  Neither party contends that Robinson inadvertently sent the documents to Milberg, or that Milberg inadvertently received them.

that we had discussed during the interview. ( . . . ) During these conversations, she expressed some additional concerns about sharing these materials." (Exhibit 45.) Defendants point out that certain documents attached to her emails were explicitly marked confidential. (*See, e.g.*, Exhibit 47.) Defendants argue that the large volume of documents Robinson kept after her termination, and her willingness to turn those documents over to REMEC's adversary, demonstrate that the she had unlawful intent.

Defendants assert that the same evidence which shows Robinson acted illegally also proves that Milberg knowingly and willingly accepted documents possessed by her as a result of her unlawful conduct. According to Defendants, this decision, together with Milberg's use of the documents in this case, allows the Court to make a specific finding of bad faith. Defendants assert that: Milberg knew the documents were REMEC's property; Milberg knew Robinson did not retain them on behalf of REMEC or as REMEC's agent; Milberg knew REMEC no longer employed Robinson and that she was not in a position to waive any privileges associated with the documents. Defendants argue that Milberg should not have received any of the documents without contacting defense counsel first.

Robinson's actions suggest a certain degree of moral ambiguity; however, the evidence is purely circumstantial, as Defendants concede. Defendants' allegations against Milberg rest solely on this circumstantial evidence as well. Defendants offer no direct evidence of wrongdoing by Robinson, and by extension, Milberg. Robinson indicated her unwillingness to testify at the evidentiary hearing, therefore Defendants did not call her as a witness. Defendants presented no witness testimony confirming Robinson stole the documents from REMEC. During the evidentiary hearing, Rogers testified at length regarding the status of the documents and the extent of Milberg's knowledge regarding Robinson's means of acquisition:

> Q:     And what did you do at the time that you received documents in 2006 to check or make sure that Lisa Robinson was authorized to have possession of tens of thousands of pages of REMEC documents?

(over objection)

> A:     My understanding was that she had documents in her possession that obtained legitimately, lawfully, while she was employed. Some even before she was employed apparently the company sent some documents to her

before she started working there and during her work there, and she obtained some documents in the ordinary course of her work. I understand that she had some of those at home because she worked from home occasionally. It never crossed my mind that she stole anything, embezzled anything, inappropriately took documents in any way. I just, my understanding from Ken and his conversation with her was that these were documents that she lawfully possessed, had with her former employer's consent and I didn't know anything about any document that she had signed since she had returned everything when she left. I don't know whether she did or not. So when the issue of why she would still have the documents after her employment, I understood that she had some concerns about the company's practices while she was employed there and so she had some interactions with the executives there and Mr. Hickman, in particular, one that comes to mind is that he had done a trip overseas and he had asked her to change a report, soften the report. It was sort of CYA if you will. If she wanted to maintain the documents, she was a CPA, an accountant and she was concerned somebody might accuse her later of having done something. She wanted a record to protect herself so she could say that in fact she was told to do this and she [was] doing everything by the book. She had some concerns so she kept them more her own self-protection than any other reason.

( . . . )

Q:    Well part of your answer that you just gave, Ms. Rogers, is that you believed Ms. Robinson lawfully possessed the documents with REMEC's consent. That's what I wrote down when you said it. Did Mr. Keatly tell you that Ms. Robinson had stated that she lawfully possessed documents with REMEC's consent in 2006?

A:    He did not state those words. This is what I had gathered from what he told me about how she got the documents in the normal course of business. There wasn't any suggestion ever that she had stolen the documents or otherwise should not have them just because she was employed by REMEC. She needed these documents either because they were relevant to her work or because other people had given her the documents, asked her to make copies of the documents or whatever. And I don't know. There may have been many more hundreds of thousands of documents she had with her before she left and she didn't take those with her, but this subset I gathered were some things that she either had just left or hadn't returned them . . .

(*Transcript of Evidentiary Hearing*, Day One, 58:3-59:13; 59:22-60:15.)

When questioned by defense counsel during the evidentiary hearing, Ken Keatly testified regarding his understanding of the manner in which Robinson obtained the documents:

Q:    Did she tell you how she actually got documents from REMEC?

A:    It was my understanding through our conversations that she had . . . received these materials in performing the ordinary course of her job duties as a director of base station operations while employed at REMEC.

Q:    Did she tell as [sic] how, when she left REMEC, how she actually stored these

1     documents when she left employment at REMEC in 2004?

2     A:     I don't know if we covered it exactly the way you are phrasing the question.
         My understanding was she would have received these materials, like I say,
3         possibly in the course of her laptop computer, while she working there, but I
         don't know the exact way that she were received by her during her tenure.
4

(*Transcript of Evidentiary Hearing*, Day Two, 65:23-66:12.)  Jeff Westerman testified that his

5

knowledge regarding Robinson's acquisition of the documents consists of what he was told by

6

Keatly.  (*Id.*, 51:18-19.)

7

         Defense counsel Robert Brownlie's testimony supports the conclusion that Defendants

8

proceeded on their suspicions, rather than any direct evidence of Robinson's wrongdoing:

9

10    A:     I had suspicions going back to the Fourth Amended Complaint but those
         suspicions had various levels of strength, if you will, and it wasn't until we
         actually took Ms. Robinson's deposition that I felt comfortable in our ability
11        to at least say, based on what we knew, that a former REMEC employee stole
         documents.
12

13    Q:     Now when was it that you first felt you had a sufficient factual basis to assert
         in a federal court pleading that . . . one or more former REMEC employees had
         stolen company documents? Was it at that time?
14

15    A:     No.

16    Q:     What time then?

17    A:     Well when we answered a Fourth Amended Complaint based on what we knew
         then, which was very little, I felt comfortable we can make an allegation on
18        information and belief that the act of building a case on documents that may
         have been stolen constituted unclean hands and we asserted it as an affirmative
19        defense on information and belief.

20    (*Transcript of Evidentiary Hearing*, Day Two, 138:13-139:6.)  With respect to his beliefs

21    regarding Milberg's conduct in handling the documents, Brownlie testified that Defendants'

22    position was that Milberg's conduct "fell below the standard of care:"

23    Q:     Do you recall making a statement in your supplemental brief that Milberg's
         conduct fell below the standard of care?

24    A:     I think we said something along those lines, yes.

25    Q:     What standard of care were you referring to?

26    A:     I think, in general, the standard of care with respect to working up a case and
         asking the appropriate questions.  I think what we may have said in that respect
27        is that if they didn't ask if Ms. Robinson had a confidentiality agreement or
         some other restrictions, they should have. If they didn't ask Ms. Robinson why
28        she had possession, why she was authorized to possess the documents at the

1

2

3

4

> same time, they should have.  If they received the documents without making any inquiry as to whether or not the documents were at that time lawfully in possession of Ms. Robinson or whether at that time she had authority from the owners of the documents to Milberg, I thought they fell below the standard of care.  I may have said more along those lines in the brief.  The brief speaks for itself.

5   (*Transcript of Evidentiary Hearing*, Day Two, 139:14-140:7.)  Neither Brownlie nor his co-

6   counsel, Noah Katsell, testified to having any direct evidence to demonstrate Robinson unlawfully

7   obtained the documents.  When asked about Milberg's conduct, Brownlie testified only about his

8   view of the appropriate standard of care Milberg should have used when they were offered and

9   made the choice to receive the documents.  Brownlie continued to allege that Milberg received

10  stolen documents in violation of California law during his arguments before the Court, but when

11  testifying under oath, he spoke only of suspicions of Robinson's wrongdoing and with personal

12  disapproval of Milberg's conduct.

13          Based on the record, the Court finds that Defendants have failed to show by a

14  preponderance of the evidence that Robinson stole the documents or otherwise possessed them or

15  converted them in violation of the law.[4]  Even if the Court found the circumstantial evidence

16  sufficient to meet the standard of proof on this motion, and determined that Robinson was in

17  possession of the documents illegally and committed a crime handing them over to Milberg,

18  Defendants fail to present any evidence to show that Milberg knew or should have known that the

19  documents were stolen.  Without an underlying wrong on the part of Robinson, and knowledge

20  thereof on the part of Milberg, there are no grounds for a finding of any unethical conduct by

21  Milberg, much less a specific finding of bad faith, with respect to the receipt of the documents.

22                  b)      *Review of the Documents*

23          Another category of alleged misconduct relates to the handling of the documents by

24  Milberg once received from Robinson.  Defendants assert that Milberg first should have notified

25  defense counsel that they received documents appearing to be REMEC's property.  Defendants

26

27          [4] Additionally, Defendants fail to provide evidence demonstrating that Robinson was bribed

28  or otherwise paid by Milberg for the documents themselves.  Defendants' allegation that Milberg paid off Robinson's gambling debts as part of the alleged bribery is completely baseless and warrants no further discussion by the Court.

argue that Milberg acted unethically by conducting a privilege review of the documents subsequent to Robinson's own review.[5]

Although not binding authority on this Court or California's state courts, the American Bar Association Committee on Ethics' formal opinions regarding various ethical concerns in the practice of law can be instructive.  *See Frye v. Tenderloin Housing Clinic, Inc.* (2006)  38 Cal. 4th 23 (2006) (holding that the ABA rules may be helpful and persuasive in situations where coverage of state disciplinary rules is unclear or inadequate, but the rules are not binding).  Of assistance here is Formal Opinion 94-382, regarding the receipt of privileged or confidential materials, cited with approval by the Ninth Circuit in *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001).  The Committee found that:

> A lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon recognizing the privileged or confidential nature of the materials, either refrain from reviewing such materials or review them only to the extent required to determine how appropriately to proceed; she should notify her adversary's lawyer that she has such materials and should either follow instructions of the adversary's lawyer with respect to the disposition of the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.

*Gomez*, 255 F.3d at 1132 (citing ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 382 (1994)).  The documents at issue in *Gomez* were letters exchanged between counsel and their clients, photocopied by employees of the opposing party at the instruction of opposing counsel. The Court held that the letters "were of the most sensitive kind – the kind that any trial lawyer would recognize as privileged, highly valuable, very confidential, and potentially devastating in the wrong hands."  *Gomez*, 255 F.3d at 1132.

In order to make an initial determination regarding the privileged or confidential status of the documents, Milberg took certain precautions.  Karen Rogers testified during the evidentiary hearing on this subject.

> Q:   Now first of all, did Milberg – was it your understanding that Ms. Robinson, before she sent the documents to Mr. Keatly, did her own review of the documents for privileged confidential information?

---

[5] Although it should be noted that Defendants also allege that Robinson did not perform her own privilege review.

1   A:   Yes.  Absolutely.

2   Q:   Did Milberg set up a procedure for a second review once the documents came
        to Milberg?

3

4   A:   Yes, we did.

    Q:   And did you look at any of the documents before that second privilege review
5        was completed?

6   A:   No.  I did not.

7   Q:   To your knowledge, did any other Milberg attorneys look at them before the
        second privilege review was completed?

8

9   A:   No.  No Milberg attorneys who were working on the REMEC matter reviewed
        them.

10  (*Transcript of Evidentiary Hearing*, Day One, 120:17-121:6.)  Defense counsel questioned Jeff

11  Westerman regarding specific documents, inquiring whether in his opinion the documents were

12  privileged or confidential.  Westerman testified that the documents were reviewed and were

13  determined not to be privileged or confidential.  Defendants did not present any evidence to

14  contradict the testimony of Rogers and Westerman.  Rather, defense counsel Noah Katsell testified

15  that Defendants did not identify as privileged or confidential any particular document of the

16  approximately 2200 documents turned over by Robinson.

17  Q:   What you are saying of the 81 emails that had counsel Mr. Wilkins or Mr.
        Sackett's name on those, of the 81, you were telling the Court that several of
18       those 81 were in your view, arguably privileged, correct?

19  A:   That's what it says.

20  Q:   Right.  And in "several," does that mean two, three, and four?

21  A:   I don't remember the number specifically.

22  Q:   Well at this point in time, when you wrote this declaration and noted that
        several of these emails were as you use the term arguably privileged, did you
23       make a listing anywhere of those several emails and what they were?

24  A:   I did not.

25  Q:   And you, as I understand it, with respect to those several emails that were
        arguably privileged, am I correct you did not itemize those and provide a list
26       to Milberg and ask Milberg to return those documents to DLA, correct?

27  A:   That's correct.

28  Q:   And the attorney/client privilege, do you remember of the several emails which

were attorney/client and which were attorney work product?

A:   I don't have a memory.

Q:   And the privilege that was being discussed here, privileged as attorney/client communications, that was REMEC's privilege.  That's what you were talking about, is that correct?

A:   Correct.

(*Transcript of Evidentiary Hearing,* Day Two, 162:11-163:13.)

"'The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, as well as an attorney's advice in response to such disclosures.'" *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992) (citations omitted).  The privilege is limited to "'only those disclosures – necessary to obtain informed legal advice – which might not have been made absent the privilege.'" *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).  As the party asserting the attorney-client privilege, Defendants have the burden of proving that the documents provided by Robinson are indeed privileged.  *Id*; *see also United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).  To meet his burden, Defendants must show that the documents adhere to the essential elements of the attorney-client privilege on a document-by-document basis.  Neither Katsell nor anyone else from the defense identified any particular document as protected by the attorney-client privilege.  Katsell's declaration in support of Defendants' motion, referenced above, essentially amounts to Katsell's speculation regarding the privileged nature of the documents provided by Robinson.

With respect to confidentiality, Defendants point to specific documents marked by REMEC as confidential at the time of their creation and exchange during Robinson's term of employment in 2004.  However, in 2006, when Robinson and Milberg conducted their separate reviews, confidentiality could no longer be ascertained by the markings on those documents; at that point, not only was it necessary for the reviewer to determine whether the documents ever were treated as confidential, having been marked as such, but also whether the documents remained confidential subsequent to the dissolution of REMEC, the sales of assets to other companies, the historical nature of financial data, and other variables.  *See, e.g., United States v. Shiah*, 2008 U.S. Dist. LEXIS 11973 (C.D. Cal. Feb. 19, 2008) (noting that the value of

information contained in documents marked as "confidential" is time-sensitive, being less likely to qualify as confidential with the passing of time).

Defendants fail to demonstrate that the documents were subject to the attorney-client privilege, and did not present any direct testimony to support their assertion that the documents contained information protected by the language of the PIA between Robinson and REMEC. Under the applicable ethical standards, Milberg is not guilty of acting in bad faith by conducting a multi-stage review of documents deemed unprivileged and non-confidential by Robinson without a preponderance of the evidence demonstrating otherwise.

    c)  *Use of the Documents*

The culmination of the motion before the Court is Milberg's allegedly unethical use of the documents obtained from Robinson in this litigation. Defendants argue that Milberg acted in bad faith by using the documents to support a fourth amended complaint with the knowledge that Robinson embezzled the documents from REMEC. Having insufficient evidentiary support for their allegations of criminal and unethical behavior, Defendants likewise cannot demonstrate that Milberg acted in bad faith by using the documents obtained from Robinson to support their clients' case.

<u>CONCLUSION</u>

Based on the foregoing, the Court **DENIES** Defendants' motion for sanctions.

**IT IS SO ORDERED**.

DATED:  September 25, 2009

                   Hon. Michael M. Anello
                   United States District Judge

04CV1948