1    ROBERT W. BROWNLIE (Bar No. 138793)
        GERARD A. TRIPPITELLI (Bar. No. 235788)
2    NOAH A. KATSELL (Bar No. 217090)
        **DLA PIPER LLP (US)**
3    401 B Street, Suite 1700
        San Diego, CA  92101-4297
4    Tel:  619.699.2700
        Fax: 619.699.2701
5

6    Attorneys for Defendants REMEC, INC., RONALD
        E. RAGLAND, WINSTON E. HICKMAN
7

8                  UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

| 11 IN RE: | CASE NO. 04 CV 1948 MMA (AJB) |
|---|---|
| 12 REMEC INCORPORATED SECURITIES LITIGATION | **DEFENDANTS REMEC, INC., RONALD E. RAGLAND, AND WINSTON E. HICKMAN'S NOTICE OF CROSS-APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT** |
| 13 This Document Relates to: | |
| 14 | |
| 15 ALL ACTIONS | |
| 16 | |
| 17 | |

18

19

20

21

22

23

24

25

26

27

28

ORIGINAL

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

2       PLEASE TAKE NOTICE THAT Defendants REMEC, Inc., Ronald E. Ragland, and

3   Winston E. Hickman (collectively "Defendants") cross-appeal to the United States Court of

4   Appeals for the Ninth Circuit from the Order Denying Defendants' Motion for Sanctions, dated

5   September 25, 2009.  A true and correct copy of this Order is attached hereto as Exhibit A.

6   Dated:  June 1, 2010                          DLA PIPER LLP (US)

7

8                                                 _____

9                                                 ROBERT W. BROWNLIE
                                                  Attorney for Defendants
10                                                REMEC, INC., RONALD E. RAGLAND and
                                                  WINSTON E. HICKMAN
11                                                E-mail: robert.brownlie@dlapiper.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

1

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  IN RE: REMEC INCORPORATED           CASE NO. 04-CV-1948-MMA (AJB)
    SECURITIES LITIGATION
12                                       **ORDER DENYING DEFENDANTS'**
                                         **MOTION FOR SANCTIONS**
13  This Document Relates to all Actions.
                                         [Doc. No. 240]
14

15       This matter comes before the Court on Defendants REMEC, Inc., Ronald E. Ragland, and

16  Winston E. Hickman's motion for sanctions based on allegations of serious misconduct against

17  Plaintiffs' counsel in this securities fraud class action.  Defendants request that the Court exercise

18  its inherent power to impose terminating sanctions and dismiss the case.  Upon initial

19  consideration of Defendants' motion, the Court deferred ruling and held a sealed evidentiary

20  hearing on July 29 and July 30, 2009.  Witnesses were sworn and called to testify; documents and

21  other exhibits were offered and received into evidence; and, subject to the filing of post-hearing

22  briefs and closing arguments presented on September 14, 2009, the Court took the matter under

23  submission.  For the reasons stated below, the Court **DENIES** Defendants' motion.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**BACKGROUND**

1

2     This securities class action arises out of events related to Defendant REMEC, Inc.'s

3  September 8, 2004 announcement of goodwill impairment and internal control deficiencies, and

4  the sharp decline in the value of REMEC's stock following the announcement.  Plaintiffs are a

5  class of purchasers of REMEC securities between September 8, 2003 and September 8, 2004,

6  charging REMEC with violation of the Securities Exchange Act of 1934.  September 27, 2009 will

7  mark the fifth anniversary of this litigation.  As a result, the case has a lengthy procedural history,

8  the majority of which shall not be detailed here.  The following background information is specific

9  to the matter currently before the Court.

10     On April 13, 2006, Plaintiffs filed an *ex parte* application and supporting declaration of

11  counsel [Doc. Nos. 52-53], seeking leave to file a Fourth Amended Complaint, stating that they

12  had obtained newly discovered evidence in support of their allegations through their ongoing

13  investigative efforts ("including approximately 50,000 pages of internal Company documents that

14  were made available on March 21, 2006 . . . [and] approximately 10,000 more documents [that]

15  were made available to Lead Counsel between April 3 and 7, 2006").  Plaintiffs did not disclose

16  the source of this "newly discovered evidence" in the *ex parte* application.

17     On May 4, 2006, after being granted leave by the Court and without objection from

18  Defendants, Plaintiffs filed their Fourth Amended Complaint ("FAC") [Doc. No. 56], including an

19  additional 76 pages of detailed allegations obtained from "confidential" witnesses not found in the

20  Third Amended Complaint.  The FAC identified confidential "Witness 15" as a "former Remec

21  Director of Base Station Operations," and made reference to several internal e-mails, and other

22  internal company documents and reports, which had been "copied to" or otherwise acquired by

23  "Witness 15" ("Witness 15" was later identified as Lisa Robinson).  On September 25, 2006, the

24  Court denied Defendants' motion to dismiss [Doc. Nos. 57-58] the FAC, based in part upon the

25  Court's determination that the newly discovered evidence provided sufficient support under

26  Federal Rules of Civil Procedure 12(b)(6) and 9(b) for Plaintiffs' allegations of fraud and scienter.

27  Defendants answered the FAC on November 6, 2006 [Doc. No. 67].

28     . On March 23, 2007, as part of their Rule 26 initial disclosures, Plaintiffs produced

1   approximately 60,000 pages of internal REMEC documents, most of which consisted of email

2   messages and documents attached thereto. The majority of those email messages were redacted to

3   conceal their source, but at least one revealed that Lisa Robinson (i.e., confidential "Witness 15")

4   was its source. Thereafter, as Defendants acknowledge in their moving papers, "review of

5   plaintiffs' production showed that Robinson either sent or received virtually all of the emails

6   included in the production, making Robinson the likely source of the documents produced by

7   Plaintiffs."

8          Following the commencement of discovery in this case, the parties engaged in a number of

9   contentious discovery disputes regarding the newly discovered emails and other internal company

10  documents and reports. The parties filed a Joint Discovery Status Report on April 25, 2008 [Doc.

11  No. 127]. In that report, Defendants reference the Robinson documents in a footnote (FN2, p. 6),

12  alleging for the first time in the record of the case that Robinson illegally possessed and supplied

13  the documents used by Plaintiffs to support the FAC:

14          [t]hese documents were clearly taken from REMEC in violation of employment
            agreements and company policy. Neither Plaintiffs, nor their counsel, nor the
15          individuals who initially pilfered the documents have any right to them. REMEC
            reserves its rights with respect to these documents.
16

17  Subsequently, Defendants attempted via subpoenas and deposition testimony to prove these

18  allegations.

19         On May 2, 2008, this Court, by counsel for Defendants, issued subpoenas duces tecum to

20  previous employers of Robinson and educational institutions attended by Robinson, requesting

21  records from these entities concerning Robinson's employment and educational background.

22  Pursuant to Federal Rule of Civil Procedure 45(c)(3), Plaintiffs sought an order of the Court

23  quashing and/or modifying the subpoenas, which Magistrate Judge Anthony J. Battaglia granted

24  based on his finding that the material sought in the subject subpoenas was not relevant or

25  reasonably calculated to lead to the discovery of admissible evidence, and even if relevant,

26  implicated Robinson's privacy rights [Doc. No. 55].

27         REMEC deposed Robinson in December 2008. (See e.g., Doc. Nos. 155 & 269.)

28  Robinson, who has since retained her own attorney, asserted her Fifth Amendment privilege

04CV1948

1   against self-incrimination over 250 times in response to defense counsel's inquiries regarding her

2   employment at REMEC, her access to confidential and proprietary information during and after

3   her employment, her communications with Plaintiffs' investigators, the manner in which she

4   obtained the internal documents upon which Plaintiffs based their FAC, whether she was paid for

5   the documents, if so, by whom, and other related subjects.  Robinson responded to questioning

6   regarding her financial status.  Robinson testified that she was heavily in debt and that she

7   declared bankruptcy in February 2008.  Robinson also testified that she had gambling losses in

8   2007 of approximately $228,000, and approximately $100,000 in gambling losses in 2006, even

9   though her annual salary in 2007 was less than $150,000.

10          Subsequent to the deposition, Defendants issued subpoenas to L.R. Hodges & Associates

11   and Lynne Hodges, investigators hired by counsel for Plaintiffs, Milberg LLP,[1] seeking facts

12   surrounding communications with Robinson and Milberg's receipt of REMEC's internal

13   documents from Robinson.  Milberg and L.R. Hodges filed separate objections to the subpoenas,

14   asserting that any communications between Robinson and L.R. Hodges or Milberg qualified as

15   attorney work-product, entitled to protection from discovery by Defendants.  Judge Battaglia

16   agreed and issued an order quashing the subpoenas [Doc. No. 269].

17          In the interim, Defendants filed the motion for sanctions currently before the Court.  As the

18   primary basis for their motion, Defendants contend that the subject e-mails and other internal

19   company documents "were stolen or embezzled" from REMEC by Robinson, and that Milberg

20   "may have been complicit" in that theft or embezzlement, and/or that they "intentionally received

21   documents that were stolen or embezzled by Robinson by knowingly or recklessly doing so,"

22   which "could very well constitute a violation of California Penal Code section 496(a)."

23   Defendants seek dismissal of the case, requesting that the Court exercise its "inherent equitable

24   authority to prevent abuse, oppression and injustice in the litigation process."

25          Milberg denies these allegations of misconduct, and contends that there is no basis to

26

27   _____

[1] Generally, investigators and Plaintiffs' counsel shall be referred to collectively hereafter as
"Milberg."  The actions of L.R. Hodges & Associates and their investigators may be imputed to
Milberg.  *See* Model Rules of Prof'l Conduct R. 8.4(a) (2005) ("It is professional misconduct for a

28   lawyer to ... violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce
another to do so, or *do so through the acts of another*.") (emphasis added).

1  dismiss this case or to levy any alternative sanction against them.  Briefly stated, Milberg contends

2  that Robinson voluntarily provided internal company documents that Milberg believed at the time,

3  and still believe, were lawfully obtained by Robinson while in REMEC's employ.  Milberg

4  contends further that at all times they adhered to the applicable standard of care in investigating

5  this case, and they took reasonable precautions to assure that no privileged or confidential

6  documents were received from Robinson.  Milberg asserts that in the absence of evidence

7  establishing their "bad faith," the Court has no power, inherent or otherwise, to impose sanctions

8  based on the facts and circumstances of this case.

9       The Court found in its initial review that Defendants' motion was based entirely on

10  speculation and allegations of wrongdoing, devoid of evidentiary support.  Based on the

11  seriousness of the accusations, considering the impact they might have on the disposition of the

12  case, the Court ordered the parties to appear for a two-day evidentiary hearing.  The parties

13  submitted exhibits, presented witness testimony, and filed post-hearing briefs.  During a final

14  hearing before the Court on September 14, 2009, counsel for the parties presented closing

15  arguments in support of their respective positions.

16                                          **THE EVIDENCE**

17       In their case in chief, Defendants called three witnesses: Karen Rogers, a former

18  attorney/partner at the Milberg firm who worked on this case until her departure from the firm in

19  May 2009; Jeff Westerman, an attorney/partner at the Milberg firm who currently serves as lead

20  counsel on this case; and Ken Keatly, the current Director of Investigations at L.R. Hodges &

21  Associates, who serves as Milberg's investigator on this case.

22       *1.    Testimony of Karen Rogers*

23       Karen Rogers testified that she was responsible for the day-to-day handling of this case

24  under the general supervision of Jeff Westerman until she left Milberg in May 2009, with the

25  exception of one brief leave of absence from the firm.  As was her practice, Rogers worked closely

26  with the firm's investigator Ken Keatly and generally directed the investigation.  It was routine for

27  the investigator to develop a list of former employees of the target defendant to be contacted, and

28  to be asked whether they had any relevant internal documents they would be willing to turn over.

1   Rogers learned from Keatly during the course of the investigation that he had been in contact with

2   a former employee named Lisa Robinson, who said that she had copies of internal company

3   documents that she was willing to turn over to them.

4       As was their custom and practice, Milberg asked Robinson to review the documents prior

5   to turning them over and cull out any confidential or trade secret documents and anything subject

6   to the attorney-client privilege, and then email the remaining documents to Keatly. Keatly would

7   then email the documents to Milberg, at which time they would be screened by law firm staff

8   members (not the lawyers handling the case) for any legally privileged materials. After this

9   second screening, the remaining documents were forwarded to the lawyers handling the case.

10   Rogers testified that her usual custom and practice was followed in this case, and that no legally

11   privileged documents were identified in the documents produced by Robinson. The documentary

12   evidence produced supports Rogers' testimony in this regard. (*See, e.g.*, Exhibit 57, which

13   generally describes the document review process).

14       With regard to the existence of a confidentiality agreement between Robinson and

15   REMEC, Rogers testified that it has always been Milberg's custom and practice to advise

16   witnesses that they are not being encouraged to violate any confidentiality agreement, and that

17   they should seek legal advice from their own attorney if they have any concerns along those lines.

18   Rogers recalled Robinson saying that she (Robinson) thought she had signed a confidentiality

19   agreement of some sort when she began her employment with REMEC, but Rogers was not

20   provided a copy of the agreement, and was not told what type of information, etc., it may have

21   covered. Since she was not acting as Robinson's attorney, Rogers did not believe it to be

22   appropriate to advise Robinson further on that subject. Rogers believed it was adequate under the

23   circumstances to ask Robinson to perform an initial review and screening of the documents before

24   turning them over to Keatly, and instructed her to remove anything that might violate a

25   confidentiality agreement with her former employer.

26       While Rogers apparently had little, if any, direct contact with Robinson (other than emails),

27   she testified that it was always her understanding, mainly from what she was told by Keatly, that

28   Robinson had obtained these documents "legally" while employed at REMEC (i.e., she didn't

1  some how "hack into" the company computer after she left to obtain them), and that she had

2  retained them primarily to protect herself in case she was later accused of misconduct.  It never

3  occurred to her, Rogers testified, that Robinson might have "stolen" the documents, or otherwise

4  obtained them "illegally," since, among other things, she (Rogers) knew that REMEC was out of

5  business at that point, and was in the process of being dissolved, such that any "trade secret" or

6  "competitive advantage" issues were non-existent.

7          During the evidentiary hearing and when questioning Rogers under oath, defense counsel

8  placed substantial reliance on the fact that Milberg paid a sum of money to Robinson allegedly as

9  a "bribe" or "purchase price" for the "stolen" documents.  Rogers testified that Milberg paid a sum

10  of money ($1500) to Robinson, but testified that it was not payment for the documents – Robinson

11  had offered the documents without requesting any payment – but rather compensation for

12  Robinson's time (10 hours at $150.00 per hour) in conducting the initial review and screening of

13  the documents to eliminate confidential or privileged materials.  The documentary evidence

14  presented on this subject supports Rogers' contention in this regard.  For example, Exhibit 58 is an

15  email from Robinson to Keatly describing her document review activities and indicating that she

16  "may need 6 more hours to finish," which accompanied her initial "Invoice" for $525.00 for

17  "Consulting;" Exhibit 63 is an email from Robinson to Keatly enclosing a second "Invoice" for

18  $975.00 for "Consulting-Email File Recovery" and "Consulting-Files Search and Backup to

19  DVD;" and, Exhibit 95 is the Form 1099-MISC sent by the Milberg to Robinson reflecting total

20  "non-employee compensation" of $1500 paid in 2006.

21          Defense counsel also questioned Rogers regarding the fact that Milberg had been accused

22  previously in another case, *Carpenters Health & Welfare Fund v. The Coca-Cola Company*, of

23  having "paid for stolen documents," accompanied by the assertion that "[t]he same thing may have

24  happened here."  Disregarding the admissibility of any such evidence, Rogers testified that she did

25  not work on the *Coca-Cola* case, and that to her knowledge none of the attorneys who worked on

26  that case worked on the REMEC case.  Moreover, she disavowed any policy or practice on her

27  part to pay for "stolen documents" in shareholder litigation, and specifically denied any such intent

28  in this case.

1    Rogers testified that the "original" documents, excluding some email transmittals from

2  Robinson to Keatly, provided by Robinson were produced (albeit some in redacted form) to

3  Defendants as part of Plaintiffs' Rule 26 disclosures in March 2007, and that despite a variety of

4  contacts with defense counsel after that date, including several settlement meetings, defense

5  counsel did not allege that the subject documents were "stolen," or that Rogers or Milberg

6  otherwise improperly obtained them.

7    ## 2.    *Testimony of Jeff Westerman*

8    Jeff Westerman confirmed that he is the lead partner in charge of handling this case for

9  Milberg; that Rogers worked on the case under his general supervision; that the document review

10  procedure described by Rogers was implemented in this case at his direction; that no documents

11  produced by Robinson were reviewed by the lawyers handling this case until after they were

12  screened for privileged and/or confidential materials; that, to his knowledge, defense counsel never

13  claimed that the subject documents were "stolen" (or otherwise accused the Milberg firm of

14  misconduct) or asked that any of the documents be returned until the subject sanctions motion was

15  filed on January 21, 2009; and that neither he nor anyone else at Milberg to his knowledge had any

16  information or suspicion that Robinson had "stolen" the subject documents or that she otherwise

17  had any criminal intent in acquiring and producing them.

18    With regard to the *Coca-Cola* case, Westerman testified that the original "Milberg" firm

19  split in May 2004, with the West coast office becoming the "Lerach" firm, and that the *Coca-Cola*

20  case went with the "Lerach firm." He testified further that neither he, nor Rogers, nor anyone else

21  in his office (i.e., the Los Angeles office of the former "Milberg" firm) ever worked on that case.

22  He testified further that Milberg had denied the allegations made against it in that case, and that

23  the Special Master's Report finding those allegations to be true was never adopted by the court

24  (since the case ultimately settled). He conceded on cross-examination, however, that L.R. Hodges

25  & Associates was also the investigator hired by Milberg, pre-split, in the *Coca-Cola* case.

26    With regard to the generally recognized ethical obligation to return and not use documents

27  or other evidence inadvertently produced in discovery or otherwise improperly acquired,

28  Westerman professed his own and his firm's agreement with and adherence to that obligation.

1   Apropos of that obligation, he recalled an incident in this case when he complied with a request

2   from defense counsel that certain inadvertently produced documents be returned and not used.

3   However, he testified that no such request was ever made by defense counsel with respect to the

4   documents produced by Robinson.

5       **3.     *Testimony of Ken Keatly***

6       Ken Keatly testified that he currently serves as the Director of Investigations of L.R.

7   Hodges & Associates, where he has worked for approximately 10 years, and that 85-90% of his

8   work is in securities litigation cases. He explained how he located and contacted Lisa Robinson

9   through a process of identifying and locating former employees of REMEC. In that regard, he

10  identified and authenticated his initial March 2, 2006 email exchange with Robinson (Exhibit 44),

11  in which she told him that she has "hundreds if not thousands of emails accumulated in my short

12  time at Remec . . . ," and that "if you decide you need further information, please have your

13  attorneys contact me." He also identified and authenticated his redacted "Investigation

14  Memorandum" (Exhibit 45) sent to Milberg on March 3, 2006, which describes his initial contacts

15  and interviews with Robinson. Keatly identified and authenticated several other emails to and

16  from the Milberg office and Robinson describing his on-going contacts with her.

17      Keatly testified that Robinson told him that she received the subject emails and

18  attachments on her computer during the normal course of her employment at REMEC, not after

19  she left REMEC, and that he had no reason to believe that she had "stolen" them or otherwise

20  improperly acquired them. Keatly confirmed Rogers' testimony that Robinson was being paid an

21  hourly rate for her time in conducting an initial screening of the documents (i.e., she was not being

22  paid to "steal" the documents, or otherwise being paid for the documents themselves). When

23  asked by defense counsel how Robinson possibly could have screened or reviewed over 60,000

24  documents in the 10 hours allegedly allotted for that task, Keatly testified that in reality there were

25  approximately 2200 documents, totaling approximately 60,000 pages, and many of the documents

26  were in the form of Excel spreadsheets.

27      Keatly also testified that he has conducted many investigations in the course of his

28  employment with L.R. Hodges, and that most of the investigations involved shareholder class

1  action cases similar to this case. It has been his custom and practice in those cases to do

2  essentially the same types of things he did here, particularly including obtaining documents from

3  former employees with potential evidentiary value to the pending litigation.

**DISCUSSION**

4

5  *1.    Legal Standard*

6          It is well established that a federal court has inherent power, independent of the Federal

7  Rules of Civil Procedure, such as Rules 11 and 37, and of statutes, such as 28 U.S.C. § 1927, to

8  impose sanctions both to prevent fraud upon the court and to protect the integrity of the judicial

9  process. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). Defendants ask the Court to exercise its

10  inherent power to impose terminating sanctions based on Milberg's allegedly unethical conduct.

11  *Chambers*, 501 U.S. at 50. "A court must, of course, exercise caution in invoking its inherent

12  power, and it must comply with the mandates of due process, both in determining that the requisite

13  bad faith exists and in assessing [sanctions]." *Id.* (citing *Roadway Express, Inc. v. Piper*, 447 U.S.

14  752, 767 (1980)). "Dismissal under a court's inherent powers is justified in extreme

15  circumstances, in response to abusive litigation practices, and to insure the orderly administration

16  of justice and the integrity of the court's orders." *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380

17  (9th Cir. 1988) (citations omitted). The effectiveness of lesser sanctions must be considered, such

18  as excluding documents obtained unfairly, which Defendants cite as an alternative to dismissal.

19          As noted by the Court in its June 11, 2009 Order, the Ninth Circuit has set forth a five

20  factor analysis governing a court's inherent power to sanction litigants and counsel. As stated in

21  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir.1995), these

22  five factors are "(1) the public's interest in expeditious resolution of litigation; (2) the court's need

23  to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy

24  favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

25          As the moving party, Defendants have the burden of proof, and accordingly, were given the

26  opportunity to open and close evidence presented during the evidentiary hearing. An initial issue

27  arose as to whether the Court was to apply a "clear and convincing evidence" or a "preponderance

28  of the evidence" standard of proof. As pointed out by defense counsel, it appears that no Ninth

1  Circuit case has applied a "clear and convincing" standard when imposing sanctions for "bad

2  faith" conduct under the court's inherent powers.  However, the Ninth Circuit does require the trial

3  court to make a "specific finding of bad faith" before issuing sanctions pursuant to its inherent

4  powers.  *See, e.g., United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir. 1986); *Yagman v.*

5  *Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993).

6       **2.    *Analysis***

7       Defendants' argument can be distilled to two key points.  First, Defendants allege that

8  Robinson embezzled the documents she turned over to Milberg from REMEC.  Second,

9  Defendants argue that Milberg knew the documents belonged to REMEC, not Robinson, and

10  therefore Milberg received, reviewed, and used the documents in this litigation in bad faith.

11  Defendants frame their accusations against Milberg, as well as Robinson, in a criminal context.[2]

12  Framing the allegations in this manner places paramount importance on Robinson's actions.

13  Defendants claim that Robinson had a Proprietary Information Agreement ("PIA") with REMEC;

14  Robinson acted as a custodian of the documents during her employment; Robinson committed

15  embezzlement when she kept the documents and used them for her own purposes; and Robinson

16  committed theft when she gave the documents to Milberg.  Defendants argue that Milberg knew

17  all of these facts, and paid Robinson for the documents, thus leading to the ultimate conclusion

18  that Milberg's actions constitute bad faith, so tainting the litigation that Plaintiffs' case must be

19  dismissed.  Working within Defendants' framework, as a threshold matter a preponderance of the

20  evidence must support a finding that Robinson acted unlawfully.  Without sufficient evidence to

21  prove wrongdoing by Robinson, Defendants' most serious allegations against Milberg are a non

22  sequitur.

23       In considering Defendants' assertions of ethical violations in this matter, the Court is

24  bound by Civil Local Rule 83.4.b, which reads in pertinent part:

25  _____

26  [2] In California, "receiving stolen property is a serious crime involving moral turpitude." *In re
   Waisbren* (1975) 15 Cal.3d 553, 556 (citing *In re Plotner* (1971) 5 Cal.3d 714, 726); *see also In re*
27  *Conflenti* (1981) 29 Cal.3d 120, 124 (attorney disbarred following conviction for attempt to receive
   stolen property). California law provides for summary disbarment of an attorney convicted of a felony
28  offense involving moral turpitude.  Cal. Bus. & Prof. Code, § 6102, subd. (c).  Section 6102 serves
   as a clear indicator of the seriousness of Defendants' allegations against Milberg.

1         Every member of the bar of this court and any attorney permitted to practice in this
court shall be familiar with and comply with the standards of professional conduct
2         required of members of the State Bar of California, and decisions of any court
applicable thereto, which are hereby adopted as standards of professional conduct of
3         this court. This specification shall not be interpreted to be exhaustive of the standards
of professional conduct. In that connection, the Code of Professional Responsibility
4         of the American Bar Association should be noted. No attorney permitted to practice
before this court shall engage in any conduct which degrades or impugns the integrity
5         of the court or in any manner interferes with the administration of justice therein.

6   This rule embodies several principles. First, the Court shall hold attorneys before it to the

7   standards set out by the California Rules of Professional Conduct. Second, in the absence of

8   applicable California standards, the Court may use the Model Code of Professional Responsibility

9   as guidance. Finally, the Court must protect its own integrity and the fair administration of justice.

10         In order to determine whether these codes of conduct have been violated by Milberg, the

11   Court must step outside the framework used by Defendants, noted above. Although Robinson's

12   actions plainly are significant here, the Court's jurisdiction is over the parties and the attorneys in

13   this case. The Court's inherent power to sanction only extends to these individuals. Therefore, the

14   Court's inquiry is focused on the conduct of Milberg. The Court's ruling hinges on whether

15   Milberg acted unethically at any stage in their dealings with Robinson – not whether Robinson

16   acted illegally.

17        i)      <u>Plaintiffs Did Not Commit An Ethical Violation by Contacting and</u>

18                 <u>Communicating with Robinson</u>

19         The first point at which Milberg could have acted unethically arose when they contacted

20   Robinson through their investigative efforts and communicated with her thereafter. Although this

21   initial contact is not the focus of Defendants' allegations, at various points in the pleadings and

22   during the hearings on this matter Defendants have cast aspersions on Milberg's pre-answer efforts

23   to investigate this case, including the search for individuals with relevant information, witnesses to

24   any alleged wrongdoing, and particularly, former REMEC employees with firsthand knowledge

25   and/or supporting documentation of fraud.

26         Defendants assert that: "Milberg was [not] merely a passive recipient of REMEC

27   documents from Robinson. By their own admission and the admission of their investigator, the

28   documents were obtained through a diligent, result-oriented investigation. Such conduct is

04CV1948

1  anything but passive and is evidence of their bad faith conduct." (*See* Doc. No. 360 at 22.)

2  During the final hearing on this matter, defense counsel argued that Milberg actively solicited the

3  disclosure of documents containing privileged and/or confidential information from a party-

4  opponent's former employee.  The implication is that Milberg's investigative efforts, including

5  their method of contacting Robinson and communication with her to obtain her cooperation in this

6  litigation, constitute unethical conduct and warrant a finding by the Court of bad faith.

7        Karen Rogers testified regarding this issue during the evidentiary hearing.  When asked by

8  defense counsel about Milberg's investigative methods, Rogers described the interaction between

9  the firm and their investigators at L.R. Hodges:

| | |
|---|---|
| A: | We worked with L.R. Hodges for many years. They're familiar with sort of the process we need to go through and what sorts of things we need to investigate, so – but yes, I would talk to them about the specifics of the case, the facts of the case, what we're looking for.  It was routine that they would develop a witness list that would include former employees and lots of other people and they would try to contact people. |
| Q: | So one of the goals was to find some former employee that might have some relevant information about REMEC? |
| A: | Yes.  Who was there during the class period and could shed light on the situation. |
| ( . . . ) | |
| Q: | Whenever you find the witness, you actually interview the witness.  Or not, maybe not you, or one of the investigators? |
| A: | One of the investigators would interview. |
| ( . . . ) | |
| Q: | In the interview, if the person is willing to talk to you, that person would provide information about what they know about REMEC and other relevant things, is that right? |
| A: | Sometimes they do, sometimes they don't, yeah. |
| Q: | And that's what happened with Ms. Robinson, is that right? She was interviewed? |
| A: | Yes. |

(*See Transcript of Evidentiary Hearing*, Day One, 48:8-19; 49:16-19; 50:4-10.)

      Underlying Milberg's investigative methods in this case are the requirements of the Private

04CV1948

1   Securities and Litigation Reform Act of 1995 ("PSLRA"). The Ninth Circuit, in interpreting the

2   PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in

3   great detail, facts that constitute strong circumstantial evidence of deliberately reckless or

4   conscious misconduct." *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th Cir. 1999). Courts

5   often dismiss plaintiffs' complaints if the allegations rest solely on witness statements and fail to

6   point to any specific documents or data in support of their contentions. *See, e.g., Lipton v.*

7   *PathoGenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations of reports

8   relied on by insiders, without specific reference to the contents of those reports, are insufficient to

9   meet the heightened pleading requirements of the PSLRA:); *In Re Silicon Graphics, Inc.*, 183 F.3d

10   970, 985 (9th Cir. 1999) ("a proper complaint which purports to rely on the existence of internal

11   reports would contain at least some specifics from those reports as well as such facts as may

12   indicate their reliability"); *see also, In re Vantive Corp. Secs. Litig.*, 283 F.3d 1079, 1087-88 (9th

13   Cir. 2002). It is within this context that contact and communication with former employees can be

14   vital, as these individuals are more likely to possess relevant information and/or internal

15   documents and data demonstrating wrongdoing by their former employer.

16        The ethical requirements that bind an attorney in any other situation are equally binding

17   when the attorney engages in *ex parte* contact with an unrepresented former employee of an

18   opposing organizational party to obtain information and documentation in a securities case.

19   *Shearson Lehman Bros., Inc. v. Wasatch Bank*, 139 F.R.D. 412, 418 (D. Utah 1991). The matter

20   of *ex parte* contacts is regulated by Rule 4.2 of the American Bar Associations Model Rules of

21   Professional Conduct. Courts that have considered the issue have held that Rule 4.2 does not bar

22   *ex parte* communications with an adversary's former employees who are not themselves

23   represented in the matter. *See, e.g., Davidson Supply Co. v. P.P.E., Inc.*, 986 F. Supp. 956, 958 (D.

24   Md. 1997); *Hanntz v. Shiley, Inc.*, 766 F. Supp. 258, 263 (D.N.J. 1991): *Tipton v. Sonitrol Sec.*

25   *Sys.*, 958 F. Supp. 447, 451-52 (E.D. Mo. 1996). Courts adopting this view generally have found

26   that the language of Rule 4.2, which refers to "a party," cannot be reasonably interpreted to

27   include former employees where there is no continuing relationship between the organizational

28   employer and its former employee that would furnish a sufficient legal basis for imputing the

1  former employee's statements to the employer. *See Aiken v. Bus. & Indus. Health Group. Inc.*,

2  885 F. Supp. 1474, 1476 (D. Kan. 1995) ("The plain meaning of the phrase 'party the lawyer

3  knows to be represented by another lawyer in the matter' means a party to the litigation. A former

4  employee with no present relationship to the organizational party is not a 'party' as referred to in

5  the rule."); *Hanntz*, 766 F. Supp. at 266 ("Because RPC 4.2 refers only to represented parties and

6  because the purposes of RPC 4.2 would not be served by an interpretation otherwise, it cannot be

7  said that RPC 4.2 applies to former employees who are not parties.").

8      Although *ex parte* contact with former employees is not subject to Rule 4.2, attorneys have

9  a responsibility to refrain from inquiring about privileged matters. Therefore, an attorney may

10 have *ex parte* contact with an unrepresented former employee of an organizational party, subject to

11 the limitation that the attorney may not inquire into areas subject to the attorney-client privilege or

12 work product doctrine. *See Palmer v. Pioneer Hotel & Casino*, 19 F. Supp. 2d 1157, 1167 (D.

13 Nev. 1998).

14     Defendants fail to show that Milberg inquired into privileged matters during their

15 communications with Robinson. Plaintiffs' counsel testified that Milberg took appropriate

16 precautions against disclosure of privileged information by informing Robinson that she would not

17 be asked about areas likely to involve privileged communications, nor would she be asked to

18 produce such documents. Karen Rogers testified at the evidentiary hearing on this matter:

19     A:    We were taking precautions. We would not take documents that were of a
20           trade secret sensitive kind of nature, even though the company was basically
             out of business. We had told them we didn't want confidential or proprietary
21           information and we didn't want privileged information. And we set out to
             explain what we meant by that and asked her to review the documents before
22           she turned them over. In fact, she wanted to turn all the documents over
             without even looking at them and we said we would not take them under those
23           circumstances. We needed her to know what she was giving us and make that
             first determination that the documents were not confidential, sensitive trade
24           secrets or privileged . . .

25     ( . . . )

26     A:    Okay. Ms. Robinson's screening, we made it clear we did not want any
             confidential proprietary sensitive information that might be covered by the
27           confidentiality agreement or privileged information . . .

28 (*See Transcript of Evidentiary Hearing*, Da y One, 75:24-76:11; 80:14-17.) Defendants presented

1   no evidence to contradict Rogers' representations.

2        Having reviewed the evidence and considered the relevant testimony, the Court finds that

3   Milberg did not commit an ethical violation by finding, contacting, and communicating with

4   Robinson. The investigative methods used by the firm do not seem unusual or suspect within the

5   context of a securities class action. Accordingly, the Court turns to the crux of Defendants'

6   allegations and considers whether Milberg acted unethically and with bad faith by taking the

7   documents proffered by Robinson and using them in a pivotal manner in this litigation.

8         ii)    <u>Plaintiffs Did Not Commit An Ethical Violation by Receiving,</u>

9               <u>Reviewing, and/or Using REMEC's Internal Documents</u>

10        Defendants accuse Robinson of embezzlement and theft of REMEC's internal documents,

11   and acceptance of payment for those documents from Milberg. Defendants allege that after

12   Milberg contacted and communicated with Robinson, Milberg took the stolen documents and used

13   them in this litigation despite knowing that: Robinson had a confidentiality agreement with

14   REMEC; the documents in Robinson's possession were REMEC's property; and Robinson kept

15   the documents for her own personal use after her termination from REMEC. Defendants argue in

16   their briefing that "Milberg's deliberate disregard of REMEC's rights and conscious decision to

17   treat the matter of stolen documents as Robinson's problem is the very definition of bad faith."

18   The Court shall address the propriety of Milberg's handling of the documents in three stages:

19   receipt of the documents, review of their content, and use of the documents in this case.

20         a)    *Receipt of the Documents*

21        Defendants accuse Milberg of knowingly receiving stolen property. They frame the

22   allegation in a criminal context, perhaps because it is axiomatic that an attorney's commission of a

23   criminal act to further a client's cause constitutes behavior warranting the most severe sanctions.

24   Defendants argue that Milberg "knew more than enough about the circumstances under which

25   Robinson possessed REMEC's documents and thereafter provided those documents . . . to support

26

27

28

04CV1948

1  a conviction for receipt of stolen property" in violation of California Penal Code section 496(a).[3]

2  (*See Defendants' Post-Hearing Brief*, 7.) Defendants further assert that "the testimony of Rogers,

3  Westerman and Keatly that they did not believe that Robinson stole the documents does not

4  absolve them." (*Id.*) To lay the foundation for this allegation against Milberg, Defendants

5  endeavored at length in their submissions to the Court and during the evidentiary hearing to show

6  that Robinson unlawfully possessed the documents, making her guilty of embezzlement.

7          Defendants allege that Robinson breached the Proprietary Information Agreement ("PIA")

8  that she had with REMEC as a condition of her employment. During the hearings, Defendants

9  relied heavily on the language of the PIA, including the broad definition of proprietary information

10 which includes trade secrets, confidential information, as well as other data and information

11 belonging to REMEC, and the post-termination non-disclosure provision. Defendants argue that

12 the PIA makes it clear that, at best, Robinson was a custodian of the documents in her possession,

13 not the owner, which under California law renders her susceptible to charges of embezzlement and

14 theft, and implicates REMEC's legal rights with respect to the documents. On the basis of these

15 allegations, Defendants assert that Milberg violated Rule 4.4 of the American Bar Association's

16 Model Rules of Professional Conduct, which states, in pertinent part: "In representing a client, a

17 lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of such a

18 person."

19         For evidentiary support, Defendants point to Robinson's email correspondence with Keatly

20 in which she offered documents containing proprietary information, stating that the documents

21 contained "emails and spreadsheets related to the Q2 reserve calculation and forecasting that you

22 asked about." (Exhibit 44.) Defendants cite Keatly's memorandum to Milberg, in which he states

23 "she said that she had retained 'hundreds if not thousands' of emails from her brief tenure at

24 REMEC, as well as spreadsheets directly related to sales forecasting and reserve calculation issues

25

26

_____

27      [3] The Court notes that to the extent Defendants rely on Rule 4.4, subdivision (b) of the American Bar Association Model Rules of Professional Responsibility, the rule is inapplicable on its face. Its applies to documents that are "inadvertently" sent to opposing counsel. Neither party

28 contends that Robinson inadvertently sent the documents to Milberg, or that Milberg inadvertently received them.

04CV1948

1  that we had discussed during the interview. ( . . . ) During these conversations, she expressed some

2  additional concerns about sharing these materials." (Exhibit 45.)  Defendants point out that certain

3  documents attached to her emails were explicitly marked confidential.  (*See, e.g.*, Exhibit 47.)

4  Defendants argue that the large volume of documents Robinson kept after her termination, and her

5  willingness to turn those documents over to REMEC's adversary, demonstrate that the she had

6  unlawful intent.

7       Defendants assert that the same evidence which shows Robinson acted illegally also proves

8  that Milberg knowingly and willingly accepted documents possessed by her as a result of her

9  unlawful conduct.  According to Defendants, this decision, together with Milberg's use of the

10 documents in this case, allows the Court to make a specific finding of bad faith.  Defendants assert

11 that:  Milberg knew the documents were REMEC's property; Milberg knew Robinson did not

12 retain them on behalf of REMEC or as REMEC's agent; Milberg knew REMEC no longer

13 employed Robinson and that she was not in a position to waive any privileges associated with the

14 documents.  Defendants argue that Milberg should not have received any of the documents without

15 contacting defense counsel first.

16      Robinson's actions suggest a certain degree of moral ambiguity; however, the evidence is

17 purely circumstantial, as Defendants concede.  Defendants' allegations against Milberg rest solely

18 on this circumstantial evidence as well.  Defendants offer no direct evidence of wrongdoing by

19 Robinson, and by extension, Milberg.  Robinson indicated her unwillingness to testify at the

20 evidentiary hearing, therefore Defendants did not call her as a witness.  Defendants presented no

21 witness testimony confirming Robinson stole the documents from REMEC.  During the

22 evidentiary hearing, Rogers testified at length regarding the status of the documents and the extent

23 of Milberg's knowledge regarding Robinson's means of acquisition:

24      Q:   And what did you do at the time that you received documents in 2006 to
             check or make sure that Lisa Robinson was authorized to have possession of
25           tens of thousands of pages of REMEC documents?

26      (over objection)

27      A:   My understanding was that she had documents in her possession that
             obtained legitimately, lawfully, while she was employed. Some even before
28           she was employed apparently the company sent some documents to her

1  before she started working there and during her work there, and she obtained
   some documents in the ordinary course of her work. I understand that she
2  had some of those at home because she worked from home occasionally. It
   never crossed my mind that she stole anything, embezzled anything,
3  inappropriately took documents in any way. I just, my understanding from
   Ken and his conversation with her was that these were documents that she
4  lawfully possessed, had with her former employer's consent and I didn't
   know anything about any document that she had signed since she had
5  returned everything when she left. I don't know whether she did or not. So
   when the issue of why she would still have the documents after her
6  employment, I understood that she had some concerns about the company's
   practices while she was employed there and so she had some interactions
7  with the executives there and Mr. Hickman, in particular, one that comes to
   mind is that he had done a trip overseas and he had asked her to change a
8  report, soften the report. It was sort of CYA if you will. If she wanted to
   maintain the documents, she was a CPA, an accountant and she was
9  concerned somebody might accuse her later of having done something. She
   wanted a record to protect herself so she could say that in fact she was told
10 to do this and she [was] doing everything by the book. She had some
   concerns so she kept them more her own self-protection than any other
11 reason.

12     ( . . . )

13  Q:  Well part of your answer that you just gave, Ms. Rogers, is that you believed
        Ms. Robinson lawfully possessed the documents with REMEC's consent.
14      That's what I wrote down when you said it. Did Mr. Keatly tell you that Ms.
        Robinson had stated that she lawfully possessed documents with REMEC's
15      consent in 2006?

16  A:  He did not state those words. This is what I had gathered from what he told
        me about how she got the documents in the normal course of business. There
17      wasn't any suggestion ever that she had stolen the documents or otherwise
        should not have them just because she was employed by REMEC. She
18      needed these documents either because they were relevant to her work or
        because other people had given her the documents, asked her to make copies
19      of the documents or whatever. And I don't know. There may have been
        many more hundreds of thousands of documents she had with her before she
20      left and she didn't take those with her, but this subset I gathered were some
        things that she either had just left or hadn't returned them . . .
21
    (*Transcript of Evidentiary Hearing*, Day One, 58:3-59:13; 59:22-60:15.)
22

23      When questioned by defense counsel during the evidentiary hearing, Ken Keatly testified

24  regarding his understanding of the manner in which Robinson obtained the documents:

25  Q:  Did she tell you how she actually got documents from REMEC?

26  A:  It was my understanding through our conversations that she had . . . received
        these materials in performing the ordinary course of her job duties as a director
27      of base station operations while employed at REMEC.

28  Q:   Did she tell as [sic] how, when she left REMEC, how she actually stored these

1      documents when she left employment at REMEC in 2004?

2    A:    I don't know if we covered it exactly the way you are phrasing the question. My understanding was she would have received these materials, like I say,

3        possibly in the course of her laptop computer, while she working there, but I don't know the exact way that she were received by her during her tenure.

4

5  (*Transcript of Evidentiary Hearing*, Day Two, 65:23-66:12.) Jeff Westerman testified that his

6  knowledge regarding Robinson's acquisition of the documents consists of what he was told by

7  Keatly. (*Id.*, 51:18-19.)

8      Defense counsel Robert Brownlie's testimony supports the conclusion that Defendants

9  proceeded on their suspicions, rather than any direct evidence of Robinson's wrongdoing:

10    A:    I had suspicions going back to the Fourth Amended Complaint but those suspicions had various levels of strength, if you will, and it wasn't until we actually took Ms. Robinson's deposition that I felt comfortable in our ability

11        to at least say, based on what we knew, that a former REMEC employee stole documents.

12

13    Q:    Now when was it that you first felt you had a sufficient factual basis to assert in a federal court pleading that . . . one or more former REMEC employees had stolen company documents? Was it at that time?

14

15    A:    No.

16    Q:    What time then?

17    A:    Well when we answered a Fourth Amended Complaint based on what we knew then, which was very little, I felt comfortable we can make an allegation on

18        information and belief that the act of building a case on documents that may have been stolen constituted unclean hands and we asserted it as an affirmative

19        defense on information and belief.

20  (*Transcript of Evidentiary Hearing*, Day Two, 138:13-139:6.)  With respect to his beliefs

21  regarding Milberg's conduct in handling the documents, Brownlie testified that Defendants'

22  position was that Milberg's conduct "fell below the standard of care:"

23    Q:    Do you recall making a statement in your supplemental brief that Milberg's conduct fell below the standard of care?

24    A:    I think we said something along those lines, yes.

25    Q:    What standard of care were you referring to?

26    A:    I think, in general, the standard of care with respect to working up a case and asking the appropriate questions. I think what we may have said in that respect

27        is that if they didn't ask if Ms. Robinson had a confidentiality agreement or some other restrictions, they should have. If they didn't ask Ms. Robinson why

28        she had possession, why she was authorized to possess the documents at the

1   same time, they should have. If they received the documents without making
any inquiry as to whether or not the documents were at that time lawfully in
2   possession of Ms. Robinson or whether at that time she had authority from the
owners of the documents to Milberg, I thought they fell below the standard of
3   care. I may have said more along those lines in the brief. The brief speaks for
itself.

4

5   (*Transcript of Evidentiary Hearing*, Day Two, 139:14-140:7.) Neither Brownlie nor his co-

6   counsel, Noah Katsell, testified to having any direct evidence to demonstrate Robinson unlawfully

7   obtained the documents. When asked about Milberg's conduct, Brownlie testified only about his

8   view of the appropriate standard of care Milberg should have used when they were offered and

9   made the choice to receive the documents. Brownlie continued to allege that Milberg received

10  stolen documents in violation of California law during his arguments before the Court, but when

11  testifying under oath, he spoke only of suspicions of Robinson's wrongdoing and with personal

12  disapproval of Milberg's conduct.

13          Based on the record, the Court finds that Defendants have failed to show by a

14  preponderance of the evidence that Robinson stole the documents or otherwise possessed them or

15  converted them in violation of the law.[4] Even if the Court found the circumstantial evidence

16  sufficient to meet the standard of proof on this motion, and determined that Robinson was in

17  possession of the documents illegally and committed a crime handing them over to Milberg,

18  Defendants fail to present any evidence to show that Milberg knew or should have known that the

19  documents were stolen. Without an underlying wrong on the part of Robinson, and knowledge

20  thereof on the part of Milberg, there are no grounds for a finding of any unethical conduct by

21  Milberg, much less a specific finding of bad faith, with respect to the receipt of the documents.

22          b)      *Review of the Documents*

23          Another category of alleged misconduct relates to the handling of the documents by

24  Milberg once received from Robinson. Defendants assert that Milberg first should have notified

25  defense counsel that they received documents appearing to be REMEC's property. Defendants

26

27          [4] Additionally, Defendants fail to provide evidence demonstrating that Robinson was bribed
or otherwise paid by Milberg for the documents themselves. Defendants' allegation that Milberg paid
28  off Robinson's gambling debts as part of the alleged bribery is completely baseless and warrants no
further discussion by the Court.

1    argue that Milberg acted unethically by conducting a privilege review of the documents

2    subsequent to Robinson's own review.[5]

3          Although not binding authority on this Court or California's state courts, the American Bar

4    Association Committee on Ethics' formal opinions regarding various ethical concerns in the

5    practice of law can be instructive. *See Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal. 4th

6    23 (2006) (holding that the ABA rules may be helpful and persuasive in situations where coverage

7    of state disciplinary rules is unclear or inadequate, but the rules are not binding). Of assistance

8    here is Formal Opinion 94-382, regarding the receipt of privileged or confidential materials, cited

9    with approval by the Ninth Circuit in *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001). The

10   Committee found that:

11            A lawyer who receives on an unauthorized basis materials of an adverse party that she
              knows to be privileged or confidential should, upon recognizing the privileged or
12            confidential nature of the materials, either refrain from reviewing such materials or
              review them only to the extent required to determine how appropriately to proceed; she
13            should notify her adversary's lawyer that she has such materials and should either
              follow instructions of the adversary's lawyer with respect to the disposition of the
14            materials, or refrain from using the materials until a definitive resolution of the proper
              disposition of the materials is obtained from a court.
15

16   *Gomez*, 255 F.3d at 1132 (citing ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 382

17   (1994)). The documents at issue in *Gomez* were letters exchanged between counsel and their

18   clients, photocopied by employees of the opposing party at the instruction of opposing counsel.

19   The Court held that the letters "were of the most sensitive kind – the kind that any trial lawyer

20   would recognize as privileged, highly valuable, very confidential, and potentially devastating in

21   the wrong hands." *Gomez*, 255 F.3d at 1132.

22          In order to make an initial determination regarding the privileged or confidential status of

23   the documents, Milberg took certain precautions. Karen Rogers testified during the evidentiary

24   hearing on this subject.

25       Q:      Now first of all, did Milberg – was it your understanding that Ms. Robinson,
                 before she sent the documents to Mr. Keatly, did her own review of the
26               documents for privileged confidential information?

27
_____

28      [5] Although it should be noted that Defendants also allege that Robinson did not perform her
     own privilege review.

1    A:    Yes. Absolutely.

2    Q:    Did Milberg set up a procedure for a second review once the documents came
to Milberg?

3

4    A:    Yes, we did.

Q:    And did you look at any of the documents before that second privilege review
5       was completed?

6    A:    No. I did not.

7    Q:    To your knowledge, did any other Milberg attorneys look at them before the
second privilege review was completed?

8

A:    No. No Milberg attorneys who were working on the REMEC matter reviewed
9       them.

10 (*Transcript of Evidentiary Hearing*, Day One, 120:17-121:6.) Defense counsel questioned Jeff

11 Westerman regarding specific documents, inquiring whether in his opinion the documents were

12 privileged or confidential. Westerman testified that the documents were reviewed and were

13 determined not to be privileged or confidential. Defendants did not present any evidence to

14 contradict the testimony of Rogers and Westerman. Rather, defense counsel Noah Katsell testified

15 that Defendants did not identify as privileged or confidential any particular document of the

16 approximately 2200 documents turned over by Robinson.

17    Q:    What you are saying of the 81 emails that had counsel Mr. Wilkins or Mr.
Sackett's name on those, of the 81, you were telling the Court that several of
18       those 81 were in your view, arguably privileged, correct?

19    A:    That's what it says.

20    Q:    Right. And in "several," does that mean two, three, and four?

21    A:    I don't remember the number specifically.

22    Q:    Well at this point in time, when you wrote this declaration and noted that
several of these emails were as you use the term arguably privileged, did you
23       make a listing anywhere of those several emails and what they were?

24    A:    I did not.

25    Q:    And you, as I understand it, with respect to those several emails that were
arguably privileged, am I correct you did not itemize those and provide a list
26       to Milberg and ask Milberg to return those documents to DLA, correct?

27    A:    That's correct.

28    Q:    And the attorney/client privilege, do you remember of the several emails which

| 1 | | were attorney/client and which were attorney work product? |
|---|---|---|
| 2 | A: | I don't have a memory. |
| 3 | Q: | And the privilege that was being discussed here, privileged as attorney/client communications, that was REMEC's privilege. That's what you were talking |
| 4 | | about, is that correct? |
| 5 | A: | Correct. |

6  (*Transcript of Evidentiary Hearing,* Day Two, 162:11-163:13.)

7  "'The attorney-client privilege protects confidential disclosures made by a client to an

8  attorney in order to obtain legal advice, as well as an attorney's advice in response to such

9  disclosures.'" *In re Grand Jury Investigation,* 974 F.2d 1068, 1070 (9th Cir. 1992) (citations

10  omitted). The privilege is limited to "'only those disclosures − necessary to obtain informed legal

11  advice − which might not have been made absent the privilege.'" *Id.* (citing *Fisher v. United*

12  *States,* 425 U.S. 391, 403 (1976)). As the party asserting the attorney-client privilege, Defendants

13  have the burden of proving that the documents provided by Robinson are indeed privileged. *Id;*

14  *see also United States v. Martin,* 278 F.3d 988, 999 (9th Cir. 2002). To meet his burden,

15  Defendants must show that the documents adhere to the essential elements of the attorney-client

16  privilege on a document-by-document basis. Neither Katsell nor anyone else from the defense

17  identified any particular document as protected by the attorney-client privilege. Katsell's

18  declaration in support of Defendants' motion, referenced above, essentially amounts to Katsell's

19  speculation regarding the privileged nature of the documents provided by Robinson.

20  With respect to confidentiality, Defendants point to specific documents marked by

21  REMEC as confidential at the time of their creation and exchange during Robinson's term of

22  employment in 2004. However, in 2006, when Robinson and Milberg conducted their separate

23  reviews, confidentiality could no longer be ascertained by the markings on those documents; at

24  that point, not only was it necessary for the reviewer to determine whether the documents ever

25  were treated as confidential, having been marked as such, but also whether the documents

26  remained confidential subsequent to the dissolution of REMEC, the sales of assets to other

27  companies, the historical nature of financial data, and other variables. *See, e.g., United States v.*

28  *Shiah,* 2008 U.S. Dist. LEXIS 11973 (C.D. Cal. Feb. 19, 2008) (noting that the value of

1   information contained in documents marked as "confidential" is time-sensitive, being less likely to

2   qualify as confidential with the passing of time).

3      Defendants fail to demonstrate that the documents were subject to the attorney-client

4   privilege, and did not present any direct testimony to support their assertion that the documents

5   contained information protected by the language of the PIA between Robinson and REMEC.

6   Under the applicable ethical standards, Milberg is not guilty of acting in bad faith by conducting a

7   multi-stage review of documents deemed unprivileged and non-confidential by Robinson without a

8   preponderance of the evidence demonstrating otherwise.

9      c)  *Use of the Documents*

10     The culmination of the motion before the Court is Milberg's allegedly unethical use of the

11  documents obtained from Robinson in this litigation.  Defendants argue that Milberg acted in bad

12  faith by using the documents to support a fourth amended complaint with the knowledge that

13  Robinson embezzled the documents from REMEC.  Having insufficient evidentiary support for

14  their allegations of criminal and unethical behavior, Defendants likewise cannot demonstrate that

15  Milberg acted in bad faith by using the documents obtained from Robinson to support their clients'

16  case.

17             **CONCLUSION**

18     Based on the foregoing, the Court **DENIES** Defendants' motion for sanctions.

19     **IT IS SO ORDERED**.

20  DATED:  September 25, 2009

21

22            Hon. Michael M. Anello
              United States District Judge

23

24

25

26

27

28

04CV1948

1   ROBERT W. BROWNLIE (Bar No. 138793)
    GERARD A. TRIPPITELLI (Bar. No. 235788)
2   NOAH A. KATSELL (Bar No. 217090)
    **DLA PIPER LLP (US)**
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel:  619.699.2700
    Fax: 619.699.2701
5

6   Attorneys for Defendants REMEC, INC., RONALD
    E. RAGLAND, WINSTON E. HICKMAN
7

8                    UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11  IN RE:                              **CASE NO. 04 CV 1948 MMA (AJB)**

12  REMEC INCORPORATED SECURITIES       **REPRESENTATION STATEMENT**
    LITIGATION                          **[F.R.A.P. 12(b); 9th Circuit Rule 3-2(b)]**
13
    This Document Relates to:
14

15          ALL ACTIONS

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER LLP (US)    WEST\21978741.1                        04 CV 1948 MMA (AJB)
  SAN DIEGO

1    The undersigned represents Defendants REMEC, Inc., Ronald E. Ragland and Winston E.

2   Hickman, and no other party.  Attached is a Service List that shows all of the parties to the action

3   below, and identifies their counsel by name, firm, address, and telephone number, where

4   appropriate.  (F.R.A.P. 12(b); Circuit Rule 3-2(b).)

5   Dated:  June 1, 2010                          DLA PIPER LLP (US)

6

7

8                                                 ROBERT W. BROWNLIE
                                                  Attorney for Defendants
9                                                 REMEC, INC., RONALD E. RAGLAND and
                                                  WINSTON E. HICKMAN
10                                                E-mail: robert.brownlie@dlapiper.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# SERVICE LIST

*In Re: REMEC Incorporated Securities Litigation*
Case No. 04-cv-01948-MMA-AJB

| **Counsel for Plaintiffs** | |
|---|---|
| Jeff S. Westerman<br>Michiyo Michelle Furukawa<br>Andrew J. Sokolowski<br>**MILBERG LLP**<br>One California Plaza<br>300 S. Grand Avenue, Suite 3900<br>Los Angeles, CA  90071-3149<br>Telephone:  (213) 617-1200<br>Facsimile:  (213) 617-1975<br>E-mail:  jwesterman@milberg.com<br>       mfurukawa@milberg.com<br>       asokolowski@milberg.com | Bruce G. Murphy<br>**LAW OFFICES OF BRUCE G. MURPHY**<br>265 Llwyds Lane, Suite 100<br>Vero Beach, FL  32963<br>Telephone:  (772) 331-4202<br>Facsimile:  (772) 231-7222<br>E-mail:  bgm@brucemurphy.biz |
| Neil Fraser<br>Matt Bucher<br>**MILBERG LLP**<br>One Pennsylvania Plaza, 49th Floor<br>New York, NY  10119<br>Telephone:  (212) 594-5300<br>Facsimile:  (212) 868-1229<br>E-mail:  nfraser@milberg.com<br>       mbucher@milberg.com | Blake M. Harper<br>Dennis Stewart<br>Bridget Gramme<br>**HULETT HARPER STEWART LLP**<br>525 B Street, Suite 760<br>San Diego, CA  92102<br>Telephone:  (619) 338-1133<br>Facsimile:  (619) 338-1139<br>E-mail:  bmh@hulettharper.com<br>       dstewart@hulettharper.com<br>       bridget@hulettharper.com |
| **Counsel for Defendants** | |
| Robert W. Brownlie<br>Gerard A. Trippitelli<br>Noah A. Katsell<br>**DLA PIPER LLP (US)**<br>401 B Street, Suite 1700<br>San Diego, CA  92101<br>Telephone:  (619) 699-2700<br>Facsimile:  (619) 699-2701<br>E-mail:  robert.brownlie@dlapiper.com<br>       jerry.trippitelli@dlapiper.com<br>       noah.katsell@dlapiper.com | |

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   IN RE: REMEC INCORPORATED                CASE NO. 04-CV-1948-MMA (AJB)
     SECURITIES LITIGATION
12                                            **ORDER DENYING DEFENDANTS'**
                                              **MOTION FOR SANCTIONS**
13   This Document Relates to all Actions.
                                              [Doc. No. 240]
14

15          This matter comes before the Court on Defendants REMEC, Inc., Ronald E. Ragland, and

16   Winston E. Hickman's motion for sanctions based on allegations of serious misconduct against

17   Plaintiffs' counsel in this securities fraud class action.  Defendants request that the Court exercise

18   its inherent power to impose terminating sanctions and dismiss the case.  Upon initial

19   consideration of Defendants' motion, the Court deferred ruling and held a sealed evidentiary

20   hearing on July 29 and July 30, 2009.  Witnesses were sworn and called to testify; documents and

21   other exhibits were offered and received into evidence; and, subject to the filing of post-hearing

22   briefs and closing arguments presented on September 14, 2009, the Court took the matter under

23   submission.  For the reasons stated below, the Court **DENIES** Defendants' motion.

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**BACKGROUND**

This securities class action arises out of events related to Defendant REMEC, Inc.'s September 8, 2004 announcement of goodwill impairment and internal control deficiencies, and the sharp decline in the value of REMEC's stock following the announcement.  Plaintiffs are a class of purchasers of REMEC securities between September 8, 2003 and September 8, 2004, charging REMEC with violation of the Securities Exchange Act of 1934.  September 27, 2009 will mark the fifth anniversary of this litigation.  As a result, the case has a lengthy procedural history, the majority of which shall not be detailed here.  The following background information is specific to the matter currently before the Court.

On April 13, 2006, Plaintiffs filed an *ex parte* application and supporting declaration of counsel [Doc. Nos. 52-53], seeking leave to file a Fourth Amended Complaint, stating that they had obtained newly discovered evidence in support of their allegations through their ongoing investigative efforts ("including approximately 50,000 pages of internal Company documents that were made available on March 21, 2006 . . . [and] approximately 10,000 more documents [that] were made available to Lead Counsel between April 3 and 7, 2006").  Plaintiffs did not disclose the source of this "newly discovered evidence" in the *ex parte* application.

On May 4, 2006, after being granted leave by the Court and without objection from Defendants, Plaintiffs filed their Fourth Amended Complaint ("FAC") [Doc. No. 56], including an additional 76 pages of detailed allegations obtained from "confidential" witnesses not found in the Third Amended Complaint.  The FAC identified confidential "Witness 15" as a "former Remec Director of Base Station Operations," and made reference to several internal e-mails, and other internal company documents and reports, which had been "copied to" or otherwise acquired by "Witness 15" ("Witness 15" was later identified as Lisa Robinson).  On September 25, 2006, the Court denied Defendants' motion to dismiss [Doc. Nos. 57-58] the FAC, based in part upon the Court's determination that the newly discovered evidence provided sufficient support under Federal Rules of Civil Procedure 12(b)(6) and 9(b) for Plaintiffs' allegations of fraud and scienter. Defendants answered the FAC on November 6, 2006 [Doc. No. 67].

On March 23, 2007, as part of their Rule 26 initial disclosures, Plaintiffs produced

1   approximately 60,000 pages of internal REMEC documents, most of which consisted of email

2   messages and documents attached thereto.  The majority of those email messages were redacted to

3   conceal their source, but at least one revealed that Lisa Robinson (i.e., confidential "Witness 15")

4   was its source.  Thereafter, as Defendants acknowledge in their moving papers, "review of

5   plaintiffs' production showed that Robinson either sent or received virtually all of the emails

6   included in the production, making Robinson the likely source of the documents produced by

7   Plaintiffs."

8           Following the commencement of discovery in this case, the parties engaged in a number of

9   contentious discovery disputes regarding the newly discovered emails and other internal company

10  documents and reports.  The parties filed a Joint Discovery Status Report on April 25, 2008 [Doc.

11  No. 127].  In that report, Defendants reference the Robinson documents in a footnote (FN2, p. 6),

12  alleging for the first time in the record of the case that Robinson illegally possessed and supplied

13  the documents used by Plaintiffs to support the FAC:

14          [t]hese documents were clearly taken from REMEC in violation of employment
            agreements and company policy. Neither Plaintiffs, nor their counsel, nor the
15          individuals who initially pilfered the documents have any right to them. REMEC
            reserves its rights with respect to these documents.
16

17  Subsequently, Defendants attempted via subpoenas and deposition testimony to prove these

18  allegations.

19          On May 2, 2008, this Court, by counsel for Defendants, issued subpoenas duces tecum to

20  previous employers of Robinson and educational institutions attended by Robinson, requesting

21  records from these entities concerning Robinson's employment and educational background.

22  Pursuant to Federal Rule of Civil Procedure 45(c)(3), Plaintiffs sought an order of the Court

23  quashing and/or modifying the subpoenas, which Magistrate Judge Anthony J. Battaglia granted

24  based on his finding that the material sought in the subject subpoenas was not relevant or

25  reasonably calculated to lead to the discovery of admissible evidence, and even if relevant,

26  implicated Robinson's privacy rights [Doc. No. 55].

27          REMEC deposed Robinson in December 2008.  (*See e.g.*, Doc. Nos. 155 & 269.)

28  Robinson, who has since retained her own attorney, asserted her Fifth Amendment privilege

1    against self-incrimination over 250 times in response to defense counsel's inquiries regarding her

2    employment at REMEC, her access to confidential and proprietary information during and after

3    her employment, her communications with Plaintiffs' investigators, the manner in which she

4    obtained the internal documents upon which Plaintiffs based their FAC, whether she was paid for

5    the documents, if so, by whom, and other related subjects.  Robinson responded to questioning

6    regarding her financial status.  Robinson testified that she was heavily in debt and that she

7    declared bankruptcy in February 2008.  Robinson also testified that she had gambling losses in

8    2007 of approximately $228,000, and approximately $100,000 in gambling losses in 2006, even

9    though her annual salary in 2007 was less than $150,000.

10        Subsequent to the deposition, Defendants issued subpoenas to L.R. Hodges & Associates

11   and Lynne Hodges, investigators hired by counsel for Plaintiffs, Milberg LLP,[1] seeking facts

12   surrounding communications with Robinson and Milberg's receipt of REMEC's internal

13   documents from Robinson.  Milberg and L.R. Hodges filed separate objections to the subpoenas,

14   asserting that any communications between Robinson and L.R. Hodges or Milberg qualified as

15   attorney work-product, entitled to protection from discovery by Defendants.  Judge Battaglia

16   agreed and issued an order quashing the subpoenas [Doc. No. 269].

17        In the interim, Defendants filed the motion for sanctions currently before the Court.  As the

18   primary basis for their motion, Defendants contend that the subject e-mails and other internal

19   company documents "were stolen or embezzled" from REMEC by Robinson, and that Milberg

20   "may have been complicit" in that theft or embezzlement, and/or that they "intentionally received

21   documents that were stolen or embezzled by Robinson by knowingly or recklessly doing so,"

22   which "could very well constitute a violation of California Penal Code section 496(a)."

23   Defendants seek dismissal of the case, requesting that the Court exercise its "inherent equitable

24   authority to prevent abuse, oppression and injustice in the litigation process."

25        Milberg denies these allegations of misconduct, and contends that there is no basis to

26   _____

27        [1] Generally, investigators and Plaintiffs' counsel shall be referred to collectively hereafter as
     "Milberg."  The actions of L.R. Hodges & Associates and their investigators may be imputed to
28   Milberg.  *See* Model Rules of Prof'l Conduct R. 8.4(a) (2005) ("It is professional misconduct for a
     lawyer to ... violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce
     another to do so, or *do so through the acts of another*.") (emphasis added).

1  dismiss this case or to levy any alternative sanction against them.  Briefly stated, Milberg contends

2  that Robinson voluntarily provided internal company documents that Milberg believed at the time,

3  and still believe, were lawfully obtained by Robinson while in REMEC's employ.  Milberg

4  contends further that at all times they adhered to the applicable standard of care in investigating

5  this case, and they took reasonable precautions to assure that no privileged or confidential

6  documents were received from Robinson.  Milberg asserts that in the absence of evidence

7  establishing their "bad faith," the Court has no power, inherent or otherwise, to impose sanctions

8  based on the facts and circumstances of this case.

9      The Court found in its initial review that Defendants' motion was based entirely on

10  speculation and allegations of wrongdoing, devoid of evidentiary support.  Based on the

11  seriousness of the accusations, considering the impact they might have on the disposition of the

12  case, the Court ordered the parties to appear for a two-day evidentiary hearing.  The parties

13  submitted exhibits, presented witness testimony, and filed post-hearing briefs.  During a final

14  hearing before the Court on September 14, 2009, counsel for the parties presented closing

15  arguments in support of their respective positions.

16                                    **THE EVIDENCE**

17      In their case in chief**,** Defendants called three witnesses: Karen Rogers, a former

18  attorney/partner at the Milberg firm who worked on this case until her departure from the firm in

19  May 2009; Jeff Westerman, an attorney/partner at the Milberg firm who currently serves as lead

20  counsel on this case; and Ken Keatly, the current Director of Investigations at L.R. Hodges &

21  Associates, who serves as Milberg's investigator on this case.

22      ***1.    Testimony of Karen Rogers***

23      Karen Rogers testified that she was responsible for the day-to-day handling of this case

24  under the general supervision of Jeff Westerman until she left Milberg in May 2009, with the

25  exception of one brief leave of absence from the firm.  As was her practice, Rogers worked closely

26  with the firm's investigator Ken Keatly and generally directed the investigation.  It was routine for

27  the investigator to develop a list of former employees of the target defendant to be contacted, and

28  to be asked whether they had any relevant internal documents they would be willing to turn over.

1   Rogers learned from Keatly during the course of the investigation that he had been in contact with

2   a former employee named Lisa Robinson, who said that she had copies of internal company

3   documents that she was willing to turn over to them.

4        As was their custom and practice, Milberg asked Robinson to review the documents prior

5   to turning them over and cull out any confidential or trade secret documents and anything subject

6   to the attorney-client privilege, and then email the remaining documents to Keatly.  Keatly would

7   then email the documents to Milberg, at which time they would be screened by law firm staff

8   members (not the lawyers handling the case) for any legally privileged materials.  After this

9   second screening, the remaining documents were forwarded to the lawyers handling the case.

10  Rogers testified that her usual custom and practice was followed in this case, and that no legally

11  privileged documents were identified in the documents produced by Robinson.  The documentary

12  evidence produced supports Rogers' testimony in this regard.  (*See, e.g.*, Exhibit 57, which

13  generally describes the document review process).

14       With regard to the existence of a confidentiality agreement between Robinson and

15  REMEC, Rogers testified that it has always been Milberg's custom and practice to advise

16  witnesses that they are not being encouraged to violate any confidentiality agreement, and that

17  they should seek legal advice from their own attorney if they have any concerns along those lines.

18  Rogers recalled Robinson saying that she (Robinson) thought she had signed a confidentiality

19  agreement of some sort when she began her employment with REMEC, but Rogers was not

20  provided a copy of the agreement, and was not told what type of information, etc., it may have

21  covered.  Since she was not acting as Robinson's attorney, Rogers did not believe it to be

22  appropriate to advise Robinson further on that subject.  Rogers believed it was adequate under the

23  circumstances to ask Robinson to perform an initial review and screening of the documents before

24  turning them over to Keatly, and instructed her to remove anything that might violate a

25  confidentiality agreement with her former employer.

26       While Rogers apparently had little, if any, direct contact with Robinson (other than emails),

27  she testified that it was always her understanding, mainly from what she was told by Keatly, that

28  Robinson had obtained these documents "legally" while employed at REMEC (i.e., she didn't

1    some how "hack into" the company computer after she left to obtain them), and that she had

2    retained them primarily to protect herself in case she was later accused of misconduct.  It never

3    occurred to her, Rogers testified, that Robinson might have "stolen" the documents, or otherwise

4    obtained them "illegally," since, among other things, she (Rogers) knew that REMEC was out of

5    business at that point, and was in the process of being dissolved, such that any "trade secret" or

6    "competitive advantage" issues were non-existent.

7         During the evidentiary hearing and when questioning Rogers under oath, defense counsel

8    placed substantial reliance on the fact that Milberg paid a sum of money to Robinson allegedly as

9    a "bribe" or "purchase price" for the "stolen" documents.  Rogers testified that Milberg paid a sum

10   of money ($1500) to Robinson, but testified that it was not payment for the documents – Robinson

11   had offered the documents without requesting any payment – but rather compensation for

12   Robinson's time (10 hours at $150.00 per hour) in conducting the initial review and screening of

13   the documents to eliminate confidential or privileged materials.  The documentary evidence

14   presented on this subject supports Rogers' contention in this regard.  For example, Exhibit 58 is an

15   email from Robinson to Keatly describing her document review activities and indicating that she

16   "may need 6 more hours to finish," which accompanied her initial "Invoice" for $525.00 for

17   "Consulting;" Exhibit 63 is an email from Robinson to Keatly enclosing a second "Invoice" for

18   $975.00 for "Consulting-Email File Recovery" and "Consulting-Files Search and Backup to

19   DVD;" and, Exhibit 95 is the Form 1099-MISC sent by the Milberg to Robinson reflecting total

20   "non-employee compensation" of $1500 paid in 2006.

21        Defense counsel also questioned Rogers regarding the fact that Milberg had been accused

22   previously in another case, *Carpenters Health & Welfare Fund v. The Coca-Cola Company*, of

23   having "paid for stolen documents," accompanied by the assertion that "[t]he same thing may have

24   happened here."  Disregarding the admissibility of any such evidence, Rogers testified that she did

25   not work on the *Coca-Cola* case, and that to her knowledge none of the attorneys who worked on

26   that case worked on the REMEC case.  Moreover, she disavowed any policy or practice on her

27   part to pay for "stolen documents" in shareholder litigation, and specifically denied any such intent

28   in this case.

1        Rogers testified that the "original" documents, excluding some email transmittals from

2   Robinson to Keatly, provided by Robinson were produced (albeit some in redacted form) to

3   Defendants as part of Plaintiffs' Rule 26 disclosures in March 2007, and that despite a variety of

4   contacts with defense counsel after that date, including several settlement meetings, defense

5   counsel did not allege that the subject documents were "stolen," or that Rogers or Milberg

6   otherwise improperly obtained them.

7        **2.**    *Testimony of Jeff Westerman*

8        Jeff Westerman confirmed that he is the lead partner in charge of handling this case for

9   Milberg; that Rogers worked on the case under his general supervision; that the document review

10   procedure described by Rogers was implemented in this case at his direction; that no documents

11   produced by Robinson were reviewed by the lawyers handling this case until after they were

12   screened for privileged and/or confidential materials; that, to his knowledge, defense counsel never

13   claimed that the subject documents were "stolen" (or otherwise accused the Milberg firm of

14   misconduct) or asked that any of the documents be returned until the subject sanctions motion was

15   filed on January 21, 2009; and that neither he nor anyone else at Milberg to his knowledge had any

16   information or suspicion that Robinson had "stolen" the subject documents or that she otherwise

17   had any criminal intent in acquiring and producing them.

18        With regard to the *Coca-Cola* case, Westerman testified that the original "Milberg" firm

19   split in May 2004, with the West coast office becoming the "Lerach" firm, and that the *Coca-Cola*

20   case went with the "Lerach firm." He testified further that neither he, nor Rogers, nor anyone else

21   in his office (i.e., the Los Angeles office of the former "Milberg" firm) ever worked on that case.

22   He testified further that Milberg had denied the allegations made against it in that case, and that

23   the Special Master's Report finding those allegations to be true was never adopted by the court

24   (since the case ultimately settled). He conceded on cross-examination, however, that L.R. Hodges

25   & Associates was also the investigator hired by Milberg, pre-split, in the *Coca-Cola* case.

26        With regard to the generally recognized ethical obligation to return and not use documents

27   or other evidence inadvertently produced in discovery or otherwise improperly acquired,

28   Westerman professed his own and his firm's agreement with and adherence to that obligation.

1   Apropos of that obligation, he recalled an incident in this case when he complied with a request

2   from defense counsel that certain inadvertently produced documents be returned and not used.

3   However, he testified that no such request was ever made by defense counsel with respect to the

4   documents produced by Robinson.

5           **3.      *Testimony of Ken Keatly*

6           Ken Keatly testified that he currently serves as the Director of Investigations of L.R.

7   Hodges & Associates, where he has worked for approximately 10 years, and that 85-90% of his

8   work is in securities litigation cases.  He explained how he located and contacted Lisa Robinson

9   through a process of identifying and locating former employees of REMEC.  In that regard, he

10  identified and authenticated his initial March 2, 2006 email exchange with Robinson (Exhibit 44),

11  in which she told him that she has "hundreds if not thousands of emails accumulated in my short

12  time at Remec . . . ," and that "if you decide you need further information, please have your

13  attorneys contact me."  He also identified and authenticated his redacted "Investigation

14  Memorandum" (Exhibit 45) sent to Milberg on March 3, 2006, which describes his initial contacts

15  and interviews with Robinson.  Keatly identified and authenticated several other emails to and

16  from the Milberg office and Robinson describing his on-going contacts with her.

17          Keatly testified that Robinson told him that she received the subject emails and

18  attachments on her computer during the normal course of her employment at REMEC, not after

19  she left REMEC, and that he had no reason to believe that she had "stolen" them or otherwise

20  improperly acquired them.  Keatly confirmed Rogers' testimony that Robinson was being paid an

21  hourly rate for her time in conducting an initial screening of the documents (i.e., she was not being

22  paid to "steal" the documents, or otherwise being paid for the documents themselves).  When

23  asked by defense counsel how Robinson possibly could have screened or reviewed over 60,000

24  documents in the 10 hours allegedly allotted for that task, Keatly testified that in reality there were

25  approximately 2200 documents, totaling approximately 60,000 pages, and many of the documents

26  were in the form of Excel spreadsheets.

27          Keatly also testified that he has conducted many investigations in the course of his

28  employment with L.R. Hodges, and that most of the investigations involved shareholder class

1  action cases similar to this case.  It has been his custom and practice in those cases to do

2  essentially the same types of things he did here, particularly including obtaining documents from

3  former employees with potential evidentiary value to the pending litigation.

4                                          **DISCUSSION**

5       *1.      Legal Standard*

6            It is well established that a federal court has inherent power, independent of the Federal

7  Rules of Civil Procedure, such as Rules 11 and 37, and of statutes, such as 28 U.S.C. § 1927, to

8  impose sanctions both to prevent fraud upon the court and to protect the integrity of the judicial

9  process.  *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  Defendants ask the Court to exercise its

10  inherent power to impose terminating sanctions based on Milberg's allegedly unethical conduct.

11  *Chambers*, 501 U.S. at 50.  "A court must, of course, exercise caution in invoking its inherent

12  power, and it must comply with the mandates of due process, both in determining that the requisite

13  bad faith exists and in assessing [sanctions]."  *Id.*  (citing *Roadway Express, Inc. v. Piper*, 447 U.S.

14  752, 767 (1980)).  "Dismissal under a court's inherent powers is justified in extreme

15  circumstances, in response to abusive litigation practices, and to insure the orderly administration

16  of justice and the integrity of the court's orders."  *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380

17  (9th Cir. 1988) (citations omitted).  The effectiveness of lesser sanctions must be considered, such

18  as excluding documents obtained unfairly, which Defendants cite as an alternative to dismissal.

19            As noted by the Court in its June 11, 2009 Order, the Ninth Circuit has set forth a five

20  factor analysis governing a court's inherent power to sanction litigants and counsel.  As stated in

21  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir.1995), these

22  five factors are "(1) the public's interest in expeditious resolution of litigation; (2) the court's need

23  to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy

24  favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."

25            As the moving party, Defendants have the burden of proof, and accordingly, were given the

26  opportunity to open and close evidence presented during the evidentiary hearing.  An initial issue

27  arose as to whether the Court was to apply a "clear and convincing evidence" or a "preponderance

28  of the evidence" standard of proof.  As pointed out by defense counsel, it appears that no Ninth

1   Circuit case has applied a "clear and convincing" standard when imposing sanctions for "bad

2   faith" conduct under the court's inherent powers.  However, the Ninth Circuit does require the trial

3   court to make a "specific finding of bad faith" before issuing sanctions pursuant to its inherent

4   powers.  *See, e.g.*, *United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir. 1986); *Yagman v.*

5   *Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993).

6           **2.    *Analysis***

7           Defendants' argument can be distilled to two key points.  First, Defendants allege that

8   Robinson embezzled the documents she turned over to Milberg from REMEC.  Second,

9   Defendants argue that Milberg knew the documents belonged to REMEC, not Robinson, and

10  therefore Milberg received, reviewed, and used the documents in this litigation in bad faith.

11  Defendants frame their accusations against Milberg, as well as Robinson, in a criminal context.[2]

12  Framing the allegations in this manner places paramount importance on Robinson's actions.

13  Defendants claim that Robinson had a Proprietary Information Agreement ("PIA") with REMEC;

14  Robinson acted as a custodian of the documents during her employment; Robinson committed

15  embezzlement when she kept the documents and used them for her own purposes; and Robinson

16  committed theft when she gave the documents to Milberg.  Defendants argue that Milberg knew

17  all of these facts, and paid Robinson for the documents, thus leading to the ultimate conclusion

18  that Milberg's actions constitute bad faith, so tainting the litigation that Plaintiffs' case must be

19  dismissed.  Working within Defendants' framework, as a threshold matter a preponderance of the

20  evidence must support a finding that Robinson acted unlawfully.  Without sufficient evidence to

21  prove wrongdoing by Robinson, Defendants' most serious allegations against Milberg are a non

22  sequitur.

23          In considering Defendants' assertions of ethical violations in this matter, the Court is

24  bound by Civil Local Rule 83.4.b, which reads in pertinent part:

25

26          [2] In California, "receiving stolen property is a serious crime involving moral turpitude." *In re Waisbren* (1975) 15 Cal.3d 553, 556 (citing *In re Plotner* (1971) 5 Cal.3d 714, 726); *see also In re*
27  *Conflenti* (1981) 29 Cal.3d 120, 124 (attorney disbarred following conviction for attempt to receive stolen property).  California law provides for summary disbarment of an attorney convicted of a felony
28  offense involving moral turpitude.  Cal. Bus. & Prof. Code, § 6102, subd. (c).  Section 6102 serves as a clear indicator of the seriousness of Defendants' allegations against Milberg.

04CV1948

1
2
3
4
5

> Every member of the bar of this court and any attorney permitted to practice in this court shall be familiar with and comply with the standards of professional conduct required of members of the State Bar of California, and decisions of any court applicable thereto, which are hereby adopted as standards of professional conduct of this court.  This specification shall not be interpreted to be exhaustive of the standards of professional conduct.  In that connection, the Code of Professional Responsibility of the American Bar Association should be noted.  No attorney permitted to practice before this court shall engage in any conduct which degrades or impugns the integrity of the court or in any manner interferes with the administration of justice therein.

6   This rule embodies several principles.  First, the Court shall hold attorneys before it to the

7   standards set out by the California Rules of Professional Conduct.  Second, in the absence of

8   applicable California standards, the Court may use the Model Code of Professional Responsibility

9   as guidance.  Finally, the Court must protect its own integrity and the fair administration of justice.

10          In order to determine whether these codes of conduct have been violated by Milberg, the

11  Court must step outside the framework used by Defendants, noted above.  Although Robinson's

12  actions plainly are significant here, the Court's jurisdiction is over the parties and the attorneys in

13  this case.  The Court's inherent power to sanction only extends to these individuals.  Therefore, the

14  Court's inquiry is focused on the conduct of Milberg.  The Court's ruling hinges on whether

15  Milberg acted unethically at any stage in their dealings with Robinson – not whether Robinson

16  acted illegally.

17                  i)      <u>Plaintiffs Did Not Commit An Ethical Violation by Contacting and</u>

18                          <u>Communicating with Robinson</u>

19          The first point at which Milberg could have acted unethically arose when they contacted

20  Robinson through their investigative efforts and communicated with her thereafter.  Although this

21  initial contact is not the focus of Defendants' allegations, at various points in the pleadings and

22  during the hearings on this matter Defendants have cast aspersions on Milberg's pre-answer efforts

23  to investigate this case, including the search for individuals with relevant information, witnesses to

24  any alleged wrongdoing, and particularly, former REMEC employees with firsthand knowledge

25  and/or supporting documentation of fraud.

26          Defendants assert that: "Milberg was [not] merely a passive recipient of REMEC

27  documents from Robinson.  By their own admission and the admission of their investigator, the

28  documents were obtained through a diligent, result-oriented investigation.  Such conduct is

1   anything but passive and is evidence of their bad faith conduct." (*See* Doc. No. 360 at 22.)

2   During the final hearing on this matter, defense counsel argued that Milberg actively solicited the

3   disclosure of documents containing privileged and/or confidential information from a party-

4   opponent's former employee.  The implication is that Milberg's investigative efforts, including

5   their method of contacting Robinson and communication with her to obtain her cooperation in this

6   litigation, constitute unethical conduct and warrant a finding by the Court of bad faith.

7          Karen Rogers testified regarding this issue during the evidentiary hearing.  When asked by

8   defense counsel about Milberg's investigative methods, Rogers described the interaction between

9   the firm and their investigators at L.R. Hodges:

10         A:     We worked with L.R. Hodges for many years.  They're familiar with sort of the
                  process we need to go through and what sorts of things we need to investigate,
11                so – but yes, I would talk to them about the specifics of the case, the facts of
                  the case, what we're looking for.  It was routine that they would develop a
12                witness list that would include former employees and lots of other people and
                  they would try to contact people.
13
          Q:     So one of the goals was to find some former employee that might have some
14                relevant information about REMEC?

15         A:     Yes.  Who was there during the class period and could shed light on the
                  situation.
16
          ( . . . )
17
          Q:     Whenever you find the witness, you actually interview the witness.  Or not,
18                maybe not you, or one of the investigators?

19         A:     One of the investigators would interview.

20         ( . . . )

21         Q:     In the interview, if the person is willing to talk to you, that person would
                  provide information about what they know about REMEC and other relevant
22                things, is that right?

23         A:     Sometimes they do, sometimes they don't, yeah.

24         Q:     And that's what happened with Ms. Robinson, is that right? She was
                  interviewed?
25
          A:     Yes.
26
    (*See Transcript of Evidentiary Hearing*, Day One, 48:8-19; 49:16-19; 50:4-10.)
27
          Underlying Milberg's investigative methods in this case are the requirements of the Private
28

                                          - 13 -                                    04CV1948

1   Securities and Litigation Reform Act of 1995 ("PSLRA").  The Ninth Circuit, in interpreting the

2   PSLRA, has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in

3   great detail, facts that constitute strong circumstantial evidence of deliberately reckless or

4   conscious misconduct."  *In re Silicon Graphics Inc*., 183 F.3d 970, 974 (9th Cir. 1999).  Courts

5   often dismiss plaintiffs' complaints if the allegations rest solely on witness statements and fail to

6   point to any specific documents or data in support of their contentions.  *See, e.g., Lipton v.*

7   *PathoGenesis Corp*., 284 F.3d 1027, 1036 (9th Cir. 2002) ("negative characterizations of reports

8   relied on by insiders, without specific reference to the contents of those reports, are insufficient to

9   meet the heightened pleading requirements of the PSLRA:); *In Re Silicon Graphics, Inc.*, 183 F.3d

10  970, 985 (9th Cir. 1999) ("a proper complaint which purports to rely on the existence of internal

11  reports would contain at least some specifics from those reports as well as such facts as may

12  indicate their reliability"); *see also, In re Vantive Corp. Secs. Litig*., 283 F.3d 1079, 1087-88 (9th

13  Cir. 2002.  It is within this context that contact and communication with former employees can be

14  vital, as these individuals are more likely to possess relevant information and/or internal

15  documents and data demonstrating wrongdoing by their former employer.

16          The ethical requirements that bind an attorney in any other situation are equally binding

17  when the attorney engages in *ex parte* contact with an unrepresented former employee of an

18  opposing organizational party to obtain information and documentation in a securities case.

19  *Shearson Lehman Bros., Inc. v. Wasatch Bank*, 139 F.R.D. 412, 418 (D. Utah 1991).  The matter

20  of *ex parte* contacts is regulated by Rule 4.2 of the American Bar Associations Model Rules of

21  Professional Conduct.  Courts that have considered the issue have held that Rule 4.2 does not bar

22  *ex parte* communications with an adversary's former employees who are not themselves

23  represented in the matter.  *See, e.g., Davidson Supply Co. v. P.P.E., Inc.*, 986 F. Supp. 956, 958 (D.

24  Md. 1997); *Hanntz v. Shiley, Inc.*, 766 F. Supp. 258, 263 (D.N.J. 1991): *Tipton v. Sonitrol Sec.*

25  *Sys*., 958 F. Supp. 447, 451-52 (E.D. Mo. 1996).  Courts adopting this view generally have found

26  that the language of Rule 4.2, which refers to "a party," cannot be reasonably interpreted to

27  include former employees where there is no continuing relationship between the organizational

28  employer and its former employee that would furnish a sufficient legal basis for imputing the

1    former employee's statements to the employer.  *See Aiken v. Bus. & Indus. Health Group. Inc.*,

2    885 F. Supp. 1474, 1476 (D. Kan. 1995) ("The plain meaning of the phrase 'party the lawyer

3    knows to be represented by another lawyer in the matter' means a party to the litigation.  A former

4    employee with no present relationship to the organizational party is not a 'party' as referred to in

5    the rule."); *Hanntz*, 766 F. Supp. at 266 ("Because RPC 4.2 refers only to represented parties and

6    because the purposes of RPC 4.2 would not be served by an interpretation otherwise, it cannot be

7    said that RPC 4.2 applies to former employees who are not parties.").

8           Although *ex parte* contact with former employees is not subject to Rule 4.2, attorneys have

9    a responsibility to refrain from inquiring about privileged matters.  Therefore, an attorney may

10   have *ex parte* contact with an unrepresented former employee of an organizational party, subject to

11   the limitation that the attorney may not inquire into areas subject to the attorney-client privilege or

12   work product doctrine.  *See Palmer v. Pioneer Hotel & Casino*, 19 F. Supp. 2d 1157, 1167 (D.

13   Nev. 1998).

14          Defendants fail to show that Milberg inquired into privileged matters during their

15   communications with Robinson.  Plaintiffs' counsel testified that Milberg took appropriate

16   precautions against disclosure of privileged information by informing Robinson that she would not

17   be asked about areas likely to involve privileged communications, nor would she be asked to

18   produce such documents.  Karen Rogers testified at the evidentiary hearing on this matter:

19          A:    We were taking precautions.  We would not take documents that were of a
                  trade secret sensitive kind of nature, even though the company was basically
20                out of business.  We had told them we didn't want confidential or proprietary
                  information and we didn't want privileged information.  And we set out to
21                explain what we meant by that and asked her to review the documents before
                  she turned them over.  In fact, she wanted to turn all the documents over
22                without even looking at them and we said we would not take them under those
                  circumstances.  We needed her to know what she was giving us and make that
23                first determination that the documents were not confidential, sensitive trade
                  secrets or privileged . . .
24
25          ( . . . )

26          A:    Okay.  Ms. Robinson's screening, we made it clear we did not want any
                  confidential proprietary sensitive information that might be covered by the
27                confidentiality agreement or privileged information . . .

28   (*See Transcript of Evidentiary Hearing*, Da y One, 75:24-76:11; 80:14-17.)  Defendants presented

1    no evidence to contradict Rogers' representations.

2         Having reviewed the evidence and considered the relevant testimony, the Court finds that

3    Milberg did not commit an ethical violation by finding, contacting, and communicating with

4    Robinson.  The investigative methods used by the firm do not seem unusual or suspect within the

5    context of a securities class action.  Accordingly, the Court turns to the crux of Defendants'

6    allegations and considers whether Milberg acted unethically and with bad faith by taking the

7    documents proffered by Robinson and using them in a pivotal manner in this litigation.

8              ii)    <u>Plaintiffs Did Not Commit An Ethical Violation by Receiving,</u>

9                     <u>Reviewing, and/or Using REMEC's Internal Documents</u>

10        Defendants accuse Robinson of embezzlement and theft of REMEC's internal documents,

11   and acceptance of payment for those documents from Milberg.  Defendants allege that after

12   Milberg contacted and communicated with Robinson, Milberg took the stolen documents and used

13   them in this litigation despite knowing that: Robinson had a confidentiality agreement with

14   REMEC; the documents in Robinson's possession were REMEC's property; and Robinson kept

15   the documents for her own personal use after her termination from REMEC.  Defendants argue in

16   their briefing that "Milberg's deliberate disregard of REMEC's rights and conscious decision to

17   treat the matter of stolen documents as Robinson's problem is the very definition of bad faith."

18   The Court shall address the propriety of Milberg's handling of the documents in three stages:

19   receipt of the documents, review of their content, and use of the documents in this case.

20            a)    *Receipt of the Documents*

21        Defendants accuse Milberg of knowingly receiving stolen property.  They frame the

22   allegation in a criminal context, perhaps because it is axiomatic that an attorney's commission of a

23   criminal act to further a client's cause constitutes behavior warranting the most severe sanctions.

24   Defendants argue that Milberg "knew more than enough about the circumstances under which

25   Robinson possessed REMEC's documents and thereafter provided those documents . . . to support

26

27

28

1   a conviction for receipt of stolen property" in violation of California Penal Code section 496(a).[3]

2   (*See Defendants' Post-Hearing Brief*, 7.)  Defendants further assert that "the testimony of Rogers,

3   Westerman and Keatly that they did not believe that Robinson stole the documents does not

4   absolve them."  (*Id.*)  To lay the foundation for this allegation against Milberg, Defendants

5   endeavored at length in their submissions to the Court and during the evidentiary hearing to show

6   that Robinson unlawfully possessed the documents, making her guilty of embezzlement.

7   Defendants allege that Robinson breached the Proprietary Information Agreement ("PIA")

8   that she had with REMEC as a condition of her employment.  During the hearings, Defendants

9   relied heavily on the language of the PIA, including the broad definition of proprietary information

10  which includes trade secrets, confidential information, as well as other data and information

11  belonging to REMEC, and the post-termination non-disclosure provision.  Defendants argue that

12  the PIA makes it clear that, at best, Robinson was a custodian of the documents in her possession,

13  not the owner, which under California law renders her susceptible to charges of embezzlement and

14  theft, and implicates REMEC's legal rights with respect to the documents.  On the basis of these

15  allegations, Defendants assert that Milberg violated Rule 4.4 of the American Bar Association's

16  Model Rules of Professional Conduct, which states, in pertinent part: "In representing a client, a

17  lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of such a

18  person."

19  For evidentiary support, Defendants point to Robinson's email correspondence with Keatly

20  in which she offered documents containing proprietary information, stating that the documents

21  contained "emails and spreadsheets related to the Q2 reserve calculation and forecasting that you

22  asked about."  (Exhibit 44.)  Defendants cite Keatly's memorandum to Milberg, in which he states

23  "she said that she had retained 'hundreds if not thousands' of emails from her brief tenure at

24  REMEC, as well as spreadsheets directly related to sales forecasting and reserve calculation issues

25

26  ───────────────

27      [3] The Court notes that to the extent Defendants rely on Rule 4.4, subdivision (b) of the American Bar Association Model Rules of Professional Responsibility, the rule is inapplicable on its face.  Its applies to documents that are  "inadvertently" sent to opposing counsel.  Neither party

28  contends that Robinson inadvertently sent the documents to Milberg, or that Milberg inadvertently received them.

1   that we had discussed during the interview. ( . . . ) During these conversations, she expressed some

2   additional concerns about sharing these materials." (Exhibit 45.)  Defendants point out that certain

3   documents attached to her emails were explicitly marked confidential.  (*See, e.g.*, Exhibit 47.)

4   Defendants argue that the large volume of documents Robinson kept after her termination, and her

5   willingness to turn those documents over to REMEC's adversary, demonstrate that the she had

6   unlawful intent.

7       Defendants assert that the same evidence which shows Robinson acted illegally also proves

8   that Milberg knowingly and willingly accepted documents possessed by her as a result of her

9   unlawful conduct.  According to Defendants, this decision, together with Milberg's use of the

10  documents in this case, allows the Court to make a specific finding of bad faith.  Defendants assert

11  that: Milberg knew the documents were REMEC's property; Milberg knew Robinson did not

12  retain them on behalf of REMEC or as REMEC's agent; Milberg knew REMEC no longer

13  employed Robinson and that she was not in a position to waive any privileges associated with the

14  documents.  Defendants argue that Milberg should not have received any of the documents without

15  contacting defense counsel first.

16       Robinson's actions suggest a certain degree of moral ambiguity; however, the evidence is

17  purely circumstantial, as Defendants concede.  Defendants' allegations against Milberg rest solely

18  on this circumstantial evidence as well.  Defendants offer no direct evidence of wrongdoing by

19  Robinson, and by extension, Milberg.  Robinson indicated her unwillingness to testify at the

20  evidentiary hearing, therefore Defendants did not call her as a witness.  Defendants presented no

21  witness testimony confirming Robinson stole the documents from REMEC.  During the

22  evidentiary hearing, Rogers testified at length regarding the status of the documents and the extent

23  of Milberg's knowledge regarding Robinson's means of acquisition:

24       Q:    And what did you do at the time that you received documents in 2006 to
             check or make sure that Lisa Robinson was authorized to have possession of
25             tens of thousands of pages of REMEC documents?

26       (over objection)

27       A:    My understanding was that she had documents in her possession that
             obtained legitimately, lawfully, while she was employed.  Some even before
28             she was employed apparently the company sent some documents to her

1
2
3
4
5
6
7
8
9
10
11

before she started working there and during her work there, and she obtained some documents in the ordinary course of her work. I understand that she had some of those at home because she worked from home occasionally. It never crossed my mind that she stole anything, embezzled anything, inappropriately took documents in any way. I just, my understanding from Ken and his conversation with her was that these were documents that she lawfully possessed, had with her former employer's consent and I didn't know anything about any document that she had signed since she had returned everything when she left. I don't know whether she did or not. So when the issue of why she would still have the documents after her employment, I understood that she had some concerns about the company's practices while she was employed there and so she had some interactions with the executives there and Mr. Hickman, in particular, one that comes to mind is that he had done a trip overseas and he had asked her to change a report, soften the report. It was sort of CYA if you will. If she wanted to maintain the documents, she was a CPA, an accountant and she was concerned somebody might accuse her later of having done something. She wanted a record to protect herself so she could say that in fact she was told to do this and she [was] doing everything by the book. She had some concerns so she kept them more her own self-protection than any other reason.

12

( . . . )

13
14
15

Q:   Well part of your answer that you just gave, Ms. Rogers, is that you believed Ms. Robinson lawfully possessed the documents with REMEC's consent. That's what I wrote down when you said it. Did Mr. Keatly tell you that Ms. Robinson had stated that she lawfully possessed documents with REMEC's consent in 2006?

16
17
18
19
20
21

A:   He did not state those words. This is what I had gathered from what he told me about how she got the documents in the normal course of business. There wasn't any suggestion ever that she had stolen the documents or otherwise should not have them just because she was employed by REMEC. She needed these documents either because they were relevant to her work or because other people had given her the documents, asked her to make copies of the documents or whatever. And I don't know. There may have been many more hundreds of thousands of documents she had with her before she left and she didn't take those with her, but this subset I gathered were some things that she either had just left or hadn't returned them . . .

22

(*Transcript of Evidentiary Hearing*, Day One, 58:3-59:13; 59:22-60:15.)

23

When questioned by defense counsel during the evidentiary hearing, Ken Keatly testified

24

regarding his understanding of the manner in which Robinson obtained the documents:

25

Q:   Did she tell you how she actually got documents from REMEC?

26
27

A:   It was my understanding through our conversations that she had . . . received these materials in performing the ordinary course of her job duties as a director of base station operations while employed at REMEC.

28

Q:   Did she tell as [sic] how, when she left REMEC, how she actually stored these

1          documents when she left employment at REMEC in 2004?

2      A:     I don't know if we covered it exactly the way you are phrasing the question.
              My understanding was she would have received these materials, like I say,
3             possibly in the course of her laptop computer, while she working there, but I
              don't know the exact way that she were received by her during her tenure.
4

5  (*Transcript of Evidentiary Hearing*, Day Two, 65:23-66:12.)  Jeff Westerman testified that his

6  knowledge regarding Robinson's acquisition of the documents consists of what he was told by

7  Keatly.  (*Id.*, 51:18-19.)

8          Defense counsel Robert Brownlie's testimony supports the conclusion that Defendants

9  proceeded on their suspicions, rather than any direct evidence of Robinson's wrongdoing:

10     A:     I had suspicions going back to the Fourth Amended Complaint but those
              suspicions had various levels of strength, if you will, and it wasn't until we
11            actually took Ms. Robinson's deposition that I felt comfortable in our ability
              to at least say, based on what we knew, that a former REMEC employee stole
12            documents.

13     Q:     Now when was it that you first felt you had a sufficient factual basis to assert
              in a federal court pleading that . . . one or more former REMEC employees had
14            stolen company documents? Was it at that time?

15     A:     No.

16     Q:     What time then?

17     A:     Well when we answered a Fourth Amended Complaint based on what we knew
              then, which was very little, I felt comfortable we can make an allegation on
18            information and belief that the act of building a case on documents that may
              have been stolen constituted unclean hands and we asserted it as an affirmative
19            defense on information and belief.

20  (*Transcript of Evidentiary Hearing*, Day Two, 138:13-139:6.)  With respect to his beliefs

21  regarding Milberg's conduct in handling the documents, Brownlie testified that Defendants'

22  position was that Milberg's conduct "fell below the standard of care:"

23     Q:     Do you recall making a statement in your supplemental brief that Milberg's
              conduct fell below the standard of care?

24     A:     I think we said something along those lines, yes.

25     Q:     What standard of care were you referring to?

26     A:     I think, in general, the standard of care with respect to working up a case and
              asking the appropriate questions. I think what we may have said in that respect
27            is that if they didn't ask if Ms. Robinson had a confidentiality agreement or
              some other restrictions, they should have. If they didn't ask Ms. Robinson why
28            she had possession, why she was authorized to possess the documents at the

1    same time, they should have.  If they received the documents without making
2    any inquiry as to whether or not the documents were at that time lawfully in
    possession of Ms. Robinson or whether at that time she had authority from the
3    owners of the documents to Milberg, I thought they fell below the standard of
    care.  I may have said more along those lines in the brief.  The brief speaks for
4    itself.

5  (*Transcript of Evidentiary Hearing*, Day Two, 139:14-140:7.)  Neither Brownlie nor his co-

6  counsel, Noah Katsell, testified to having any direct evidence to demonstrate Robinson unlawfully

7  obtained the documents.  When asked about Milberg's conduct, Brownlie testified only about his

8  view of the appropriate standard of care Milberg should have used when they were offered and

9  made the choice to receive the documents.  Brownlie continued to allege that Milberg received

10  stolen documents in violation of California law during his arguments before the Court, but when

11  testifying under oath, he spoke only of suspicions of Robinson's wrongdoing and with personal

12  disapproval of Milberg's conduct.

13        Based on the record, the Court finds that Defendants have failed to show by a

14  preponderance of the evidence that Robinson stole the documents or otherwise possessed them or

15  converted them in violation of the law.[4]  Even if the Court found the circumstantial evidence

16  sufficient to meet the standard of proof on this motion, and determined that Robinson was in

17  possession of the documents illegally and committed a crime handing them over to Milberg,

18  Defendants fail to present any evidence to show that Milberg knew or should have known that the

19  documents were stolen.  Without an underlying wrong on the part of Robinson, and knowledge

20  thereof on the part of Milberg, there are no grounds for a finding of any unethical conduct by

21  Milberg, much less a specific finding of bad faith, with respect to the receipt of the documents.

22        b)    *Review of the Documents*

23        Another category of alleged misconduct relates to the handling of the documents by

24  Milberg once received from Robinson.  Defendants assert that Milberg first should have notified

25  defense counsel that they received documents appearing to be REMEC's property.  Defendants

26

27        [4] Additionally, Defendants fail to provide evidence demonstrating that Robinson was bribed
    or otherwise paid by Milberg for the documents themselves.  Defendants' allegation that Milberg paid
28    off Robinson's gambling debts as part of the alleged bribery is completely baseless and warrants no
    further discussion by the Court.

        04CV1948

1 argue that Milberg acted unethically by conducting a privilege review of the documents

2 subsequent to Robinson's own review.[5]

3          Although not binding authority on this Court or California's state courts, the American Bar

4 Association Committee on Ethics' formal opinions regarding various ethical concerns in the

5 practice of law can be instructive. *See Frye v. Tenderloin Housing Clinic, Inc.* (2006)  38 Cal. 4th

6 23 (2006) (holding that the ABA rules may be helpful and persuasive in situations where coverage

7 of state disciplinary rules is unclear or inadequate, but the rules are not binding).  Of assistance

8 here is Formal Opinion 94-382, regarding the receipt of privileged or confidential materials, cited

9 with approval by the Ninth Circuit in *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001).  The

10 Committee found that:

11          A lawyer who receives on an unauthorized basis materials of an adverse party that she
           knows to be privileged or confidential should, upon recognizing the privileged or
12         confidential nature of the materials, either refrain from reviewing such materials or
           review them only to the extent required to determine how appropriately to proceed; she
13         should notify her adversary's lawyer that she has such materials and should either
           follow instructions of the adversary's lawyer with respect to the disposition of the
14         materials, or refrain from using the materials until a definitive resolution of the proper
           disposition of the materials is obtained from a court.
15

16 *Gomez*, 255 F.3d at 1132 (citing ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 382

17 (1994)).  The documents at issue in *Gomez* were letters exchanged between counsel and their

18 clients, photocopied by employees of the opposing party at the instruction of opposing counsel.

19 The Court held that the letters "were of the most sensitive kind – the kind that any trial lawyer

20 would recognize as privileged, highly valuable, very confidential, and potentially devastating in

21 the wrong hands."  *Gomez*, 255 F.3d at 1132.

22          In order to make an initial determination regarding the privileged or confidential status of

23 the documents, Milberg took certain precautions.  Karen Rogers testified during the evidentiary

24 hearing on this subject.

25          Q:     Now first of all, did Milberg – was it your understanding that Ms. Robinson,
                  before she sent the documents to Mr. Keatly, did her own review of the
26                documents for privileged confidential information?

27

28 _____

          [5] Although it should be noted that Defendants also allege that Robinson did not perform her
own privilege review.

1    A:    Yes.  Absolutely.

2    Q:    Did Milberg set up a procedure for a second review once the documents came
           to Milberg?
3
4    A:    Yes, we did.

     Q:    And did you look at any of the documents before that second privilege review
5          was completed?

6    A:    No.  I did not.

7    Q:    To your knowledge, did any other Milberg attorneys look at them before the
           second privilege review was completed?
8
     A:    No.  No Milberg attorneys who were working on the REMEC matter reviewed
9          them.

10   (*Transcript of Evidentiary Hearing*, Day One, 120:17-121:6.)  Defense counsel questioned Jeff

11   Westerman regarding specific documents, inquiring whether in his opinion the documents were

12   privileged or confidential.  Westerman testified that the documents were reviewed and were

13   determined not to be privileged or confidential.  Defendants did not present any evidence to

14   contradict the testimony of Rogers and Westerman.  Rather, defense counsel Noah Katsell testified

15   that Defendants did not identify as privileged or confidential any particular document of the

16   approximately 2200 documents turned over by Robinson.

17   Q:    What you are saying of the 81 emails that had counsel Mr. Wilkins or Mr.
           Sackett's name on those, of the 81, you were telling the Court that several of
18         those 81 were in your view, arguably privileged, correct?

19   A:    That's what it says.

20   Q:    Right.  And in "several," does that mean two, three, and four?

21   A:    I don't remember the number specifically.

22   Q:    Well at this point in time, when you wrote this declaration and noted that
           several of these emails were as you use the term arguably privileged, did you
23         make a listing anywhere of those several emails and what they were?

24   A:    I did not.

25   Q:    And you, as I understand it, with respect to those several emails that were
           arguably privileged, am I correct you did not itemize those and provide a list
26         to Milberg and ask Milberg to return those documents to DLA, correct?

27   A:    That's correct.

28   Q:    And the attorney/client privilege, do you remember of the several emails which

1          were attorney/client and which were attorney work product?

2     A:     I don't have a memory.

3     Q:     And the privilege that was being discussed here, privileged as attorney/client
             communications, that was REMEC's privilege.  That's what you were talking
4            about, is that correct?

5     A:     Correct.

6   (*Transcript of Evidentiary Hearing,* Day Two, 162:11-163:13.)

7          "'The attorney-client privilege protects confidential disclosures made by a client to an

8   attorney in order to obtain legal advice, as well as an attorney's advice in response to such

9   disclosures.'"  *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992) (citations

10  omitted).  The privilege is limited to "'only those disclosures –  necessary to obtain informed legal

11  advice –  which might not have been made absent the privilege.'"  *Id.* (citing *Fisher v. United*

12  *States*, 425 U.S. 391, 403 (1976)).  As the party asserting the attorney-client privilege, Defendants

13  have the burden of proving that the documents provided by Robinson are indeed privileged.  *Id*;

14  *see also United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).  To meet his burden,

15  Defendants must show that the documents adhere to the essential elements of the attorney-client

16  privilege on a document-by-document basis.  Neither Katsell nor anyone else from the defense

17  identified any particular document as protected by the attorney-client privilege.  Katsell's

18  declaration in support of Defendants' motion, referenced above, essentially amounts to Katsell's

19  speculation regarding the privileged nature of the documents provided by Robinson.

20         With respect to confidentiality, Defendants point to specific documents marked by

21  REMEC as confidential at the time of their creation and exchange during Robinson's term of

22  employment in 2004.  However, in 2006, when Robinson and Milberg conducted their separate

23  reviews, confidentiality could no longer be ascertained by the markings on those documents; at

24  that point, not only was it necessary for the reviewer to determine whether the documents ever

25  were treated as confidential, having been marked as such, but also whether the documents

26  remained confidential subsequent to the dissolution of REMEC, the sales of assets to other

27  companies, the historical nature of financial data, and other variables.  *See, e.g., United States v.*

28  *Shiah*, 2008 U.S. Dist. LEXIS 11973 (C.D. Cal. Feb. 19, 2008) (noting that the value of

1    information contained in documents marked as "confidential" is time-sensitive, being less likely to

2    qualify as confidential with the passing of time).

3              Defendants fail to demonstrate that the documents were subject to the attorney-client

4    privilege, and did not present any direct testimony to support their assertion that the documents

5    contained information protected by the language of the PIA between Robinson and REMEC.

6    Under the applicable ethical standards, Milberg is not guilty of acting in bad faith by conducting a

7    multi-stage review of documents deemed unprivileged and non-confidential by Robinson without a

8    preponderance of the evidence demonstrating otherwise.

9              c)    *Use of the Documents*

10             The culmination of the motion before the Court is Milberg's allegedly unethical use of the

11   documents obtained from Robinson in this litigation.  Defendants argue that Milberg acted in bad

12   faith by using the documents to support a fourth amended complaint with the knowledge that

13   Robinson embezzled the documents from REMEC.  Having insufficient evidentiary support for

14   their allegations of criminal and unethical behavior, Defendants likewise cannot demonstrate that

15   Milberg acted in bad faith by using the documents obtained from Robinson to support their clients'

16   case.

17                              **CONCLUSION**

18             Based on the foregoing, the Court **DENIES** Defendants' motion for sanctions.

19             **IT IS SO ORDERED**.

20   DATED:  September 25, 2009

21

22                              Hon. Michael M. Anello
                                United States District Judge
23

24

25

26

27

28

                              - 25 -                                    04CV1948

# Notice of Cross Appeal Notification Form

**To:**    Clerk, U.S. Court of Appeals                          **Date:** 6/4/2010
**From:** U.S. District Court, Southern District of California
**Subject:** New Appeals Case Information & Docket Fee Notification

Related to USCA Case No. 10-55807

## Case Information

Case Title:    In Re: Remec Inc Securities

U.S.D.C. No.:    04-cv-01948-MMA -WMC          U.S.D.C. Judge:    Michael M. Anello

Complaint/Indictment/Petition Filed:    Complaint

Appealed Order Entered:    9/25/2009 (Notice of Appeal filed by opposing parties on 5/19/2010)

Notice of Appeal Filed:    6/2/2010

Court Reporter:    Elizabeth Cesena

## Docket Fee Notification

Docket Fee:    [x] Paid          [ ] Not Paid          [ ] No Fee Required

USA/GOVT. APPEAL:    [ ] Yes    [x] No

Companion Case(s): (Please list consolidated cases, if applicable)    04-cv-01971-MMA-WMC,
04-cv-01973-MMA-WMC
04-cv-02290-MMA-WMC

## Counsel Information

**Cross-Appellant Counsel:**                    **Cross-Appellee Counsel:**

Robert W Brownlie                               Jeff S Westerman
Gerard A. Trippitelli                           Michiyo Michelle Furukawa
Noah A. Katsell                                 Andrew Joseph Sokolowski
DLA PIPER LLP (US)                              MILBERG LLP
401 B Street, Suite 1700                        300 South Grand Avenue, Suite 3900
San Diego, CA 92101-4297                        Los Angeles, CA 90071
(619) 699-2700                                  (213) 617-1200

                                                Neil Fraser
                                                Matt Bucher
                                                MILBERG LLP
                                                1 Pennsylvania Plaza
                                                New York, NY 10119-0165
                                                (212) 594-5300

**Cross-Appellee Counsel:**     (continued)

Blake M Harper
Dennis Stewart
Bridget Gramme
HULETT HARPER STEWART LLP
525 B Street, Site 760
San Diego, CA 92101
(619) 38-1133

Bruce G. Murphy
LAW OFFICES OF BRUCE G. MURPHY
265 Llwyds Lane
Vero Beach, FL 32963
(772) 231-4202

Counsel Status:  [ x ] Retained       [ ] Appointed       [ ] Pro Se
Appointed _____
(Attach copy of order/minutes)

## SERVICE LIST

Counsel for Appellant(s) and Appellee(s), as listed on the previous page, have been sent copies of the following items:

| | |
|---|---|
| x | Transmittal to U.S.C.A. (Appellant and Appellee) |
| x | Case Information/Docketing Fee Notification Form (Appellant and Appellee) |
| x | Notice of Cross Appeal t/w Representation Statement (Appellant, Appellee, U.S. District Judge) |
| x | Transcript Designation and Ordering Form (Cross-Appellant Only, mailed separately to counsel who signed the notice of appeal) |
| x | ORDER Denying Defendants' Motion for Sanctions, entered 9/25/2009 |

Form Completed And Documents Served By U.S. District Court Deputy Clerk:

A. Rowland _____        s/ A. Rowland _____

Deputy's Name                                         Deputy's Signature

# UNITED STATES DISTRICT COURT
Southern District Of California
Office Of The Clerk
880 Front Street, Room 4290
San Diego, California 92101-8900
Phone: (619) 557-5600
Fax: (619) 702-9900

W. Samuel Hamrick, Jr.
Clerk of Court

To:     Clerk, U.S. Court of Appeals
        P.O. Box 193939
        San Francisco, CA 94119-3939
        (via electronic transmission)

**Re:     USCA No:**
**        USDC No:        04-cv-01948-MMA -WMC**
**        In Re: Remec Inc Securities, et al v.**

Related to USCA Case No. 10-55807

Clerk, U.S. Court of Appeals, enclosed herewith you will please find:

| | | | | | |
|---|---|---|---|---|---|
| x | Notice of Cross Appeal t/w Representation Statement | | | | |
| x | Case Information/Docket Fee Payment Notification Form | | | | |
| | Original Clerk's Record in | | set(s) of | volume(s) | |
| | Reporter's transcripts in | | set(s) of | volume(s) | |
| | Lodgments in | envelope(s) | box(es) | folder(s) | |
| | Judgment Order | | | | |
| | Magistrate Judge's Report and Recommendation | | | | |
| | F/P Order | | | | |
| | COA Order | | | | |
| x | ORDER Denying Defendants' Motion for Sanctions, entered 9/25/2009 | | | | |
| x | Please acknowledge receipt | | | | |

Sincerely yours,

W. Samuel Hamrick, Jr.
Clerk of Court

s/ A. Rowland
By:_____
A. Rowland, **Deputy**

Date:  6/4/2010